IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
* * * * *
Case Number 23-2111

---

AKIL CARTER, PAULETTE BARR,
AND SANDY ADAMS,

*Plaintiffs-Appellants,*


CITY OF WAUWATOSA, et al.,

*Defendants-Appellees.*

---

**PLAINTIFFS-APPELLANTS' OPENING BRIEF**

---

Joy Bertrand
Attorney for Plaintiffs-Appellants
PO Box 2734
Scottsdale, AZ 85252-2734
(414) 687-4932
FAX (602) 374-2712
Email: joy@joybertrandlaw.com

# DISCLOSURE STATEMENT

The undersigned counsel of record for Akil Carter, Paulette Barr, and Sandy Adams furnishes the following list in compliance with Circuit Rule 26.1.

1.    I appear as counsel for Akil Carter, Paulette Barr, and Sandy Adams, Plaintiffs-Appellants, in this case.

2.    Only the undersigned counsel will appear on behalf of the Plaintiffs in this appeal.

Dated:    December 1, 2023.

Respectfully submitted,

s/Joy Bertrand
Joy Bertrand
Attorney for Plaintiffs-Appellants

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................v

JURISDICTIONAL STATEMENT ...............................................................1

STATEMENT OF THE ISSUES ....................................................................1

Issue One: The Trial Court's *Sua Sponte* Reversal of its Summary Judgment Order. ....................................................................................................1

Issue Two: Recusal ....................................................................................2

Issue Three: Striking of the Only Two African American Jurors on the Venire Panel. ...........................................................................................3

Issue Four: The trial court's refusal to give the Plaintiffs' proffered jury instructions. ..............................................................................................3

Issue Five: The trial court's preclusion of the testimony of the Plaintiffs' proffered expert. .......................................................................................4

Issue Six: Cumulative Error ....................................................................4

STATEMENT OF THE CASE .......................................................................4

I. Underlying Facts ...................................................................................4

A. *The City of Wauwatosa's History of Racial Disparities* ....................4

B.  *The Defendants' Detention of the Plaintiffs* ..................................10

II. Procedural History ............................................................................18

A. *Initial Proceedings*............................................................................18

B. *Summary Judgment Proceedings* ....................................................19

*C. Events Between August 10, 2022 and December 12, 2022* .................................24

*D. The February 8, 2023 Final Pretrial Conference* .................................................25

*E. The Jury Instructions and Forms of Verdict the Plaintiffs Sought and the Trial Court Refused.*..................................................................................................28

1. Forms of Verdict .................................................................................................28

2. Jury Instructions .................................................................................................29

*F. The Jury Trial*.....................................................................................................30

1. The Trial Court's comments about Plaintiff's Counsel.............................31

2. Jury Selection......................................................................................................34

3. The trial court precludes the testimony Plaintiffs' law enforcement expert. ......................................................................................................................35

4. The trial court fails to give the Plaintiffs' requested jury instructions. ...39

SUMMARY OF THE ARGUMENT .................................................................40

ARGUMENT ........................................................................................................41

I. The District Court's *Sua Sponte* Reversal of its Summary Judgment Order Requires Reversal and Remand for a New Trial. ..........................................41

*A. Standard of Review* ...........................................................................................41

*B. The Trial Court's Reversal of its Prior Summary Judgment Decision, With No Notice, Requires Reversal and Remand for a New Trial.* ......................................42

II. The District Court's Failure to Recuse Itself Requires Reversal and Remand for a New Trial Before a Different Judge. ........................................43

*A. Standard of Review* ..............................................................................43

*B. The Trial Court's Failure to Recuse Itself Requires Reversal and Remand, with Instruction to Reassign the Matter to a Different Judge* ........................................44

III. The Strike of the Only Two African American Jurors on the Venire Panel Requires Reversal and Remand for a New Trial.................................47

*A. Standard of Review* ..............................................................................48

*B. The Strike of Both African American Jurors Violated the Equal Protection Clause.* ........................................................................50

*C. The District Court's Additional Comments About <u>Batson's</u> Application to this Matter Underscore its Clear Error.* ........................................53

IV. The District Court's Refusal to Allow Plaintiff to Call its Proffered Law Enforcement Expert, Requires Reversal and Remand for a New Trial. ........................................................................55

*A. Standard of Review* ..............................................................................55

*B. The Trial Abused its Discretion in Precluding the Plaintiffs from Calling their Proffered Expert.* ........................................56

V. The District Court's Refusal to Give the Plaintiff's Requested Jury Instructions Constitutes an Abuse of Discretion, Requiring Reversal and Remand for a New Trial. ........................................57

*A. Standard of Review* ..............................................................................58

*B. The District Court Abused its Discretion in Failing to Give the Plaintiffs' Proposed Instruction Regarding an Officer's Basis for a <u>Terry</u> Stop versus an Arrest.* ..................................................................................................59

*C. The District Court Abused its Discretion in Failing to Give the Plaintiffs' Proposed Jury Instruction Regarding the Factors that Support a Reasonable <u>Terry</u> Stop.* ...............................................................................................61

*D. The District Court Abused its Discretion in Failing to Give the Plaintiffs' Proposed Jury Instruction Regarding Wisconsin State Law.* ...............................64

VI...The Cumulative Error in this Trial Requires Reversal and Remand for a New Trial. ...............................................................................................65

CONCLUSION .............................................................................................66

CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32(a)(7) ..............68

CERTIFICATE OF SERVICE ......................................................................69

APPENDIX .................................................... bound separately, filed *instanter*

# TABLE OF AUTHORITY

## CASES

*A.V. Consultants, Inc. v. Barnes,* 978 F.2d 996 (7th Cir. 1992)..........................45

*Alvarez v. Boyd,* 225 F.3d 820 (7th Cir.2000)). ....................................................70

*Blakely v. Washington*, 542 U.S. 296 (2004)..........................................................53

*Carter v. Jury Comm'n of Greene Cty.*, 396 U.S. 320 (1970). . ii, 15, 16, 17, 18, 37, 54.

*Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981 (7th Cir.2005) ...............60

*Choudry v. Jenkins*, 559 F.2d 1085, 1089 (7th Cir. 1977)....................................46

*City of Canton v. Harris*, 489 U.S. 378, 389 (1989). ............................................31

*City of St. Louis v. Prapotnick*, 485 U.S. 112, 128 (1988) ...................................31

*Consumer Products Research & Design, Inc. v. Jensen*, 572 F.3d 436 (7th Cir. 2009). ......................................................................................................................63

*Flowers v. Mississippi*, 588 U.S. ___, 139 S.Ct. 2228 (2019)..........................55, 59

*Foster v. Chatman*, 578 U.S. 488 (2016). ........................................................55, 56

*Fowler v. Butts*, 829 F.3d 788 (7th Cir. 2016)......................................................48

*Hamling v. United States*, 418 U.S. 87 (1974). ....................................................60

*Horn v. City of Chicago*, 860 F.2d 700, 703 n. 6 (1988).......................................46

*Huff v. Reichert*, 744 F.3d 999 (7th Cir. 2014). ..............................................23, 24

*In re: U.S.*, 572 F.3d 301, 307 (7th Cir. 2009).................................48, 49, 50, 51

*J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994)..........................................54, 59

*Jarrard v. CDI Telecommunications, Inc.*, 408 F.3d 905 (7th Cir. 2005). ............46

*Mahaffey v. Pages*, 162 F.3d 481 (7th Cir. 1998). .............................................54, 55

*Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005). ........46

*Miller–El v. Dretke*, 545 U.S. 231 (2005). .............................................................56

*Monell v. Dept. of Soc. Svcs.*, 436 U.S. 658 (1978).................................................47

*Nguyen v. United States*, 539 U.S. 69 (2003) .........................................................2

*Parsons Bedford, Breedlove & Robeson*, 28 U.S. (3 Pet.) 433 (1830) ..............52, 55

*Powers v. Ohio*, 499 U.S. 400 (1991). .........................................................52, 53, 59

*Rose v. Mitchell*, 443 U.S. 545 (1979) ....................................................................54

*Sec'y of Labor v. DeSisto*, 929 F.2d 789 (1st Cir.1991).........................................60

*Smego v. Payne*, 854 F.3d 387, 391 (7th Cir. 2017). ..............................................64

*Terry v. Ohio*, 392 U.S. 1 (1968)......................................10, 11, 17, 21, 27, 30, 64

*Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220-22 (1946). ................................54

*Thompson v. City of Chicago*, 722 F.3d 963, 971 (7th Cir. 2013).........................60

*United States v. Hicks*, 531 F.3d 555 (7th Cir. 2008) ...........................................23

*United States v. Jones*, 56 F.4th 455 (7th Cir. 2022). ......................................55, 60

*United States v. Powell*, 652 F.3d 702, 706 (7th Cir.2011) ..................................70

*United States v. Raibley*, 243 F.3d 1069, 1074 (7th Cir. 2001) ...........................22

*United States v. Watson*, 900 F.3d 892 (7th Cir. 2018) ........................................23

*Williams v. Pennsylvania*, 579 U.S. 1 (2016) .........................................................2

## STATUTES AND RULES

28 U.S.C. § 1367 ...................................................................................1

28 U.S.C. 455(a). ...............................................................................48

42 U.S.C. § 1441 ..................................................................................1

42 U.S.C. § 1983 .............................................................................1, 19

Circuit Rule 26:1........................................................................... ii

Circuit Rule 28(c) ................................................................................1

Fed. R. App. Pro. 4(a) ......................................................................1

Fed. R. Civ. Pro. 56 ..........................................................................46

Fed. R. Crim. Pro. 11 .......................................................................50

7th Cir. Civ. JI 7.24 ...........................................................................31

7th Cir. JI Civ. Pattern Instruction 7.06........................................30

U.S. Courts Judicial Code of Ethics, Cannon 3.3, available at
    https://www.uscourts.gov/sites/default/files/code_of_conduct_for_un
    ited_states_judges_effective_march_12_2019.pdf (last visited April 3,
    2023). ..............................................................................................52

## OTHER AUTHORITIES

"Racially Restrictive Covenants: The Making of All-White Suburbs in
    Milwaukee County," Metropolitan Integration Research Center, 1979. .....6

Declaration of Independence para. 2.................................................53

Hon. J. Harvie Wilkinson III, *In Defense of American Criminal Justice*, 67
    Vand. L. Rev. 1099, 1157 (2014) (quoting Alexis de Tocqueville, *Democracy
    in America* 293–94 (Philip Bradley ed., Vintage Books 1945) (1835))..........53

Statistical Atlas, Milwaukee County, Wisconsin, Race and Ethnicity,...........6

Statistical Atlas, Wauwatosa, Wisconsin, Race and Ethnicity, available at...6

## JURISDICTIONAL STATEMENT

The Plaintiffs-Appellants provide the following jurisdictional statement pursuant to Circuit Rule 28(c)

The Plaintiffs appeal from an order and judgment of dismissal after trial, in the Eastern District of Wisconsin, the Honorable J.P. Stadtmueller, United States District Judge, presiding.[1]

The Plaintiffs filed a timely notice of appeal on June 2, 2023.[2]

The district court's federal question jurisdiction was based on an alleged violation of the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

This Court has appellate jurisdiction pursuant to Fed. R. App. Pro. 4(a) and 28 U.S.C. § 1331, following its removal to federal court, pursuant to 42 U.S.C. § 1441.  The district court had supplemental jurisdiction of the plaintiffs-appellants' state law claims, pursuant to 28 U.S.C. § 1367.

## STATEMENT OF THE ISSUES

**Issue 1:**    **The Trial Court's** *Sua Sponte* **Reversal of its Summary Judgment Order.**

---

1  Appx. at 1 and 4:ECF Docs. 165 and 166.

2  ECF Doc. 168.

The district court lacks the power to grant summary judgment *sua sponte*. Here, the trial court initially denied the Defendants' summary judgment motions. At the final pretrial and trial, the trial court then *sua sponte* – over the repeated objection of the Plaintiffs -- refused to allow the Plaintiffs to pursue all but one of their claims, despite no change in the facts or controlling law.

Did the trial court commit reversible error?

<u>Issue 2</u>:     **Recusal**

Participation by a disqualified judge constitutes structural error, which may be noticed at any time.  *Nguyen v. United States*, 539 U.S. 69 (2003); *Williams v. Pennsylvania*, 579 U.S. 1 (2016). Here, during the trial, the trial court made several comments about Plaintiffs' counsel's competency and character. The trial court also drew conclusions about the evidence, to include *sua sponte* comments to the jury.

Given the trial court's expressed opinions about Plaintiffs' Counsel and the evidence, was the trial court required to recuse itself?

<u>Issue 3</u>:     **Striking of the Only Two African American Jurors on the Venire Panel.**

'[W]hether trial is criminal or civil, potential jurors, as well as litigants, have an equal protection right to jury selection procedures that are free from stereotypes rooted in, and reflective of, historical prejudice." *J.E.B. v. Alabama, ex rel. T.B.*, 511 U.S. 127, 128 (1994). Here, only two African American jurors were struck from the panel – one by the district court and one by the Defense.

Did the strikes of these jurors violate this equal protection right?

<u>Issue 4:</u>    **The trial court's refusal to give the Plaintiffs' proffered jury instructions.**

To grant a new trial based on erroneous rulings on jury instructions, the Plaintiffs must establish both that the instructions properly stated the law and the failure to give the instructions prejudiced them. *Rapold v. Baxter Intern., Inc.*, 718 F3d 602, 609 (7th Cir. 2013). Here, the trial court refused to give the Plaintiffs' jury instructions that were taken directly from this Court's pattern instructions, this Court's and other federal circuits' prior decisions, and Supreme Court decisions. Each decision addressed a specific issue presented to the jury.

In refusing to give these instructions, did the trial court abuse its discretion, requiring reversal and remand?

**<u>Issue 5</u>:    The trial court's preclusion of the testimony of the Plaintiffs' proffered expert.**

A trial court abuses its discretion when it so limits evidence that a litigant is effectively prevented from presenting his or her case. *Thompson v. City of Chicago*, 722 F.3d 963, 971 (7th Cir. 2013). Here, the trial court, in addition to preventing the Plaintiffs from presenting evidence in support of all but one count in their Complaint, the trial court precluded the testimony of their law enforcement expert to address the defense's assertions at trial.

Was this preclusion of evidence an abuse of discretion that requires reversal and remand?

**<u>Issue 6</u>:    Cumulative Error**

Cumulative error requires reversal and remand when multiple errors occurred at trial and those errors, in the context of the entire trial, were so severe as to have rendered the trial fundamentally unfair.

Here, taking the totality of the errors described above, did the trial court prevent the Plaintiffs from receiving a fair trial?

**STATEMENT OF THE CASE**

**I.    Underlying Facts.**

A.    *The City of Wauwatosa's History of Racial Disparities.*

4

This detention did not occur in a vacuum.  Here, the Plaintiffs need not rely only on statistics to support their claim that this stop was part of a more insidious pattern of race-based policing.

While Milwaukee County is 52.7% Caucasian and 26.4% African American,[3] the City of Wauwatosa is 85.5% and 4.8% African American.[4] For one hundred years, Wauwatosa sub-divisions included racially restrictive covenants. Starting in 1919, the Wauwatosa Washington Highlands subdivision included covenants that prohibited People of Color from owning or occupying residential property within the subdivisions' boundaries.[5] After World War II, seven Wauwatosa subdivisions developed between 1945-49 excluded African American families. Two additions created in the 1950's, six years after the Supreme Court's ruling

3  Statistical Atlas, Milwaukee County, Wisconsin, Race and Ethnicity, available at https: / / statisticalatlas.com/county/ Wisconsin/Milwaukee-County / Race-and-Ethnicity (last visited July 20, 2019).

4  Statistical Atlas, Wauwatosa, Wisconsin, Race and Ethnicity, available at https://statisticalatlas.com/place/Wisconsin/Wauwatosa/Race-and-Ethnicity (last visited July 20, 2019).

5  "Racially Restrictive Covenants: The Making of All-White Suburbs in Milwaukee County," Metropolitan Integration Research Center, 1979, at 2.

against government enforcement of racially restrictive covenants, still
provided twenty-year prohibitions against Black ownership or occupancy
of homes in their subdivisions.[6] In Wauwatosa, some of these racially-
restricted covenants had termination dates reaching into the 1980s.[7]
Excluding parkway systems, county grounds, country clubs, and industrial
land, historically, approximately half of Wauwatosa property was
encumbered with racially restrictive covenants.[8] Some Wauwatosa racially-
restricted covenants had automatic renewals, allowing them to continue
into perpetuity.[9]

 Wauwatosa's policing statistics track its history of housing
segregation:

  -- a 2014 study placed Wauwatosa at the top of the list in Wisconsin
  for the most disproportionate number of arrests by race;

  -- Wauwatosa is 95% Caucasian;

  -- between 2011 and 2012, 4,829 people were arrested in Wauwatosa;

---

6 *Id*. at 3.

7 *Id*. at 2.

8 *Id*.

9 *Id*.

-- almost sixty percent of the 4,829 people arrested in Wauwatosa were African American; and

-- African American people were **thirty times** more likely to be arrested in Wauwatosa than Caucasians.[10]

Defendant Weber, who was the Wauwatosa Chief of Police at the time of the incident in this case, did not dispute these statistics:

> During the course of a day in our community, with the mall, and all the retail, the court system and all that, our population changes drastically. I don't know what that number is. They used to say before Covid and all that, that Mayfair Mall used to bring in like 17 million people a year.
>
> And many people are minorities that come to the businesses in Wauwatosa. So that's really not a valid number to say, well, only 4 percent of your population . . . Well, 4 percent of my population is black. I've also got more than 4 percent in our department that's black too.
>
> . . . A couple weeks ago, and it was in the news, a man in the Pasadena neighborhood, he's snow blowing in the driveway on a Sunday morning. Car comes up to them and they try to get money from him. They try to rob him. He says I'm out here snow blowing. I don't have my wallet on me, so they take off.
>
> About within two hours we got the description and we found the car. And in that car were ten, ten, it was a Kia, I believe, there were ten African American kids. I mean from ages 13 up to 18 was the oldest one. Ten. One of the guys said it looked like one of the circus cars because kids kept piling out of this car. And I said you know the bad

---

10  ECF Doc. 36-6 at 118 (emphasis added).

7

thing is we shouldn't arrest any of them because now that's ten blacks that's going to go on our statistics. Right?

That's the absurdity of all that. These are ten kids that were trying to jack a guy for his wallet, but yet we'll be accused of arresting a disproportionate number. What were ten juveniles doing on a Sunday morning out driving around, you know, cruising like that? . . . [W]hat are police officers supposed to do? You know, we could very easily in Wauwatosa say, you know what's guys, don't arrest any minorities because it's making our statistics look bad.

. . . Look what's happening in Minneapolis and Portland and all of these places. People just don't want to do it . .. . **But 60 percent, that's not a bad statistic**. . . .[11]

The cited statistics likely understate of the disparity between African Americans and Caucasian persons stopped and detained in Wauwatosa. The 2014 study looked only at arrests, not car stops. The study did not consider other subjects in the vehicles. So, for example, if the Wauwatosa Police Department stops a car with three African American people in it and arrests one of them, the other people are not included in the counting of the arrests. Most troublingly -- the data Wauwatosa does collect is not stored in a way that is practically useful.[12]

---

11  ECF Doc. 36-7 at 55-56 (emphasis added).

12  *Id.*.

In 2021, the company Wauwatosa hired to review its police practices walked up to the edge of calling this City's practices regarding car stops and "suspicious persons" stops racially discriminatory. With regards to car stops, the Center for Public Safety Management (CPSM) found in its report:

> During the period studied, the WPD engaged in more than 10,000 traffic stops. These stops accounted for approximately one-third of all CFS handled by the department. This is an enormous amount of activity, in both sheer numbers and in context of total work. It signifies a very robust approach to traffic enforcement. It is not clear, however, if this enforcement is contributing to any improvement in overall traffic safety in the community.[13]

With regards to "suspicious persons" stops, CPSM wrote:

> In the year being examined here, the WPD responded to 4,754 suspicious persons/vehicle CFS. Surely, not every one of these resulted in a Terry Stop. However, with 91 sworn officers assigned to the WPD, if all of these were stop encounters, it would equate to more than 52 stops per officer per year, or about a three-times greater rate than the NYPD at the height of its unlawful practices. There is absolutely no evidence to suggest that the WPD is engaging in unlawful stop activity or racial profiling, but the point that is being made is that this is a high-risk area that must be monitored and managed carefully.[14]

---

13  ECF Doc. 102-5 at 52.

14  *Id*. at 55.

The CPSM report did not factor into its analysis the starkly disproportionate findings of the 2014 study, finding that African Americans in Wauwatosa were thirty times more likely to be arrested than Caucasians. Taking all of this evidence in a light most favorable to the Plaintiffs, the record shows a pattern and practice of targeting People of Color for investigative stops and arrests under *Terry v. Ohio*, 392 U.S. 1 (1968).

The statistical evidence in this record creates a significant factual and inferential basis, in themselves, to show a pattern and practice of race-based vehicle stops. The endorsement of this statistics as "not a bad statistic" by the agency's chief policy maker further supports the Plaintiffs' claim that these statistics are the result of a deliberate policy of race-based policing.

B.    *The Defendants' Detention of the Plaintiffs.*

Against that historical and statistical backdrop, Wauwatosa Police Officer Patrick Kaine stopped this family on a summer Sunday afternoon, as they drove to Culver's for custard, before dropping off Mr. Carter at

10

work.[15] Paulette Barr and Sandy Adams are Caucasian.[16] Akil Carter, Ms. Barr's grandson, is African American.[17]

Kaine did not simply pull over the Plaintiffs, whom he observed do nothing wrong. Rather, Kaine claimed that he was "flagged down" by another driver – later believed to be Carl Anderson -- who claimed the Plaintiffs could be involved in a "possible robbery."[18] Kaine did not get the other driver's name, the other driver's license plate, or any identifying information about this driver.[19] While Kaine had two video cameras in his vehicle, he activated neither of them in the course of his purported conversation, so none of this "flagging down" event was recorded.[20]

---

15  JT Day One at 86.

16  *Id*. at 74.

17  *Id*.

18  ECF Doc. 108 at 25.

19  JT Day One at 190.

20  *Id*. at 192.

Kaine stopped the Plaintiffs, despite observing them do nothing illegal. "They were just driving along, as far as I can tell."[21] As he followed the Plaintiffs and initiated the stop, he observed them commit no crime and make no furtive movement.[22] Other than the statement Kaine attributed to an anonymous tip, Kaine had no reason to believe any violation of any kind was occurring in the Plaintiffs' vehicle.[23]

By the time he initiated the stop, even Kaine doubted if the "tip" was accurate.[24] Kaine has testified, "[b]y the time I stopped the car, to that point, based on the behaviors of the driver of the blue Lexus and his grandmother in the front passenger seat, I didn't get the feeling that they were the victims of a robbery in progress, which is what I was told."[25]

Kaine also could not match the people in the car with the description that Kaine said in his reports that he received.  He stated that he was told

---

21  ECF Doc. 96 at 2.

22  *Id*.

23  *Id*.

24  *Id*. at 4.

25  *Id*.

"two Black guys are robbing a white lady,"[26] but the Plaintiffs' vehicle contained two Caucasian women and an African American male.

As Vetter and Kaine, with their weapons drawn, ordered Mr. Carter out of the vehicle, they, "generally. . . had some concern that was the complaint given to us about the robbery, was it going to be legitimate or not,"[27] because, "It's not uncommon for complaints to - once you start investigating them, for them not to be valid."[28]

Despite having no evidence of a crime and having doubts about the veracity of the purported tip, Vetter and Kaine press forward. They order Mr. Carter to walk backward, his hands up, and then to his knees.[29]  Vetter then handcuffs Mr. Carter and places Mr. Carter in his squad car.[30]  It is only by the grace of Providence that Mr. Carter heard the officers' commands and followed them to the letter. Had Mr. Carter misunderstood,

---

26  *Id*. at 5.

27  *Id*.

28  *Id*., quoting Defendant Vetter's deposition testimony.

29  *Id*. at 3.

30  *Id*.

or tripped while walking backward, we would be litigating a lawsuit brought by his estate.

Here, the uncontroverted evidence shows that the circumstances included two women in their sixties, riding in a Lexus with a young man in the back seat, travelling at or below the speed limit.[31]  They committed no violation.[32]  They pulled over when Kaine turned on his lights.[33]

Kaine waits for backup to arrive, with still no evidence of any criminal conduct.[34]  Mr. Carter remains calm and respectful as follows the officers' commands.[35]

Despite no observation of any crime or any threat, the Defendants conducted a "high risk" stop, with weapons drawn, all three Plaintiffs detained and at risk of deadly force if they did not comply with the officers' orders.  They further used force against Mr. Carter by ordering to

---

31  ECF Doc. 96 at 2.

32  *Id.*

33  *Id.* at 3.

34  *Id.*

35  *Id.*

him walk, with his hands up, backward, and get on his knees before handcuffing him and placing him in the back of the squad.[36]

The fact that the Defendants did not actually fire any of at least two drawn weapons[37] cannot absolve the Defendants of culpability in this case. All of this potentially deadly force – weapons drawn, ordered out of the vehicle, ordered to the ground, an AR-15 assault rifle charged and readied to be used against the driver side of the Lexus, handcuffed and put in a squad.

Lacking observation of the Plaintiffs doing anything that even hinted at illegal conduct -- not to mention a threat to the officers or the public -- the Defendants used an escalated level of force. Kaine had unholstered his sidearm as he approached Mr. Carter.[38] Dienhart had a charged AR-15 at the low-ready position, to be used against the driver side of the vehicle.[39] Mr. Carter was ordered out, ordered to his knees, handcuffed, and placed

---

36  *Id*.

37  *Id*. at 3, 4.

38  ECF Doc. 93-5 at 6:21.

39  ECF Doc. 96 at 3.

in the back of a squad car. When the facts and inferences of these

circumstances are drawn in favor of the Plaintiffs, the conclusion must be –

at the least –issues of fact for a jury to determine.

Law enforcement expert Brian Landers confirms that conclusion,

opining, "that the force used against Mr. Carter, and the female occupants

of the car was unreasonable. The officers detained and threated force of all

the car's occupants through a display of weapons, which could have led to

an unintentional consequence and physical harm by the officer's actions."[40]

Here, all three Plaintiffs were subject to a vehicle stop involving four

police squads, at least two firearms drawn[41] -- to include a charged AR-15

rifle[42] -- the handcuffing of Mr. Carter, the separation of Mr. Carter from

Ms. Adams and Ms. Barr, and placing the handcuffed Mr. Carter in the

back of a squad car. Had any of them tried to leave, the Defendants were

prepared to use deadly force against them. Taking all facts and inferences

---

40  ECF Doc. 59-3 at 20.

41  ECF Doc. 93-5 at 6:21 (Kaine unholstering his sidearm when
approaching Mr. Carter); ECF Doc. 96-3.

42  ECF Doc. 96 at 3.

in favor of the Plaintiffs, this encounter was an arrest, not a simple *Terry* stop.

After Ms. Barr exits their vehicle and tells the officers that Mr. Carter is her grandson – showing the four officers on the scene that no crime was in progress – they continue to detain Mr. Carter.[43] From the beginning, to the middle, to the end of this stop, the Defendants had no legal basis to stop these citizens.

At least on this record, Mr. Anderson was not known to the Wauwatosa Police Department before the Defendants' claimed report from him. The record contains no facts that show that Defendants had a track record of Mr. Anderson's reports being reliable and accurate, as would be expected with a confidential informant. According to the Defendants, Defendants did not know his name or background at the time of the stop.

Even if the Court accepts for the purposes of discussion the Defendants' claim that Mr. Anderson reported to Kaine to report that the Plaintiffs' vehicle was in the midst of a carjacking, Kaine only observed innocent details: an African American young man riding in the vehicle

---

43  ECF Doc. 93-5 at 7:15.

with two Caucasian women. That dearth of corroboration certainly does not give officers the basis, with guns drawn and at the ready, to order a vehicle occupant out of a vehicle, order him to his knees, handcuff him, and hold him in the back of a squad car.

## II.   Procedural History

*A     Initial Proceedings.*

On August 9, 2019, the Plaintiffs filed their Complaint with the Milwaukee County Circuit Court.[44]  Their complaint alleged two federal civil rights claims and eight claims based on Wisconsin law: a civil rights violation, under 42 U.S.C. 1983;[45] one *Monell* claim;[46]  negligence;[47] violation of the Wisconsin constitution;[48] negligent infliction of emotional distress;[49]

---

44  ECF Doc. 1-2.

45  *Id*. at 11.

46  *Id*.

47  *Id*. at 16.

48  *Id*. at 16-17.

49  *Id*. at 18.

18

negligent hiring, training, and promotion;[50] false imprisonment;[51] and intentional infliction of emotional distress.[52]

On September 30, 2019, the Defense removed this matter to the Eastern District of Wisconsin and filed its answer to the Complaint.[53]

B.       *Summary Judgment Proceedings.*

The trial court allowed two rounds of summary judgment briefing. After the first round, the trial court denied the both the Defendants' and the Plaintiffs' summary judgment motions.[54]  In denying the Defendants' motion, the trial court stated that it would allow re-submitted briefing if the parties followed a yet-to-be-formalized procedure in that particular court of submitting a joint statement of agreed-upon facts.[55]

---

50  *Id.* at 18-19.

51  *Id.* at 19.

52  *Id.*

53  ECF Doc. 1.

54  Appx. 113:ECF Doc. 65.

55  *Id.*

After the trial court's May 6, 2022 ruling on the Parties' subsequent motions,[56] the Defense sought and the trial court granted a second round of summary judgment briefings.[57]

Both parties submitted revised summary judgment motions,[58] along with the statement of stipulated facts. The Defense's re-submitted motion sought summary judgment and dismissal on several theories:

On August 10, 2022, the trial court denied the Parties summary judgment motions, finding that "sufficient disputes of fact exist such that summary judgment for either side is precluded."[59] Regarding the Defense's arguments, the trial court ruled as follows:

As to whether this detention was a *Terry* stop or an arrest, the trial court ruled:

> the Court will conduct its analysis under the reasonable suspicion standard. In any event, significant disputes of material fact and credibility preclude the Court from granting summary judgment to Defendants under the reasonable suspicion standard—so, by

---

56  ECF Doc. 83.

57  ECF Docs. 86, 90.

58  ECF Docs. 95, 96, 99.

59  Appx. 77:ECF Doc. 108 at 4.

20

extension, summary judgment could not be granted to Plaintiffs under a probable cause standard either. See *United States v. Raibley*, 243 F.3d 1069, 1074 (7th Cir. 2001) (comparing the reasonable suspicion and probable cause standards).[60]

Regarding Defendant Kaine's basis to stop the Plaintiffs, the trial

court ruled:

> The validity of Officer Kaine's decision to initiate a traffic stop of Plaintiffs' vehicle hinges on whether the tip bore sufficient indicia of reliability such that Officer Kaine was justified in relying on it. The answer to this question depends on the resolution of factual disputes and credibility determinations. The Court is not authorized to resolve either as a matter of law, and therefore is obliged to deny summary judgment so that these disputes and determinations may be submitted to a jury.[61]

The reliability of the statements attributed to Carl Anderson also

were left up to the jury:

> To adopt Defendants' position, the Court would have to accept that a face-to-face, anonymous, unrecorded tip is perfectly analogous—as a matter of law—to an anonymous call placed to the 911 emergency system. The Court cannot do so, given that *Navarette*'s 911 traceability rationale is not present here. The Court would also have to in that the face-to-face, anonymous, unrecorded tip occurred, which the Court cannot do in a summary judgment posture, considering Plaintiffs' dispute of this key fact (and, as discussed below, the credibility determinations required to assess whether the tip provided a valid legal basis for the traffic stop). Even setting aside this factor in the

---

60  Appx. at 93:ECF Doc. 108 at 20.

61  Appx. at 95:ECF Doc. 108 at 22.

analysis, further fact and credibility disputes preclude summary judgment on the question of whether Mr. Anderson's tip bore sufficiency indicia of reliability to permit Officer Kaine to rely on it in stopping Plaintiffs. While it is true that Mr. Anderson's tip "asserts eyewitness knowledge of the reported event," *Watson*, 900 F.3d at 895, it is unclear whether it purports to describe an "ongoing emergency," *Hicks*, 531 F.3d at 558.

Mr. Anderson has stated that, when he gave the tip, he told Officer Kaine he believed there may be a gun involved in the supposed robbery, based on what he saw occurring inside the blue Lexus from his vantage point. Aside from his perception of a gun in the vehicle, Mr. Anderson did not otherwise specify what information persuaded him that there was a robbery occurring (at least according to the parties' fact statements)—for example, whether the people inside the blue Lexus looked distressed or whether the driver was driving erratically as if being threatened by a weapon. For his part, Officer Kaine has not stated whether Mr. Anderson ever told him about a gun when giving the tip. Officer Kaine did not mention a possible gun or armed suspect in any of his communications with dispatch or the other officers; he only made conclusory statements about "a possible robbery."

The difference between how Mr. Anderson recalled giving the tip, and how Officer Kaine relayed the tip to others and recalled it in his deposition, points to a significant dispute of material fact: what did Officer Kaine know after he spoke with Mr. Anderson? See *Huff*, 744 F.3d at 1004 (assessing reasonable suspicion requires objective examination of the circumstances the officer knows at the time of the stop). On the facts now before the Court, it is unclear what part(s) of Mr. Anderson's statements Officer Kaine knew when he stopped Plaintiffs—this is a jury question.[62]

---

[62]  Appx. at 97-98:ECF Doc. 108 at 24-25.

Regarding Anderson's expected testimony, the trial court found in its

summary judgment decision, after reviewing Kaine's and Anderson's

deposition testimony, that the question of whether or not Anderson's tip

ever happened remained an issue for the jury:

> . . . The Court would also have to find that the face-to-face,
> anonymous, unrecorded tip occurred, which the Court cannot do in a
> summary judgment posture, considering Plaintiffs' dispute of this
> key fact (and, as discussed below, the credibility determinations
> required to assess whether the tip provided a valid legal basis for the
> traffic stop).
>
> Even setting aside this factor in the analysis, further fact and
> credibility disputes preclude summary judgment on the question of
> whether Mr. Anderson's tip bore sufficiency indicia of reliability to
> permit Officer Kaine to rely on it in stopping Plaintiffs.
>
> . . . .
>
> The difference between how Mr. Anderson recalled giving the tip,
> and how Officer Kaine relayed the tip to others and recalled it in his
> deposition, points to a significant dispute of material fact: what did
> Officer Kaine know after he spoke with Mr. Anderson? *See Huff*, 744
> F.3d at 1004 (assessing reasonable suspicion requires objective
> examination of the circumstances the officer *knows* at the time of the
> stop). On the facts now before the Court, it is unclear what part(s) of
> Mr. Anderson's statements Officer Kaine knew when he stopped
> Plaintiffs—this is a jury question.
>
> This question also puts Officer Kaine's and Mr. Anderson's
> credibility in play. While Mr. Anderson does "explain[] how he knew
> about the gun," *Florida v. J.L.*, 529 U.S. at 271–72, whether Officer
> Kaine was justified in relying on Mr. Anderson's supposed
> knowledge relies at least in part on whether the factfinder is

23

persuaded that Mr. Anderson accurately perceived whatever was occurring inside the blue Lexus.  Officer Kaine's credibility, insofar as whether he accurately perceived Mr. Anderson's tip, is also for the jury to determine (considering, for example, that Officer Kaine recounted Mr. Anderson's tip as to the racial and gender makeup of the occupants of the vehicle differently before the stop versus after).[63]

The trial court further stated that the inclusion of the Parties' joint statement of fact would not be considered, because the "decision to credit expert witness testimony is for the jury, not the Court."[64]

The Defense did not move the trial court to reconsider its summary judgment rulings.

C.    *Events Between August 10, 2022 and December 12, 2022.*

The trial court's second summary judgment order was issued the morning on August 10, 2023.[65]  The Parties' joint pretrial statement was due that afternoon.[66]

---

[63]  Appx. at 97-99:ECF Doc. 108 at 24-26.

[64]  Appx. at 78:ECF Doc. 108 at 5 n. 5.

[65]  Appx. at 74:ECF Doc. 108.

[66]  ECF Doc. 84.

At the August 16, 2022 final pretrial conference, the trial court found that the joint pretrial report did not allow the Parties to proceed to trial the following week. The trial court scratched the August 22, 2022 trial setting and sent the Parties back to the drawing board.[67]

Over the next three months, the Plaintiffs worked to get the case back on track for trial.[68]  On December 12, 2023, the Court re-set the matter for trial, commencing March 13, 2023.[69]  In setting the new trial, the trial court stated that it would not entertain further dispositive motions from the Parties.[70]

D.    *The February 8, 2023 Final Pretrial Conference.*

At the final pretrial conference, with no prior from the trial court, the trial court stated that 1) the trial in this matter shall only proceed against Defendant Kaine; and 2) it is "not necessary" for the Plaintiffs to call

---

67  ECF Doc. 113.

68  ECF Docs. 114 and 116.

69  ECF Doc. 117.

70  *Id*. at 2, n.1.

witnesses Barry Weber, Sean Lowe, Brian Landers, or Dwight Johnson.[71] The trial court then distributed its draft forms of verdict and jury instructions, which also did not contain verdicts or instructions for the *Monell* claim or any of the state law claims. The jury instructions did not include the Seventh Circuit's pattern instruction for cases in which a jury must determine whether a detention was a *Terry* stop or an arrest.

The Plaintiffs objected to the trial court's findings and moved the trial court to reconsider.[72]

With regards to the trial court's intention to proceed only against Defendant Kaine, Plaintiffs noted, "The Court's *sua sponte* decision was given with no notice and opportunity to be heard. The decision also contradicts its prior summary judgment order, despite no change in the factual record. The Court's new, severe limits on the defendants and counts proceeding to trial constitutes clear error and a manifest injustice."[73] With

---

71  ECF Doc. 132 at 1;  February 8, 2023 text-only order.

72  ECF Doc. 134.

73  ECF Doc. 134 at 3.

regards to the trial court's intention to limit what witnesses the Plaintiffs

could call, the Plaintiffs noted, *inter alia*:

> Dwight Johnson, who is Mr. Carter's mental health provider, is a
> necessary damages witness for the Plaintiff. The Court has expressed
> its concerns that, because the length of the detention of the Plaintiffs
> was fifteen minutes or less, the Plaintiffs likely will not recover more
> than nominal damages. The Plaintiffs expect Mr. Johnson to testify as
> to the lasting emotional damage this experience caused Mr. Carter.
> Mr. Johnson's treatment records for Mr. Carter were properly
> disclosed to the Defense, through a HIPAA release signed by Mr.
> Carter and given to the Defense. The Defense then disclosed the
> records it received to the Plaintiff. With no discovery issue as to these
> records . . . – despite the Defense's claim to the contrary --
> precluding this evidence constitutes clear error and a manifest
> injustice.

> Brian Landers can testify regarding the uniform training that
> Wisconsin law enforcement officers receive regarding vehicle
> contacts and constitutional law. This evidence is relevant not only to
> the reasonableness of the seizure of the Plaintiffs, but also to any
> defense of qualified immunity that the Defense may bring.

> Particularly if the Court allows Plaintiffs to proceed against all
> defendants on all counts of their Complaint, then the testimony of
> Barry Weber and Sean Lowe also is relevant. Weber's testimony
> would be relevant to the Plaintiffs' *Monell* claim, under any one of the
> three theories of *Monell* liability that the Plaintiffs are pursuing. He
> will be expected to testify regarding: his former department's
> policies, for which he was the ultimate decision maker; the training,
> supervision, and discipline of his former officers; and his ratification
> of the officers' conduct in this case. This testimony is directly
> relevant to the Plaintiffs' *Monell* claim.

Sean Lowe, who was the chair of the Wauwatosa Equity and Inclusion Commission formed after the incident in this case also is expected to testify regarding his commission's findings regarding the need for reforms within in the Wauwatosa Police department.

To preclude the testimony of each these witnesses, all of whom are expected to provide relevant evidence, constitutes clear error and a manifest injustice. [74]

The trial court denied the Plaintiffs' Motion for Reconsideration not on the merits, but because, according to the trial court, its comments at the final pretrial were not final orders.[75]

As discussed further, below, at trial, the trial court followed all of its comments at the final pretrial, except as to Dwight Johnson, whom the trial court allowed to testify.

E.    *The Jury Instructions and Forms of Verdict the Plaintiffs Sought and the Trial Court Refused.*

**1.    Forms of Verdict**

The Plaintiffs objected to the trial court's proposed forms of verdict, which even excluded forms of verdict that the Parties jointly requested.[76]

_____

74  *Id*. at 3-4.

75  Appx at 70:ECF Doc. 140. at 5.

76  ECF Doc. 141.

The trial court's proposed forms of verdict reflected its intention to proceed only on Count One of the complaint.

### 2.    Jury Instructions.

The Plaintiffs also objected to the trial court's proposed jury instructions, which excluded several of their proposed instructions.[77] Specifically, the Plaintiffs objected to the trial court's omission of their *Terry* stop/arrest instruction, that was based on this Court's comment to Pattern Instruction 7.06.[78]

The Plaintiffs further objected to the omission of Defendants Vetter, Dienhart, and Gabriel from the instructions.[79] Their omission from the jury instructions was also consistent with the trial court's stated intention to proceed only on Count One of the complaint against only Defendant Kaine.

---

77  ECF Doc. 147.

78  *Id*. at 4.

79  *Id*. at 5.

The Plaintiffs objected to the omission of any instruction pertaining to their *Monell* claim.[80] Without these instructions, the Plaintiffs would not be able to proceed on that claim.

The Plaintiffs further objected to the trial court's omission of their proposed jury instruction pertaining to reasonable suspicion, which stated, "To have reasonable suspicion based on anonymous tip, an officer must corroborate evidence of criminal conduct, not simply corroborate innocent details."[81] This instruction was based on the Supreme Court's holding in *Florida v. J.L.*, 529 U.S. 266, 268 (2000).[82]

F.    *The Jury Trial.*

The jury trial commenced on March 13, 2023.

Shortly before the Parties commenced their opening statements, the trial court ordered *sua sponte* and over the Plaintiffs' objection, dismissal of

---

80  ECF Doc. 147 at 7.

81  *Id*. at 8; ECF Doc. 125-5 at 16.

82  *Id.*

all Defendants except Kaine from the lawsuit and allowed the Plaintiffs

only to proceed on Count One of the Complaint.[83]

**1.    The Trial Court's comments about Plaintiff's Counsel.**

The trial court included with that ruling dismissing all but one

defendant and one count of the complaint, several statements about

Plaintiff's Counsel:

> [W]ith all due respect Ms. Bertrand, if you or any lawyer looked at
> the docket sheet in this case, you talk about obfuscations and stream
> of consciousness and lack of professionalism in response to this
> Court's order, and I specifically am referencing the matter of the
> summary judgment debacle and now just last night at 9:00 filing
> changes in jury instructions.  Those are not going to go anywhere
> because you did not meet and confer, and you had every day since
> February 8th to do just that, and you chose a different path, and there
> are consequences seriously.  Serious consequences I might add.
>
> If that's the way you can practice law in Arizona, God bless you.  But
> it ain't the way things are done in Judge Stadtmueller's court, and I
> say that against the backdrop of over 35 years as a judge and over 250
> trials.  I dare say there are pro se litigants without the benefit of
> counsel who endeavor mightily to comport their filings with the
> protocols required of the Court.  And the reason that these protocols
> are in place is not to make life difficult for lawyers, but to ensure that
> our limited resources are applied without having to engage what
> might be charitably described as a truffle hunt or an archeological dig
> looking for facts buried in transcripts and a record because lawyers
> professionally don't have the intestinal fortitude to sit down and

---

83  Appx.at 42-44:JT Day One at 52-54.

evaluate a case against the facts, not against a fairy tail [sic] or
alternative reality.

And what's happening in this case is reality has caught up, and the
facts are there to support the reality, not make believe.  And that
should have happened back in April of 2021 when Mr. Anderson's
deposition was taken, and you had the benefit of all the facts.  And
quite honestly had been I aware of the facts as they are now before
the Court, one of two things or two things potentially could have
happened.   One, the case dismissed on summary judgment or failure
to do so.  You're opening yourself up for attorney's fees and
sanctions, and those are not subjects that should be taken lightly.
There wasn't sufficient work done in preparation of the pleadings all
be they filed in state court.  There are lots of things that may sound
good for purposes of Saturday evening cocktail conversation, but
they have no relevancy in a meaningful way to address what is
before the Court.

And no matter whether Officer Vetter or Gabriel were named, that's
not going to change the damage calculation.  There's only one
damage.  The question is who is responsible for it?  And the only
individual who is responsible for having stopped Mr. Carter's
grandmother's car is Officer Kaine, and he operated not on the basis
of a hunch or suspicion or profiling but an articulable fact given by a
lay witness who was concerned. He didn't do this lightly.  After all,
he had to turn around and come back and sought out Officer Kaine.
Given the significance of what Mr. Anderson observed, an individual
seated on the edge of a seat in-between the passenger and driver with
something in his hand and against the backdrop of the significant
number of these kinds of cases in the Milwaukee metropolitan area,
Officer Kaine did what any reasonable officer should have done.  If
he had looked the other way and your client's injured, we would be
here looking at an entirely different case because the officer didn't
oblige his sworn duty to protect and serve

And so there's an awful lot of grist in the mill here. And unfortunately, this is not the kind of grist that makes for a successful case. Seriously..[84]

At the close of the trial court's comments, Plaintiffs' Counsel asked the trial court to recuse itself.[85] The trial court denied the request.[86]

On the second day of trial, before the evidence closed, the trial court made further comments that a reasonable, well-informed observer could interpret as the Court not acting as a neutral arbiter:

> So in the final analysis, the matter that underlies this case at the end of the day is truly limited to the information that was reposed with Officer Kaine before he took pursuit of Ms. Adams' vehicle. And if the tip albeit incorrect or misadvised provided ample basis for the institution of the traffic stop. Again keep in mind, no one was arrested. No one was harmed. No one was beaten. No one was taken to jail. This was an unfortunate experience to be sure. But on the other hand, it could have been far, far worse had Officer Kaine looked the other way and did nothing.[87]

---

84  Appx. at50:*Id*. at 60.

85  *Id*.

86  *Id*.

87  Appx. at 24-25: Jury Trial Day Two at 277-78.

33

The trial court further noted in that exchange that it had stated to the jury "if you see something, say something," and "that's precisely what Mr. Anderson did."[88]

## 2.    Jury Selection

The venire panel included only two African Americans. The trial court *sua sponte* struck one African American juror for cause, over the Plaintiff's objection.[89] Using one of its three strikes, the Defense struck the only remaining African American juror – Juror 11.[90]

The Defense proffered in response that Juror Ten had a master's degree and worked as a social worker.[91] Several of the remaining jurors also had masters degrees, to include the foreperson.[92] The record contains

---

88  Appx. at 24-25: ECF Doc. 277-78.

89  ECF Doc. 158.

90  JT Day Two at 363.

91  Appx. at 34:JT Day 2 at 364.

92  JT Day One at 11, 31-32.

34

no detail about what Juror Ten's master's degree was in or in what area of

social work this juror worked as a "manager for Milwaukee County."[93]

Regarding the potential prejudice of both African American jurors

being struck, the district court said:

> And I also noted for the record that this is not a case in which there is
> a single plaintiff who happens to be a minority whether Hispanic,
> Asian or African American. There were also two plaintiffs who are
> Caucasian, so that effectively neutralizes the entirety of the
> applicability of the Supreme Court's ruling in *Batson* beyond the
> matter of a race-neutral reason for the defense having exercised one
> of their preemptory challenges as to Juror Number 10.[94]

### 3.    The trial court precludes the testimony Plaintiffs' law enforcement expert.

With regards to the Plaintiffs' expert, Brian Landers, the Plaintiffs

again proffered Mr. Landers' testimony on Day Two of the trial.[95] The

Plaintiffs noted Mr. Landers' specialized training and experience as a law

enforcement instructor with the Wisconsin Department of Justice.[96]

---

93  JT Day One at 12.

94  Appx. at 34-35:JT Day 2 at 364-65.

95  JT Day Two at 273-274.

96  *Id*.

Plaintiffs proffered that Mr. Landers' would testify that, contrary to the

Defense's assertions at trial – and the district court's comments – the

Defendants' conduct was not consistent with their training.[97] For example,

the Defendants' inability to consistently articulate what type of stop

occurred and what type of procedures were required for the various types

of stops was inconsistent with their training.[98] To the extent the Defense

continued to assert that the Defendants' had no choice but to take the

actions they did from the start to the end of the stop, Mr. Landers' would

testify that not only were they NOT trained to execute a stop like this, they

had less restrictive, less dangerous alternatives that they did not use. For

example:

> Officer Dienhart mentioned he thought it was a high-risk stop when he arrives. Vetter and Kaine discuss, well, we modified this to a no-contact stop, and that's not part of the Wisconsin Department of Justice's training. That's important because they keep coming back to this is consistent with their training. This is consistent with how they are expected to conduct themselves in car stops, and Mr. Landers would say that's not correct.

> For example, there's no modification between a high-risk stop and a no-contact stop. And that in any instance, the driver is the first

---

97  *Id.*

98  *Id*. at 273-74.

ordered out. And here, that's important because had the driver been ordered out first, be it in a no contact stop or a high-risk stop, this issue would have been resolved very quickly, and this detention would have been over in minutes.

Mr. Landers also can testify that the communication between the officers is not consistent with deescalation as they defined it. They have offered no materials, training to support this idea that their practices in this stop are consistent with the deescalation that they are representing is the official way of doing things, and I expect Mr. Landers to say that's not consistent with any of their training.[99]

The trial court precluded Mr. Landers' testimony, stating:

The Court obviously in making the comments that I did, both at the Final Pretrial Conference and at the outset of the trial, has spent more time than any judge would care to have to acknowledge addressing this issue because at the end of the day, it carries no weight in terms of the fact-finding process.

Like this jury, whether it's Officer Kaine or his colleagues Officer Vetter, Gabriele or Dienhart, police officers do not leave their common sense at home when they put on the uniform and badge anymore than a jury is expected to leave their common sense on the courthouse steps before fulfilling that most important of civic obligations.

So in the final analysis, the matter that underlies this case at the end of the day is truly limited to the information that was reposed with Officer Kaine before he took pursuit of Ms. Adams' vehicle, and if the tip albeit incorrect or misadvised provided ample basis for the institution of the traffic stop. Again keep in mind, no one was arrested. No one was harmed. No one was beaten. No one was taken to jail. This was an unfortunate experience to be sure. But on the

---

99  *Id*. at 274.

other hand, it could have been far, far worse had Officer Kaine looked the other way and did nothing.

I made the comment in front of the jury on Monday, you see something, you say something, and that's precisely what Mr. Anderson did. The plaintiffs have flirted throughout this case that there was no informant or tipster or citizen witness. That simply does not pass muster. The testimony of Mr. Anderson was taken. It's in a deposition file. He may or may not appear and testify in person, but this case revolves around the information that Officer Kaine had and how he used it.

This whole notion of you order the driver out and the passenger out, that was not necessary here because according to the tip, they were the victims. Officer Kaine did what any reasonable police officer armed with the knowledge that he had to take steps to separate both the driver and passenger from the identified apparent person involved in having committed or in progress of committing a robbery. That's Class 101 in police science. You separate individuals, and that's exactly what was done here.

And again to be sure, it was an intrusion. Make no mistake about it. But on the other hand, it could have been far worse had Officer Kaine not taken the actions that he did. And this whole notion of it being identified as a high-risk stop it was, but it was deescalated in a matter of minutes. And to suggest as Mr. Landers will opine that you either do one or the other and this was a no-contact stop from the outside – outset defies reality, and I'm not going to make the jury's task more confused by allowing that sort of testimony where it certainly serves no interest in the fact-finding process other than to obfuscate and confuse.

And accordingly, the Court is consistent in its earlier suggestion that there's no reason for this testimony, and accordingly the Court precludes Mr. Landers from testifying.[100]

---

100  Appx. 24-26:JT Day 2 at 277-79.

**4.      The trial court fails to give the Plaintiffs' requested jury instructions.**

The trial court re-iterated its reversal of its summary judgment findings on the first day of trial, stating, "this is not a racial-profiling case. This is not an improper training case. It's not an arrest case."[101]

The following day, the trial court distributed its final jury instructions.  In addition to those instructions not including instructions for all but one of the counts in the complaint and all but one defendant, the trial court's final jury instructions also failed to include the Plaintiffs' proffered instruction regarding a *Terry* stop *versus* an arrest, the Plaintiffs' proffered supplemental jury instruction regarding factors to consider regarding a basis to make an arrest, or Wisconsin law pertaining to the possession of a firearm.[102]

On March 14, 2023, the jury rendered a Defense verdict.

This appeal follows.

—————————————

101  Appx. at 45:JT Day One at 55.

102  ECF Doc. 151

39

## SUMMARY OF ARGUMENT

The trial court's August 10, 2022 summary judgment decision, which allowed the Plaintiffs to proceed on each of the claims in their Complaint correctly applied the law to the record. Because nothing changed in terms of the facts or controlling law between August 10, 2022 and the February 8, 2023 final pretrial hearing, the trial court committed reversible error in *sua sponte* – and with no notice to the Parties – ruled that the Plaintiffs would not be allowed to proceed on all but one claim against one defendant.

In limiting the Plaintiffs to only to the question of whether or not Defendant Kaine had reasonable suspicion to stop the Plaintiffs, the trial court committed further error by refusing to give the Plaintiffs' requested jury instructions and precluding the testimony of their expert witness.

The trial court's rulings were made in the context of repeated expressions of hostility and personal animosity towards Plaintiffs Counsel throughout the trial that were so severe, they prompted Plaintiffs Counsel to move the trial court to recuse itself.

Any one of these errors, taken alone, provides a basis for reversal and remand. Taken together, these errors show that the only remedy for the

errors made by the trial court is a reversal and remand, with instructions to assign this matter to a different district court judge.

## ARGUMENT

## I.    The District Court's *Sua Sponte* Reversal of its Summary Judgment Order Requires Reversal and Remand for a New Trial.

A factual issue that may reasonably be resolved in favor of either party, precludes the entry of summary judgment if it is material to the case. *A.V. Consultants, Inc. v. Barnes,* 978 F.2d 996, 1000 (7th Cir. 1992). This summary judgment standard is no more rigorous for civil rights cases.

A.    *Burden of Proof and Standard of Review.*

The district court lacks the power to grant summary judgment *sua sponte*. *Choudry v. Jenkins*, 559 F.2d 1085, 1089 (7th Cir. 1977). Fed. R. Civ. Pro. 56 "plainly does not authorize a court to enter an arbitrary summary judgment *sua sponte* against a party; indeed the express language of paragraphs (a) and (b) of the Rule discloses that a motion for summary judgment is to be made by a party." *Choudry*, 559 F.2d at 1088-89. This Court has found a grant of summary judgment without notice to be reversible error. *Horn v. City of Chicago*, 860 F.2d 700, 703 n. 6 (1988).

41

B.      *The Trial Court's Reversal of its Prior Summary Judgment Decision, With No Notice, Requires Reversal and Remand for a New Trial.*

"When a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." *Jarrard v. CDI Telecommunications, Inc.*, 408 F.3d 905, 911-12 (7th Cir. 2005). While a judge may alter previous rulings under certain circumstances, the presumption is that the prior rulings will stand unless the presumption is overcome for compelling reasons such as new controlling law or clear error. *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005).

Here, nothing in the factual record changed, between the Court's August 10, 2022 Summary Judgment Order[103] and the final pretrial conference. The trial court's August 10, 2022 Order denied the Defendants' motions for summary judgment and allowed all of the Plaintiffs' claims to proceed to trial.[104] Those claims included the federal and state law counts against Defendants Vetter, Dienhart, and Gabriel[105] and the *Monell* count[106]

_____

103  ECF Doc. 108.

104  *Id*.

105  Appx. at 102-06:*Id*. at 29-33.

106  Appx. at 97:*Id*. at 24.

42

and state-law negligent supervision, promotion, and discipline claim against the City of Wauwatosa.[107]

The trial court's February 8, 2023 limits on the counts of the Complaint and defendants against whom the Plaintiffs may proceed had the effect of a summary judgment ruling. The trial court's February 8, 2023 ruling also contradicted its own December 12, 2022 scheduling order that stated further dispositive motions would be not accepted by from any party.[108] Not only did the Plaintiffs have no notice that the Court was considering barring them from proceeding against all Defendants except Defendant Kaine, but the Court's order setting the final pretrial conference and jury trial specifically also said that it would not consider further dispositive motions.[109]

---

107  Appx. at 109:*Id*. at 36.

108  Appx. at 72:ECF Doc. 117 at 2 n. 1.

109  *Id*.

## II.    The District Court's Failure to Recuse Itself Requires Reversal and Remand for a New Trial Before a Different Judge.

*A.    Standard of Review.*

A party may raise a trial court's denial of a motion for recusal on direct appeal. *Fowler v. Butts*, 829 F.3d 788, 794 (7th Cir. 2016). This Court reviews denials of recusal *de novo*. *In re: U.S.*, 572 F.3d 301, 307 (7th Cir. 2009).

*B.    The Trial Court's Failure to Recuse Itself Requires Reversal and Remand, with Instruction to Reassign the Matter to a Different Judge.*

A judge must recuse himself, when it appears that the judge has a personal or bias or prejudice against one of the parties or in favor of one of the parties to a lawsuit.  28 U.S.C. 455(a).

Here, the basis for disqualification developed during the jury trial. The Plaintiffs immediately moved the Court to recuse itself, after it concluded its first series of comments, which included threatening sanctions against Plaintiff's Counsel, if the Plaintiffs were not successful.[110] The trial court denied that motion.[111]

---

110  Appx. 48-5-:JT Day 1 at 58-60.

111  Appx. at 51:JT Day 1 at 61.

44

This case shares several factors that this Court found supported judicial recusal in *In re: U.S.*, 572 F.3d 301 (7th Cir. 2009). In that case, the trial court – the same trial judge in this matter -- made off-the-record statements to the Parties about the Government's prosecution of the case that a reasonable observer "might well interpret as critical of Government's position in this case." *Id*. at 311. Those comments included criticism of the United States Attorney's Office delay in bringing the prosecution, *Id*. at 305, why the case had been approved for federal prosecution at all, *Id*., the number of docket entries in the matter, *Id*., and that neither party would be satisfied with its rulings on pending motions. *Id*.

This Court found that, in addition participating in a plea bargain, contrary to Fed. R. Crim. Pro. 11, the trial court:

> He questioned the Government's decision to prosecute the matter as a federal case in terms that a reasonable observer might well interpret as critical of the Government's position in the case. The statement that neither party would be pleased with his ruling on the suppression motions could have been interpreted as indicating that he was ill-disposed toward the Government's position and might rule based not on the merits, but on his distaste for its prosecutorial decision. A reasonable, well-informed observer well may have concluded that the Judge was no longer acting as a neutral arbiter, but was advocating for his desired result.

45

Here, a reasonable, well-informed observer could conclude that the Court's statements indicate that the trial court was not acting as a neutral arbiter.

As the trial court criticized the United States' charging decision in *In re: United States*, here the trial court criticized the bringing of the case at all.[112]

As the trial court criticized the number of docket entries in *In re: United States*, here the trial court here criticized the existence of 147 docket entries.[113]

The trial court further stated in this case, although no facts or law had changed since the trial court's summary judgment denial in August 2022, "this is not a racial profiling case.  This is not an improper training case. It's not an arrest case."[114]

---

112  See, *e.g.*, Appx. at 45:Jury Trial Day 1 at 55, referring to the complaint as a "dish of bad spaghetti thrown against the wall."

113  *Id*.

114  *Id*.

The trial court's comments to Plaintiffs' Counsel before opening statements, in themselves, could be construed by a reasonable, well-informed observer as lacking neutrality.

The Court's "see something, say something" comment to the jury in its introductory comments,[115] alone, could be construed by a reasonable, well-informed observer as the Court's adoption of facts that had been properly left to the jury, because it told the jury that the Court had concluded that not only had this tip happened, but also the Court had concluded that Anderson was credible and the Court perceived him as a good citizen.[116]

Plaintiffs' request that the Court recuse itself was based on the trial conduct throughout the trial, which was impatient, disrespectful, and not courteous to the Plaintiffs or their lawyer. U.S. Courts Judicial Code of Ethics, Cannon 3.3, available at https://www.uscourts.gov/sites/default/files/code_of_conduct_for_unit ed_states_judges_effective_march_12_2019.pdf (last visited April 3, 2023).

---

115  Appx. 41:JT Day One at 6.

116  *Id*.

### III.    The Strike of the Only Two African American Jurors on the Venire Panel Requires Reversal.

"[W]ith the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process." *Powers v. Ohio*, 499 U.S. 400, 407 (1991). The right to trial by an impartial jury is "justly dear to the American people . . . and every encroachment upon it has been watched with great jealousy." *Parsons v. Bedford, Breedlove & Robeson*, 28 U.S. (3 Pet.) 433, 446 (1830).

The Founders understood that a robust jury-trial right is indispensable to a government that claims to derive its "just powers from the consent of the governed." The Declaration of Independence para. 2. "Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary[,]" *Blakely v. Washington*, 542 U.S. 296, 306 (2004). At its best, this quintessentially democratic institution is a critical bulwark "against the arbitrary exercise of power[,]" *Batson v. Kentucky*, 476 U.S. 79, 86 (1986), that "guards the rights of the parties" and "ensures continued acceptance of the laws by all of the people[,]" *Powers v. Ohio*, 499 U.S. 400, 407 (1991).

48

Because the American jury helps sustain our democracy,
nondiscriminatory access to this institution is no less a part of full
citizenship than suffrage. Jury service "places the real direction of society
in the hands of the governed" and "invests the people . . . with the
direction of society."[117] That means illegitimate jury composition harms not
just the accused, but "the "law as an institution," the "community at large,"
and "'the democratic ideal reflected in the processes of our courts.'" *Rose v.
Mitchell*, 443 U.S. 545, 556 (1979) (citation omitted). Accordingly, the
Supreme Court recognizes and protects the rights of "potential jurors" as
much as defendants. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128 (1994).
Persons "excluded from juries because of their race are as much aggrieved
as those indicted and tried by juries chosen under a system of racial
exclusion." *Carter v. Jury Comm'n of Greene Cty.*, 396 U.S. 320, 329 (1970).

A.      *Standard of Review.*

---

117  Hon. J. Harvie Wilkinson III, *In Defense of American Criminal Justice*, 67
Vand. L. Rev. 1099, 1157 (2014) (quoting Alexis de Tocqueville, *Democracy
in America* 293–94 (Philip Bradley ed., Vintage Books 1945) (1835)).

"[D]iscrimination on the basis of race in selecting a jury in a civil proceeding harms the excluded juror no less than discrimination in a criminal trial." *Edmonson v. Leesville Concrete*, 500 U.S. 614, 619 (1991), citing *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220-22 (1946). In either a civil or criminal case, race cannot be the sole reason for denying the excluded venireperson the honor and privilege of participating in our system of justice.

This Court reviews *de novo* a trial court's determination regarding whether or not a *prima facie* basis for a *Batson* challenge exists. *Mahaffey v. Pages*, 162 F.3d 481, 484 (7th Cir. 1998).

After the objecting party makes that *prima facie* case, this Court applies two additional steps. *United States v. Jones*, 56 F.4th 455, 477 (7th Cir. 2022). The striking party must then provide a non-discriminatory explanation for its decision to strike the juror. *Id*. The trial court then must determine "whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Id*. (internal cites omitted) The key question is "whether a strike was racially motivated," and courts must assess "the *honesty*—not the accuracy—of a proffered race-neutral

explanation." *Id.* (internal cites omitted).  This Court reviews those factual findings for clear error. *Id.*

B.    *The Strike of Both African American Jurors Violated the Equal Protection Clause.*

An inference of discrimination arises when a party makes a pattern of strikes against minority jurors. *Mahaffey v. Pages*, 162 F.3d 481, 485 (7th Cir. 1998). The ultimate inquiry is whether the strike of the juror was "motivated in substantial part by discriminatory intent." *Flowers v. Kentucky*, 588 U.S. ___, 139 S.Ct. 2228, 2244 (2019), citing *Foster v. Chatman*, 578 U.S. 488, 513 (2016).

Here, the trial court *sua sponte* struck one African American juror for cause, over the Plaintiff's objection.[118] At an un-transcribed sidebar conference about the strike, Plaintiffs objected. The juror had not said she was unable to serve – only that she would have hardship if she could not find someone to help with the care of her elderly brother. The trial court

---

118  ECF Doc. 158 at 2.

responded with words to the effect of "you have enough jurors" or "there are enough jurors."[119]

The Defense then used one of its pre-emptory strikes on the only remaining African American juror. When Plaintiff's Counsel objected, the trial court insisted that *Batson* does not apply to civil matters.[120]

If a "proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Foster v. Chatman*, 578 U.S. 488, 512 (2016), citing *Miller–El v. Dretke*, 545 U.S. 231, 241 (2005).

The comparator jurors need not be identical, for the Plaintiffs to show that the strike was substantially based on race. *Miller-El*, 545 U.S. at 247. To hold such a high standard would "leave *Batson* inoperable." *Miller-El*, 545 U.S. at 247.

---

119  *Id*.  The Plaintiffs preserved this objection and the trial court's response *via* a post-trial Motion to Supplement the Record, which the trial court granted at ECF Doc. 175.

120  Appx. 74ECF Doc. 108.

Here, the trial court struck the first of two African American jurors for cause, over the Plaintiffs' objection.[121]  The Defense struck the remaining African American juror and the Plaintiff objected, citing *Batson* and *Leesville Concrete*. The Defense's first proffered reason for striking this juror – that she had a master's degree – applied as well to Jurors Seven and Sixteen, who were seated on the jury.[122]  The second proffered reason for striking this juror – simply that she was social worker – was tied no fact of this case. The record contains no detail about what area of social work this juror worked in, within a broad professional field. Did she work in adult protective services?  Child protection? Mental health? Hospice? Defense's failure to seek any further questioning of Juror Ten regarding her "social work" background also is evidence of pretext. *Miller-El*, 545 U.S. at 541.

These distinctions matter, because Jurors Nine, Twelve, and Sixteen, whom the Defense did not strike, worked in health care.[123] So, to the extent the Defense believed that Juror Ten's work as a social worker might impact

---

121  ECF Doc. 158 at 2.

122  JT Day 1 at 11, 31.

123  *Id*. at 12, 13, 31.

her interpretation of Dwight Johnson's testimony about Mr. Carter's

mental health care, the Defense did not strike several jurors who also

would view the testimony through the lens of working health care.

For all we know, Juror Ten may have been friendly to the Defense, if

she, like many social workers, had experience working with the police. The

Defense claim that it struck Juror Ten, because she was a social worker

does not hold water in these circumstances.

C.    *The District Court's Additional Comments About* <u>*Batson's*</u> *Application to this Matter Underscore its Clear Error.*

The on-the-record discussion regarding the Plaintiffs' *Batson*

challenge ended with the trial court's insistence that it had not addressed a

*Batson* challenge outside of criminal matters.[124]

The trial court also stated, in the context of Plaintiffs' Batson

challenge, "There was also two plaintiffs who are Caucasian, so that

effectively neutralizes the entirety of applicability of [*Batson*]. "[125] This

statement further underscores the trial court's fundamental

misunderstanding of *Batson's* principles in two ways.

---

124  Appx. at 35:JT Day 2 at 365.

125   Appx. at 34:JT Day One at 364.

First, the two African American potential jurors had distinct equal protection rights to serve on this jury. *Powers v. Ohio*, 499 U.S. 400, 407-09 (1991). "[E]ach removal of an individual juror because of his or her race is a constitutional violation." *Flowers v. Mississippi*, 588 U.S. ___, 139 S.Ct. 2228, 2242 (2019). The Supreme Court held in *Powers* that a party has standing to raise a Batson challenge, even if the juror is not the same race as the party. *Powers*, 499 U.S. 400 at 411 (internal cites omitted).

Second, each Plaintiff had a right to be tried by a jury, whose members are selected pursuant to non-discriminatory criteria. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128 (1994). The existence of two Caucasian plaintiffs in no way cures the constitutional violations of a juror struck substantially on the basis of her race. Nor does the existence of two Caucasian plaintiffs dilute the identity and interests of the sole African American plaintiff.

## IV.   The District Court's Refusal to Allow Plaintiff to Call its Proffered Law Enforcement Expert, Requires Reversal.

### A.   *Burden of Proof and Standard of Review.*

A district court "retains considerable latitude even with admittedly relevant evidence in rejecting that which is cumulative, and in requiring

55

that which is to be brought to the jury's attention to be done so in a manner least likely to confuse that body." *Hamling v. United States,* 418 U.S. 87, 127 (1974). "At the same time, however, the district court abuses its discretion if it so limits the evidence that the litigant is effectively prevented from presenting his or her case." *Thompson v. City of Chicago*, 722 F.3d 963, 971 (7th Cir. 2013) citing *Cerabio LLC v. Wright Med. Tech., Inc.,* 410 F.3d 981, 994 (7th Cir.2005) and *Sec'y of Labor v. DeSisto,* 929 F.2d 789, 796 (1st Cir.1991) ("[W]e hold that the witness limitation constituted an abuse of discretion in that it prevented both parties from presenting sufficient evidence on which to base a reliable judgment.") This standard of review also applies to a district court's decision to admit or preclude expert testimony. *United States v. Jones*, 56 F.4th 455, 481 (7th Cir. 2022).

B.    *The Trial Abused its Discretion in Precluding the Plaintiffs from Calling their Proffered Expert.*

The Plaintiffs' expert would have testified at trial regarding the uniform training that Wisconsin law enforcement officers receive regarding vehicle contacts and constitutional law.[126]  Mr. Landers' testimony would

---

126  ECF Doc. 134 at 3.

have directly contradicted the trial court's assertion that Defendants'

conduct was consistent with "Class 101 in police science."[127] Landers would

have testified – with no rebuttal expert proffered by the Defense – that the

Defendants' conduct from start to finish was inconsistent with their

training and a far cry from "Policing 101."

In precluding the Plaintiff's expert, who, as a law enforcement

instructor for the Wisconsin Department of Justice, was uniquely qualified

to give the jury relevant information about what choices the Defendants

had in conducting this stop would have directly contradicted the Defense

argument of, in essence, "What was Kaine supposed to do?"

The trial court's adoption of that defense theory underscores why Mr.

Landers' testimony was so important: Kaine was not trained to conduct a

high risk stop of a vehicle, where in which he had observed no criminal or

threatening conduct. None of the Defendants were trained to conduct the

most dangerous form of a stop – aptly named a "high risk" stop – with

guns at the ready and with the only African American in the car ordered

---

127  Appx. at 25:JT Day Two at 278.

out and to his knees, based only on what can best be described as a random stranger's claim that a crime is in progress.

The trial court's preclusion of this expert testimony was not based on accurate interpretations of the facts and the law and, therefore, was an abuse of the trial court's discretion, requiring reversal.

## V.    The District Court's Refusal to Give the Plaintiff's Requested Jury Instructions Constitutes an Abuse of Discretion, Requiring Reversal.

In addition to moving the district court to reconsider its preliminary findings at the February 8, 2023 final pretrial conference, the Plaintiffs objected to the district court's draft jury instructions, to the extent that they did not address the elements of the specific counts of the Complaint.[128] Several of those proposed instructions were submitted jointly by the Parties.[129] Because the only basis for the district court's refusal to give these instructions is the district court's refusal to allow those counts to proceed to trial at all, the error motivating the failure to give these instructions is rooted in the district court's *sua sponte* reconsideration of its summary

---

128  ECF Doc. 134.

129  *Id*.

judgment decision, the failure to give those instructions is best considered in the context of the district court's refusal to allow the Plaintiffs to proceed on all but one count of their Complaint

The Plaintiffs further objected to the district court's failure to give the Plaintiffs' proposed jury instructions that addressed the evidence for the one count that the district court allowed to proceed to trial.[130] This section addresses the error regarding those instructions applicable to Count One of the Complaint.

A.    *Standard of Review*

This Court reviews a trial court's decisions regarding jury instructions for an abuse of discretion. *Consumer Products Research & Design, Inc. v. Jensen*, 572 F.3d 436, 438 (7th Cir. 2009). Abuse of discretion means a serious error of judgment, such as a reliance on a forbidden factor, not considering an essential factor, or use of an incorrect legal standard. *Smego v. Payne*, 854 F.3d 387, 391 (7th Cir. 2017). "A district court also abuses its discretion if the record contains no evidence on which the court could have relied or if its findings of fact are clearly erroneous." *Id*.

---

130  *Id*.

B.    *The District Court Abused its Discretion in Failing to Give the Plaintiffs' Proposed Instruction Regarding an Officer's Basis for a* Terry *Stop versus an Arrest.*

The Plaintiffs objected to the district court's draft instructions, which failed to include this Court's pattern instruction to be used when the jury must determine whether a detention was a *Terry* stop or an arrest.[131]

> Plaintiffs claim that Defendants' conduct violated their right to be free from unreasonable seizure. You must first determine whether Defendant made an investigatory stop of Plaintiffs or placed any or all of the Plaintiffs under arrest.
>
> There is no set rule about the length of time that a person may be detained or the procedures that may be used before the seizure is considered to be an arrest. Rather, you should consider the length of the detention; the procedures used to detain Plaintiff, taken in context; any searches made; the questions asked of Plaintiffs; the location of the detention; whether Plaintiffs were moved from the initial location of the detention to another location; the officer's intent; whether the defendants were diligent in pursuing the investigation or whether his conduct caused delay that unnecessarily lengthened the seizure; and the impression conveyed to Plaintiff.
>
> If you determine one or more of the Plaintiffs was subjected to an investigatory stop, Plaintiffs must show the Defendants seized him or her without reasonable suspicion.
>
> If you determine if one or more of the Plaintiffs were arrested, Plaintiff must show that Defendants did not have probable cause to arrest him or her.[132]

---

131  ECF Doc. 147 at 4.
132  ECF Doc. 125-5 at 6.

This instruction was taken directly from Seventh Circuit civil jury instruction, 7.06 Comment C, which says the above instruction is appropriate when the record presents a factual dispute as to whether defendants conducted a *Terry* stop or an arrest.

The district court's initial finding that the determination of whether this detention was a *Terry* stop, requiring only reasonable suspicion, or an arrest, requiring probable cause, was the right call. The proper instruction, in alignment with that finding, is the specific instruction this Court has published in its pattern instructions. The trial court's refusal to leave this determination in the province of the jury, with the guidance provided by the Court's pattern instruction misapplied both the law and the facts of this case, constituting an abuse of discretion and reversible error.

*C.*    *The District Court Abused its Discretion in Failing to Give the Plaintiffs' Proposed Jury Instruction Regarding the Factors that Support a Reasonable Terry Stop.*

Plaintiffs' Supplemental Instruction One offered factors for the jury to consider in determining whether or not the Defendants' conduct in the course of this detention was reasonable – the ultimate determination of a Fourth Amendment claim. The Plaintiffs proposed the following language:

61

An officer may impose a momentary restriction on freedom of movement to maintain the status quo while making an initial inquiry, provided the force displayed is not excessive under the circumstances.

To qualify as an investigative stop, as opposed to an arrest, a police officer's detention of a suspect must employ the least intrusive means reasonably available to verify or dispel ... suspicion in a short amount of time.

In general, a police officer may take steps reasonably necessary to protect his or her personal safety and the safety of others and to maintain the status quo of a situation while verifying or dispelling suspicion in a short period of time. A number of factors are used to determine whether the amount and kind of force used was reasonable and consistent with an investigative stop. These include:(1) the number of officers and police cars involved, (2) the nature of the crime and whether there is reason to believe the suspect is armed, (3) the strength of the officer's articulable, objective suspicions, (4) the need for immediate action by the officer, (5) the presence or lack of suspicious behavior or movement by the person under observation, and (6) whether there was an opportunity for the officer to have made the stop in less threatening circumstances. If the totality of circumstances indicates that an encounter has become too intrusive to be classified as an investigative detention, the encounter is a full-scale arrest, and the government must establish that the arrest is supported by probable cause.[133]

This proposed instruction was based on the Supreme Court's

decision in *Adams v. Williams*, 407 U.S. 143 (1972) and the Eighth Circuit

Court of Appeals' decision in *United States v. Seelye*, 815 F.2d 48, 50 (8th Cir.

---

[133]  ECF Doc. 146 at 1-2.

1985). This instruction was consistent with the facts of this case, to include, but not be limited to the number officers involved (four), the dangerous nature of the crime alleged (robbery), the questionable strength of Kaine's articulated, objective suspicions, the claimed urgency to immediately conduct a high risk stop, the admitted lack of any suspicious behavior by any of the Plaintiffs, and Kaine's claimed lack of opportunity to make the stop in less threatening circumstances.

The trial court refused to give this instruction, reasoning that it was "saying the same thing" as what the trial court proposed.[134] The instruction proposed by the trial court, however, was far from "the same thing." The instruction proposed and then given by the trial court stated only:

> . . . Plaintiffs must prove each of the following two elements by a preponderance of the evidence:
>
> > (1) Officer Kaine seized Plaintiffs. A person is seized if his movement is restrained using physical force or by a show of authority that the person obeys. A show of authority occurs when a reasonable person would understand that he is not free to end the encounter.
> >
> > (2) Officer Kaine did not have reasonable suspicion that Akil Carter had committed, was committing, or was about to commit a crime. Reasonable suspicion must be based on specific facts known to the officer, together with the reasonable

---

134  Appx. at 28:JT Day 2 at 300.

> inferences from those facts. A hunch does not constitute reasonable suspicion. You may have heard the phrase "probable cause." Probable cause is not required for the type of seizure you are considering. You should consider only whether there was reasonable suspicion for the seizure as I have defined it in this instruction.

The trial court's version gave the jury no guidance as to what factors apply to a determination of reasonable suspicion, not to mention the reasonableness of conduct of the stop, itself. The trial court's refusal to give the Plaintiffs' proposed instruction, which correctly stated the law and addressed specific issues presented by the trial evidence and the Parties' trial theories, was an abuse of discretion that requires reversal and remand.

D.    *The District Court Abused its Discretion in Failing to Give the Plaintiffs' Proposed Jury Instruction Regarding Wisconsin State Law.*

The district court's draft jury instructions failed to include Plaintiffs' requested Supplemental Instruction One, which stated:

> Wisconsin law permits a person to carry a firearm in their vehicle under certain circumstances. To stop the Plaintiffs' vehicle, you, the jury, must also find that Defendant Kaine possessed information to support a reasonable suspicion that any firearm in the Lexus was being used illegally. Mere possibility of unlawful use of a gun is not sufficient to establish reasonable suspicion. It must instead be sufficiently probable that the observed conduct suggests illegal activity.[135]

---

135  ECF Doc. 146 at 5.

This instruction tracked the district court's language in its August 10,

2023 summary judgment decision, in which the district court stated:

> Wisconsin law permits a person to carry a firearm in their vehicle
> under certain circumstances. See Wis. Stat. §§ 167.31(2)(b)–(c). Even if
> a jury credited Mr. Anderson's and Officer Kaine's accounts, the jury
> would still need to decide whether their allegations support a
> reasonable suspicion that the firearm in the blue Lexus was being
> used unlawfully.
>
> These disputed facts and credibility determinations are material, and
> thus preclude summary judgment. These issues are for the factfinder
> to resolve . . .[136]

With regards to this instruction, the district court stated, "We can

stipulate to that and you can argue it to the jury, and you won't get any

opposition from Ms. Baynard, but there is no need to put it in the jury

instructions."[137] The Court's statement that the Plaintiff could argue a

clearly correct point of law does not cure the error of a trial court failing to

give a specific instruction.  Jurors also are instructed that argument of

counsel is just that: argument.[138] An instruction on the law from the

---

136  See ECF Doc. 108 at 26 (internal citation omitted).

137  Appx. at 31:JT Day 2 at 303.

138  See, e.g. ECF Doc. 151 at 3, 6.

presiding judge has significantly more weight and credibility than a

lawyer's closing argument. The court's failure to give this instruction,

therefore, is reversible error.

## VI.   The Cumulative Error in this Trial Requires Reversal and Remand for a New Trial.

To prevail on their cumulative effect argument, Plaintiffs must show:

"(1) that multiple errors occurred at trial; and (2) those errors, in the context

of the entire trial, were so severe as to have rendered [their] trial

fundamentally unfair." *United States v. Powell,* 652 F.3d 702, 706 (7th

Cir.2011) (citing *Alvarez v. Boyd,* 225 F.3d 820, 824 (7th Cir.2000)). In

conducting this analysis, this Court "examin[es] ... the entire record, paying

particular attention to the nature and number of alleged errors committed;

their interrelationship, if any, and their combined effect; how the trial court

dealt with the errors, including the efficacy of any remedial measures; and

the strength of the prosecution's case." *Id.*

The record in this matter shows that this trial was replete with

serious error – much of it implicating the constitutional rights not only of

the Plaintiffs, but also of two jurors. Each, individual error discussed above

provides an independent basis for reversal and remand for a new trial.

66

Combined, they show a trial that was fundamentally unfair that must be reversed.

## CONCLUSION

For the foregoing reasons, the Plaintiffs ask this Court to reverse and remand this matter to the district court for a new trial, with instructions to assign this matter to a different judge.

Respectfully submitted this First day of December, 2023,

s/Joy Bertrand
Joy Bertrand
*Attorney for Plaintiffs-Appellants*

P.O. Box 2734
Scottsdale, AZ 85252-2734
Office – (602)-374-5321
Fax – (480) 361-4694
Email – joyous@mailbag.com

## CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32(a)(7)

The undersigned, counsel of record for the Plaintiffs-Appellants, hereby certifies that this brief conforms to the rules contained in F.R.A.P Rule 32(a)(7) for a brief produced with a proportionally spaced font. The length of this brief is 13,959 words.

Respectfully submitted this First day of December, 2023,

s/Joy Bertrand
Joy Bertrand

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Based on my training and experience with electronic filing in the federal courts, it is my understanding that a copy will be automatically served upon opposing counsel *via* email to Opposing Counsel.

s/Joy Bertrand
Joy Bertrand
Attorney Plaintiffs-Appellants

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
* * * * *
Case Number 23-2111

---

AKIL CARTER, PAULETTE BARR,
AND SANDY ADAMS,

*Plaintiffs-Appellants,*


CITY OF WAUWATOSA, et al.,

*Defendants-Appellees.*

---

**PLAINTIFFS-APPELLANTS' APPENDIX**

---

Joy Bertrand
Attorney for Plaintiffs-Appellants
PO Box 2734
Scottsdale, AZ 85252-2734
(414) 687-4932
FAX (602) 374-2712
Email: joy@joybertrandlaw.com

# APPENDIX TABLE OF CONTENTS

May 4, 2023 Judgment ......................................................................1

May 4, 2023 Order .............................................................................4

Jury Trial Day Two Transcript Excerpts ...........................................18

Jury Trial Day One Transcript Excerpts.............................................40

March 3, 3023 Order on Motion for Reconsideration......................64

December 12, 2023 Amended Trial Scheduling Order. ...................71

August 10, 2023 Order on Summary Judgment................................74

September 28, 2023 Order on Summary Judgment. .......................112

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

AKIL K. CARTER, PAULETTE H.
BARR, and SANDRA K. ADAMS,

                    Plaintiffs,                          Case No. 19-CV-1422-JPS

v.

CITY OF WAUWATOSA, JAMES
MACGILLIS, PATRICK KAINE, LUKE
VETTER, NICOLE GABRIEL, DEREK
DIENHART, JOHN DOES 1–3, and                            **JUDGMENT**
JANE DOES 1–3,

                    Defendants.

**Jury Verdict**. This action came before the Court, presided over by the Honorable J.P. Stadtmueller, for a trial by jury. The issues having been tried and the jury having rendered a Special Verdict (ECF No. 152) on March 14, 2023; and the Court having previously considered Defendants' motion for summary judgment and Plaintiffs' amended motion for partial summary judgment (ECF Nos 95, 100, 108):

   **IT IS ORDERED AND ADJUDGED** that Defendants' motion for summary judgment (ECF No. 95) be and the same is hereby **DENIED** (ECF No. 108);

   **IT IS FURTHER ORDERED AND ADJUDGED** that Plaintiffs' amended motion for partial summary judgment (ECF No. 100) be and the same is hereby **DENIED** (ECF No. 108);

   **IT IS FURTHER ORDERED AND ADJUDGED** that Defendants John Does 1–3 and Jane Does 1–3 be and the same are hereby **DISMISSED** from this action (ECF No. 108);

**IT IS FURTHER ORDERED AND ADJUDGED** that Count One of Plaintiffs' Complaint, ECF No. 1-2, be and the same is hereby **DISMISSED** insofar as it may have been construed as a Fourth Amendment claim of unreasonable investigation, excessive force, and/or failure to intervene (ECF No. 165);

**IT IS FURTHER ORDERED AND ADJUDGED** that Count Two of Plaintiffs' Complaint, a claim of liability pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), be and the same is hereby **DISMISSED** (ECF No. 165);

**IT IS FURTHER ORDERED AND ADJUDGED** that Count Three of Plaintiffs' Complaint, a claim of negligence based on the circumstances under which the traffic stop was initiated and continued, be and the same is hereby **DISMISSED** (ECF No. 165);

**IT IS FURTHER ORDERED AND ADJUDGED** that Counts Four, Five, and Six of Plaintiffs' Complaint, Wisconsin constitutional claims for due process, to equal treatment, and to be free from unreasonable search and seizure, be and the same are hereby **DISMISSED** (ECF No. 165);

**IT IS FURTHER ORDERED AND ADJUDGED** that Count Seven of Plaintiffs' Complaint, a claim of negligent infliction of emotional distress, be and the same is hereby **DISMISSED** (ECF No. 165);

**IT IS FURTHER ORDERED AND ADJUDGED** that Count Eight of Plaintiffs' Complaint, a claim of negligent hiring, training, and promotion, be and the same is hereby **DISMISSED** (ECF No. 165);

**IT IS FURTHER ORDERED AND ADJUDGED** that Count Nine of Plaintiffs' Complaint, a claim of false imprisonment, be and the same is hereby **DISMISSED** (ECF No. 165);

**IT IS FURTHER ORDERED AND ADJUDGED** that Count Ten of Plaintiffs' Complaint, a claim of intentional infliction of emotional distress, be and the same is hereby **DISMISSED** (ECF No. 165);

**IT IS FURTHER ORDERED AND ADJUDGED** that Plaintiffs' requests for declaratory, injunctive, or other equitable relief be and the same are hereby **DISMISSED** (ECF No. 165);

**IT IS FURTHER ORDERED AND ADJUDGED** that the City of Wauwatosa, James MacGillis, Luke Vetter, Nicole Gabriel, and Derek

Dienhart be and the same are hereby **DISMISSED** from this action (ECF No. 165);

IT IS FURTHER ORDERED AND ADJUDGED that Defendant Patrick Kaine did not seize Plaintiffs without reasonable suspicion on September 2, 2018 (ECF No. 152);

IT IS FURTHER ORDERED AND ADJUDGED that Plaintiffs Akil K. Carter, Paulette H. Barr, and Sandra K. Adams shall have and recover nothing from Defendant Officer Patrick Kaine on Plaintiffs' unreasonable seizure claim (ECF No. 152); and

IT IS FURTHER ORDERED AND ADJUDGED that this action be and the same is hereby **DISMISSED** on the merits, together with Defendants' costs as may be taxed by the Clerk of the Court (ECF Nos. 149, 165).

APPROVED:

_____
J.P. Stadtmueller
U.S. District Judge

GINA M. COLLETTI
Clerk of Court

_____
May 4, 2023
Date

*s/ Jodi L. Malek*
_____
By: Deputy Clerk

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| AKIL K. CARTER, PAULETTE H. BARR, and SANDRA K. ADAMS, | |
| Plaintiffs, | Case No. 19-CV-1422-JPS |
| v. | |
| PATRICK KAINE, | **ORDER** |
| Defendant. | |

Plaintiffs in this matter, Akil Carter ("Carter"), Paulette Barr, and Sandra Adams (collectively, "Plaintiffs"), sued Defendants the City of Wauwatosa ("Wauwatosa"), Patrick Kaine ("Kaine"), Chief of Police James MacGillis ("MacGillis"),[1] Luke Vetter ("Vetter"), Nicole Gabriel ("Gabriel"), and Derek Dienhart ("Dienhart") (collectively, for purposes of this Order, "Defendants"). ECF No. 1-2. The matter was tried to a jury beginning on March 13, 2023. During trial, Defendants moved pursuant to Federal Rule of Civil Procedure 54(b) to dismiss all Defendants except Kaine, and to dismiss Plaintiffs' claim pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), and the Court took the motion under advisement. ECF No. 149 at 5. Ultimately, only four questions were submitted to the jury: (1) whether Kaine seized Plaintiffs without reasonable suspicion on September 2, 2018; (2) if so, whether any Plaintiff was entitled to any compensatory damages; (3) if Kaine seized Plaintiffs without reasonable suspicion, whether he did so in reckless disregard of

---

[1] MacGillis was substituted for Barry Weber, prior Wauwatosa Chief of Police, pursuant to Plaintiffs' statement that the Weber was named as a Defendant only in his official capacity. ECF No. 18 at 1, n.1.

Plaintiffs' rights; and (4) if Kaine acted with reckless disregard, whether Plaintiffs were entitled to punitive damages. ECF No. 152 at 1–2.

On March 14, 2023, the jury rendered a Special Verdict and found that Kaine did not seize Plaintiffs without reasonable suspicion on September 2, 2018, and therefore did not answer any questions as to reckless disregard or damages. *Id.* The Court issues this Order contemporaneously with entry of Judgment to clarify the disposition of certain claims and Defendants which were not subject to the jury's Special Verdict.

## 1.    ADDITIONAL PUTATIVE FOURTH AMENDMENT CLAIMS

The Complaint listed, as Count One, a single count of "Violations of the Plaintiffs' Civil Rights Under 42 U.S.C. § 1983," alleged against all Defendants. ECF No. 1-2 at 11. As the Court recognized on summary judgment, this count unquestionably includes an unreasonable seizure claim that Kaine initiated a traffic stop[2] of Plaintiffs' vehicle without reasonable suspicion to do so. ECF No. 108 at 20–28. When considering the parties' competing motions for summary judgment, the Court adopted Defendants' further construction of this count. ECF No. 108 at 2, n.3. Specifically, the Court—in response to Defendants' arguments—examined Count One as *potentially* articulating two additional, distinct factual bases for a Fourth Amendment claim:

- A claim that Defendants Kaine, Luke Vetter ("Vetter"), Nicole Gabriel ("Gabriel"), and Derek Dienhart ("Dienhart") conducted

---

[2]The Court stated on the record during trial its finding that the traffic stop at issue was a brief investigative stop, pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), rather than a full custodial arrest. ECF No. 149 at 1.

the ensuing investigation in an unreasonable manner that exceeded the scope of the facts that first justified it, *id.* at 28–31;[3]

- A claim that Kaine, Vetter, Gabriel, and Dienhart used excessive force in conducting the traffic stop of Plaintiffs, or that Vetter failed to intervene in Kaine's use of excessive force, *id.* at 31–33.

The Court expressly noted Defendants' position that Plaintiffs had not sufficiently pleaded an excessive force claim, and generally had failed to specify which Defendants were subject to which counts and claims. *Id.* at 18, n.16.[4] Ultimately, the Court denied the cross-motions for summary judgment, due to the core question—whether Kaine had reasonable suspicion to stop Plaintiffs' vehicle—being the subject of a factual dispute, the resolution of which required a jury's fact and credibility determinations. *See id.* at 20–33.

All possible Fourth Amendment claims have been disposed of as follows. The jury found for Kaine on the question of reasonable suspicion, and the unreasonable seizure claim was never properly alleged as to Vetter,

---

[3]The Court found definitively that Vetter, Gabriel, and Dienhart had no personal involvement in *initiating* the stop so could not be held liable on a unreasonable seizure theory. ECF No. 108 at 29–30.

[4]The Court failed to state expressly at summary judgment that any Fourth Amendment claim for direct-involvement liability was not properly alleged as to MacGillis (then Weber) and Wauwatosa. For the avoidance of doubt, the Court finds that MacGillis and Wauwatosa were never properly named as Defendants in Count One. This is because Plaintiffs stated MacGillis was only sued in his official capacity as Chief of Police and moreover made no allegations that then-Chief Weber was on the scene at the time of the subject events, *see* ECF No. 104 at 3, and therefore, as a matter of law, MacGillis and Wauwatosa can only be held liable for a violation of Plaintiffs' Constitutional rights on an official-policy theory of liability, not a direct-involvement theory. *See Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 689–90 (1978). Excluding this determination on summary judgment was an oversight, but the parties essentially never disputed that McGillis and Wauwatosa could not be liable as to Count One; the outcome then would have been the same as it is now.

Gabriel, and Dienhart. *See supra* note 3. An unreasonable investigation claim only ever existed to the extent that Defendants construed the Complaint as supporting such a claim, and moreover Plaintiffs did not press a "scope of investigation" claim in any of their pretrial filings. *See* ECF No. 125-7 at 1 (parties' joint proposed special verdict forms, articulating only an unreasonable seizure claim as to Kaine, Vetter, Gabriel, and Dienhart); ECF No. 125-5 (Plaintiffs' additional requested jury instructions, which do not include any instructions as to an unreasonable investigation claim); ECF No. 125-8 (Plaintiffs' additional requested special verdict forms, which do not include forms as to an unreasonable investigation claim). The Court therefore considers any unreasonable investigation claim abandoned as to Kaine, Vetter, Gabriel, and Dienhart. *See Palmer v. Marion County*, 327 F.3d 588, 597–98 (7th Cir. 2003) (deeming abandoned claims on which party presented no evidence and did not raise in briefing).

To the extent an excessive force claim ever existed in this case—which Defendants challenged both on summary judgment and in a motion *in limine*, *see* ECF No. 124-1 at 17—Plaintiffs also effectively abandoned any such claim.[5] Although Plaintiffs opposed Defendants' motion *in limine* on the basis that such a claim was sufficiently pleaded, Plaintiffs' pretrial filings did not reflect that they were seriously pressing this claim. *See* ECF

---

[5] Parenthetically, in light of the jury's determination that Kaine had reasonable suspicion to initiate a traffic stop of Plaintiffs (and in light of the fact that the parties have never disputed that the potential crime alleged as the basis for the stop was a robbery), it is doubtful that a jury presented with the question would have determined Kaine, Vetter, Gabriel, and/or Dienhart used excessive force in conducting the investigation. In any event, Plaintiffs have argued variously that either ordering Carter to his knees, handcuffing him, seating him in the back seat of a police vehicle while handcuffed, and/or the drawing of weapons, or some combination thereof, was excessive. This ill-defined theory of what act or acts of force were excessive makes it impossible for the Court to decide what case law might be on point.

No. 125-5 (Plaintiffs' additional requested jury instructions, which do not include any instructions as to an excessive force claim); ECF No. 125-8 (Plaintiffs' additional requested special verdict forms, which do not include forms as to an excessive force claim). It is also true that Plaintiffs' several filings on the eve of trial make offers of proof that, if liberally construed, could pertain to an excessive force claim. *See, e.g.*, ECF No. 141 at 3–4 (Plaintiffs' objections to Court's proposed verdict form, offering evidence that Kaine and Dienhart drew firearms). But "[i]t is not the responsibility of this Court or opposing counsel to try and piece together all potential theories of the case from scattered and opaque fragments in the [pretrial submissions] . . . ." *McFarland v. Tricam Indus., Inc.*, No. 13 C 4576, 2015 WL 3442027, at *5 (N.D. Ill. May 28, 2015), *aff'd*, 667 F. App'x 164 (7th Cir. 2016) (rejecting plaintiff's contention that references to certain theories of liability raised in pretrial submissions were a sufficient basis for the court to allow plaintiff to present evidence related to those theories at trial). Accordingly, any excessive force claim is deemed abandoned. For the same reasons, the Court considers abandoned any claim that Vetter (or any Gabriel or Dienhart, for that matter)[6] failed to intervene in a use of excessive force.

As should be evident from the above descriptions, Plaintiffs litigated this case in a manner that, to put it diplomatically, profoundly confused the Court as to what legal questions Plaintiffs viewed as actually in controversy, and why. (To be sure, there is plenty of blame to go around: Defendants could have addressed the above-described pleading snafus

---

[6]Plaintiffs' objections to the Court's proposed verdict form gesture at a failure to intervene claim as to Dienhart and Gabriel. *See* ECF No. 141 at 4. This was the first time the Court was aware of a failure to intervene claim being alleged as to these two Defendants. It should go without saying that claims apparently delineated for the first time in an offer of proof are not sufficiently pleaded so as to give the opposing party adequate notice to respond.

with an early motion to dismiss, a motion for a more definite statement, or simply by identifying them to opposing counsel and not opposing the filing of an amended complaint.) As a result, and based on the observation that "the core issue in this case, indeed the issue on which all the other claims turn, is whether Officer Kaine had reasonable suspicion to initiate the vehicle stop of Plaintiffs," ECF No. 140 at 4, the Court in its discretion proposed submitting, and indeed did submit, only an unreasonable seizure claim as to Kaine to the jury, rather than adopt Plaintiffs' other amorphous theories of Fourth Amendment liability. *See* ECF No. 132 at 1. Based on the jury's resolution of that question and the Court's determinations above, the Fourth Amendment claims as to all other Defendants—to the extent they were sufficiently pleaded to begin with—are dismissed.

**2.    *MONELL* CLAIM**

In Count Two of their Complaint, Plaintiffs alleged a count of municipal liability, pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), arising from the alleged violation of Plaintiffs' constitutional rights.[7] ECF No. 1-2 at 11–16. Shortly before trial, and at the invitation of the Court, Plaintiffs made an offer of proof related to their *Monell* claim. ECF Nos. 141 at 4–10. The *Monell* claim was subject to a Rule 54(b) motion by Defendants, which the Court took under advisement. ECF No. 149 at 5. Ultimately, this claim was not submitted to

---

[7]Plaintiffs' theory of *Monell* liability, like their Fourth Amendment claim(s), is imprecise. One of Plaintiffs' pretrial filings demonstrates that they, at one point, represented to Defendants that they had two theories for their municipal liability claim: (1) that Wauwatosa had a de facto policy of racial profiling in traffic stops and (2) that Wauwatosa failed to train or supervise its officers to avoid unconstitutional seizures. ECF No. 125-5 at 30–31. Indeed, these are the theories that the Court examined on summary judgment. ECF No. 108 at 33–35. But in that very same document, Plaintiffs request inclusion of jury instructions for a third *Monell* theory that then-Chief Weber ratified the Defendant officers' conduct. ECF No. 125-5 at 14–15.

the jury. Because Plaintiffs failed to establish an underlying Constitutional violation, the *Monell* claim is essentially moot. Accordingly, although it survived summary judgment, *see* ECF No. 108 at 33–35, it will now stand dismissed.[8]

### 3.    STATE LAW CLAIMS

In addition to their federal claims, Plaintiffs alleged an array of state law claims, including:

- A negligence claim based on the circumstances under which the traffic stop was initiated and continued, Count Three of the Complaint;

- Claims under the Wisconsin Constitution for violations of the rights to due process, to equal treatment, and to be free from unreasonable search and seizure, Counts Four, Five, and Six of the Complaint;

- A negligent infliction of emotional distress claim, Count Seven of the Complaint;

- A negligent hiring, training, and promotion claim, Count Eight of the Complaint;

- A false imprisonment claim, Count Nine of the Complaint; and

- An intentional infliction of emotional distress claim, Count Ten of the Complaint.

*See* ECF No. 1-2 at 16–20.[9] At summary judgment, the Court—while acknowledging Defendants' argument that Plaintiffs' state law claims were

---

[8]Plaintiffs' requests for "declaratory, injunctive, and other equitable relief reforming the Defendant City of Wauwatosa policies, practices, and procedures," *see* ECF No. 1-2 at 21, also must be dismissed because Plaintiffs have failed to prove any underlying Constitutional violation requiring redress.

[9]As Defendants pointed out in moving for summary judgment, some of the state law claims are pleaded as to *all* Defendants rather than specifying which

barred as a matter of law on either state sovereign immunity or governmental actor immunity grounds—declined to reach the merits of any state law claims given the factual dispute surrounding the federal claim. ECF No. 108 at 35–36.

The parties' pretrial submissions reflected their agreement as to jury instructions and special verdict forms on Plaintiffs' claims of negligence; negligent infliction of emotional distress; negligent hiring, training and promotion; false imprisonment; and intentional infliction of emotional distress. *See* ECF No. 125-4 at 39, 44–49; ECF No. 125-7. Defendants did not agree to Plaintiffs' proffered jury instructions or special verdict forms as to their three Wisconsin Constitutional claims. *See* ECF No. 125-5 at 19–23; ECF No. 125-8 at 5–6.

At trial, during the jury instructions conference, Plaintiffs objected to the exclusion of instructions and verdict forms on certain of their state law claims, on the basis that Defendants had agreed to the wording of the instructions and verdict forms related to those claims. ECF No. 149 at 13; *see also* ECF No. 155 at 4 (Plaintiffs' counsel objecting to the Court's exclusion of the parties' agreed-upon instructions as to "negligence, false imprisonment"). Defendants stated that the parties' agreement on those instructions and verdict forms did not necessarily indicate that Defendants conceded they were sufficiently pleaded. *Id.* at 14. When the Court prompted Plaintiffs for an offer of proof on the state law negligence claims as to Kaine, Vetter, Gabriel, and Dienhart, Plaintiffs responded that Defendants have a common law duty to Plaintiffs to uphold the Constitution and use the least restrictive means to conduct the traffic stop.

─────────────────────

Defendant did what with respect to whom (or explaining how a municipality could be liable in tort for negligent infliction of emotional distress). *See* ECF No. 108 at 18, n.6.

*Id.* Defendants countered that this was not enough to sustain the duty element of a negligence claim. ECF No. 155 at 6–7. That was the end of the matter; Plaintiffs raised no other substantive discussion of the instructions or verdict forms as to their state law claims in tort, nor made a case for inclusion of instructions or verdict forms on their Wisconsin constitutional claims. *See* ECF No. 149 at 13–15.

The Court will retain jurisdiction over Plaintiffs' state law claims in order to dismiss them.[10] The Court revisits and concurs in Defendants' arguments at summary judgment that Wisconsin's governmental immunity doctrine bars Plaintiffs' state law claims in tort. ECF No. 97 at 23–28. "Under Wisconsin law, the doctrine of governmental immunity is quite broad." *Est. of Perry v. Wenzel*, 872 F.3d 439, 462 (7th Cir. 2017). "The rule of governmental immunity provides that state officers and employees are immune from personal liability for injuries resulting from acts performed within the scope of their official duties." *Pries v. McMillon*, 784 N.W.2d 648, ¶ 20 (Wis. 2010). This has been interpreted to immunize all conduct that "involve[s] the exercise of discretion and judgment." *Milwaukee Metro. Sewerage Dist. v. City of Milwaukee*, 691 N.W.2d 658, ¶ 54 (Wis. 2005). "Public officer immunity does not apply to: (1) the performance of ministerial

---

[10]Although all federal claims in this case have either been resolved by the jury or dismissed by the Court, the Court will exercise its discretion to retain supplemental jurisdiction over the state law claims. *See Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 906–07 (7th Cir. 2007) (affirming district court's relinquishment of state law claim that remained after trial, appeal, and remand, but noting that supplemental jurisdiction may be retained where, for example, "substantial federal judicial resources have already been expended on the resolution of the supplemental claims" or "where it is obvious how the claims should be decided"). Although the Court's summary judgment order declined to reach the merits of the state law claims, as explained in the balance of this section, resolution of these claims is fairly straightforward. This consideration, together with the consideration of judicial economy, both counsel in favor of exercising supplemental jurisdiction.

duties; (2) the performance of duties with respect to a known danger; (3) actions involving medical discretion; and (4) actions that are malicious, willful, and intentional." *Bicknese v. Sutula*, 660 N.W.2d 289, ¶ 17 (Wis. 2003) (citation and internal quotation marks omitted).

None of these exceptions to governmental immunity applies. The known danger and medical discretion exceptions are clearly inapplicable based on the facts of this case. Plaintiffs have made no serious argument that Kaine was not exercising discretion in deciding to stop Plaintiffs' vehicle, and no serious argument that Vetter, Gabriel, and Dienhart were not exercising discretion in how they responded to Kaine's radio call for backup and how they acted on scene. Indeed, Plaintiffs' entire case rests on the notion that each of these four officers had alternative choices about what to do in the situation with which they were presented (for example, Kaine's choice to either act or not act on Carl Anderson's tip, and Dienhart's choice to either draw or not draw his service weapon in response to Kaine's report that he was responding to a robbery). Because Kaine, Vetter, Gabriel, and Dienhart were clearly exercising discretion in the discharge of their duties, the ministerial duty exception cannot be said to apply. *Cf. Sheridan v. City of Janesville*, 474 N.W.2d 799, 802 (Wis. 1991) (holding that decisions about initiating an arrest and using force are discretionary).

The jury's finding that Kaine had reasonable suspicion to stop Plaintiffs' vehicle is fundamentally incompatible with a finding that he acted in a manner that was malicious, willful, and intentional, i.e., that he stopped them for no good reason. The record is also utterly devoid of any evidence that Vetter, Gabriel, or Dienhart acted with malice, willfulness, or intent in participating in the investigation—they were relying on Kaine's representations as to the nature of the stop and the risks it posed. This exception—to the extent it even makes coherent sense as an exception to

immunity for *negligence* liability, which is subject to debate, *see Price as next friend of J.K. v. Mueller-Owens*, 516 F. Supp. 3d 816, 831 (W.D. Wis. 2021) (collecting and comparing cases)—does not apply either.

Accordingly, Plaintiffs' claims rooted in negligence—Counts Three, Seven, and Eight—are barred by the doctrine of governmental immunity and must be dismissed.[11] Similarly, Count Nine, a false imprisonment claim, is barred by the doctrine of governmental immunity, and in any event cannot be sustained in light of the jury's finding that Kaine lawfully seized Plaintiffs. Finally, Count Ten, an intentional infliction of emotional distress claim, is also barred due to governmental immunity, and as noted above, is not supported with any proof in the record that any of the officer Defendants acted with intent to cause harm.

Counts Four, Five, and Six, Plaintiffs' Wisconsin constitutional claims, must be dismissed because—even assuming Plaintiffs could actually prove such violations, which is in doubt in light of the jury's finding—"suits for damages are not permissible for violations of the Wisconsin Constitution" except in certain circumstances inapplicable here. *Maxwell v. Outagamie County Jail*, No. 20-CV-386, 2022 WL 17300881, at *4 (E.D. Wis. Nov. 29, 2022). This is true even when a municipality (rather than a state actor to whom state sovereign immunity applies) is alleged to have committed the violation. *Id.* (dismissing Wisconsin constitution count alleged against municipality); *see also Schworck v. City of Madison*, No. 19-CV-312-WMC, 2021 WL 1820779, at *19 (W.D. Wis. May 6, 2021), *aff'd as modified on other grounds*, No. 21-2055, 2022 WL 832053 (7th Cir. Mar. 21,

---

[11]This, of course, sets aside the question of what Defendants' duty, beyond upholding the federal Constitution, even was. The Court does not answer that question because the parties have not briefed it, but notes that Plaintiffs' arguments on this issue at trial were rather unpersuasive.

2022) (same); *Harper v. Giese*, No. 20-CV-493-PP, 2020 WL 7047822, at *8 (E.D. Wis. Dec. 1, 2020) (same). To the extent Plaintiffs' request for declaratory, injunctive, or equitable relief from Wauwatosa policies, practices, or procedures was intended to apply to these counts, such relief cannot be granted because the allegations in support of those counts make no mention of any Wauwatosa policy, practice, or procedure that led to the alleged violations of the state constitution. *See* ECF No. 1-2 at 16–18.

**4.     CONCLUSION**

Based on the foregoing, the Court dismisses Counts Two through Ten of Plaintiffs' complaint, as well as Count One insofar as it may have been construed as a Fourth Amendment claim of unreasonable investigation, excessive force, and/or failure to intervene. The Court dismisses Plaintiffs' requests for declaratory, injunctive, or equitable relief. Because no claims remain against Defendants the City of Wauwatosa, James MacGillis, Luke Vetter, Nicole Gabriel, and Derek Dienhart, these Defendants are dismissed.

Accordingly,

**IT IS ORDERED** that Count One of Plaintiffs' Complaint, ECF No. 1-2, be and the same is hereby **DISMISSED** insofar as it may have been construed as a Fourth Amendment claim of unreasonable investigation, excessive force, and/or failure to intervene;

**IT IS FURTHER ORDERED** that Count Two of Plaintiffs' Complaint, a claim of liability pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), be and the same is hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that Count Three of Plaintiffs' Complaint, a claim of negligence based on the circumstances under which

the traffic stop was initiated and continued, be and the same is hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that Counts Four, Five, and Six of Plaintiffs' Complaint, Wisconsin constitutional claims for due process, to equal treatment, and to be free from unreasonable search and seizure, be and the same are hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that Count Seven of Plaintiffs' Complaint, a claim of negligent infliction of emotional distress, be and the same is hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that Count Eight of Plaintiffs' Complaint, a claim of negligent hiring, training, and promotion, be and the same is hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that Count Nine of Plaintiffs' Complaint, a claim of false imprisonment, be and the same is hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that Count Ten of Plaintiffs' Complaint, a claim of intentional infliction of emotional distress, be and the same is hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that Plaintiffs' requests for declaratory, injunctive, or other equitable relief be and the same are hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that the City of Wauwatosa, James MacGillis, Luke Vetter, Nicole Gabriel, and Derek Dienhart be and the same are hereby **DISMISSED** from this action; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED** on the merits**,** together with Defendants' costs as may be taxed by the Clerk of the Court**.**

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 4th day of May, 2023.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

----------------------------------------------------------------

```
AKIL K. CARTER, et al,                 )
                                       )
                  Plaintiffs,          )      Case No. 19-CV-1422
                                       )      Milwaukee, Wisconsin
     vs.                               )
                                       )      March 14, 2023
PATRICK KAINE,                         )
                                       )
                  Defendant.           )      Volume 2
                                       )
```

----------------------------------------------------------------

**TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE JP STADTMUELLER
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

```
For the Plaintiff
Akil K. Carter, et al:        Joy Bertrand Esq
                              By: Joy M Bertrand
                              PO Box 2734
                              Scottsdale, AZ 85252-2734
                              602-374-5321
                              Fax: 480-361-4694
                              Email: Joy@joybertrandlaw.com
For the Defendant
Patrick Kaine:                Wirth & Baynard
(Present)                     By: James Wirth & Jasmyne Baynard
                              9898 W Bluemound Rd - Ste 2
                              Wauwatosa, WI 53226
                              414-291-7979
                              Fax: 414-291-7960
                              Email: Kbz@wbattys.com
```

```
U.S. Official Reporter:       SUSAN ARMBRUSTER, RPR, RMR,
Transcript Orders:            Susan_Armbruster@wied.uscourts.gov
```

Proceedings recorded by computerized stenography,
transcript produced by computer aided transcription.

APPX. 000018

March 14, 2023

1    (Witness excused.)

2        THE COURT:  You may call your next witness.

3        MS. BERTRAND:  Your Honor, the plaintiffs next witness

4    is subject to pending court ruling.  I don't know if the Court

5    wants me to proffer that in front of the jury or sidebar.

6        THE COURT:  Members of the Jury, the Court has a

7    matter to address with counsel.  This may take a bit of time, so

8    I'm going to excuse you.  It's at bit early for our morning

9    recess, but I think it would provide Court and counsel to

10   address the matter to which Ms. Bertrand refers.

11       Please keep in mind the admonition I've given you

12   throughout; that is, do not discuss the case among yourselves.

13   I want each of you to continue the oath in mind that you pledged

14   to keep until you've heard the balance of the evidence and

15   testimony being offered together with the Court's instructions

16   on the law and the closing arguments of counsel.  We'll stand in

17   recess insofar as the jury is concerned.

18       BAILIFF:  All rise.

19   (Jury excused.)

20       THE COURT:  You may be seated.  Ms. Bertrand.

21       MS. BERTRAND:  Thank you, Your Honor.  I asked to

22   speak about this outside of the presence of the jury because the

23   Court said it's reserving its ruling on allowing Mr. Brian

24   Landers to testify, and he's still available to testify by video

25   conferencing.  He remains symptomatic of COVID.

272

1          The Court had mentioned yesterday that before it would

2     allow that to happen, it wanted from the plaintiffs a factual

3     basis upon which Mr. Landers' testimony would be based.  I am

4     prepared to proffer that factual basis if the Court is open to

5     hearing it.

6          THE COURT:  Certainly.  This is your opportunity to

7     make a record as to what the factual predicate is and exactly

8     what you expect the witness to testify about.

9          MS. BERTRAND:  Mr. Landers is an instructor with the

10    Wisconsin Department of Justice.  He's participated in the

11    preparation and publication of the materials used to train the

12    officers statewide, and I expect him to testify regarding the

13    testimony we've heard in this case that first, the Wisconsin

14    Department of Justice provides these materials, including

15    materials on the constitutional law and the limitations of

16    police officers in conducting vehicle stops and detentions.  And

17    the intention behind that is that there's uniformity throughout

18    the state so there's consistency from one department to another

19    and so officers have a consistent understanding of what happens

20    at a car stop.  Here in this case, we see there was not a

21    consistent understanding.

22          Officer Dienhart mentioned he thought it was a

23    high-risk stop when he arrives.  Vetter and Kaine discuss, well,

24    we modified this to a no-contact stop, and that's not part of

25    the Wisconsin Department of Justice's training.  That's

273

1   important because they keep coming back to this is consistent

2   with their training.  This is consistent with how they are

3   expected to conduct themselves in car stops, and Mr. Landers

4   would say that's not correct.

5         For example, there's no modification between a

6   high-risk stop and a no-contact stop.  And that in any instance,

7   the driver is the first ordered out.  And here, that's important

8   because had the driver been ordered out first, be it in a no

9   contact stop or a high-risk stop, this issue would have been

10  resolved very quickly, and this detention would have been over

11  in minutes.

12        Mr. Landers also can testify that the communication

13  between the officers is not consistent with deescalation as they

14  defined it.  They have offered no materials, training to support

15  this idea that their practices in this stop are consistent with

16  the deescalation that they are representing is the official way

17  of doing things, and I expect Mr. Landers to say that's not

18  consistent with any of their training.  That would be the

19  limitation of his testimony.  I don't expect it to be long, and

20  I expect it to be targeted simply in response to the testimony

21  we have received from the officers.

22        THE COURT:  Thank you.  Ms. Baynard.

23        MS. BAYNARD:  Your Honor, I think this has been

24  briefed out fully.  But I mean to sum up, I kind of disagree

25  with the testimony as Attorney Bertrand has summarized that has

1   come to light when -- specifically when we're talking about

2   deescalation.  No one is defining it.  They are saying as we

3   learned information, we are adjusting what we're doing.  I guess

4   I'm not sure where Brian Landers would come into that.

5          Also, he can't render a final opinion on whether or

6   not there was reasonable suspicion.  I'm not sure and if you

7   want to go into kind of some of the basis in the unreliability

8   of his opinions, I'm fine to summarize some of those on the

9   record.  Throughout his testimony, as noted in our *Daubert*

10  motion, Brian Landers' original report indicates often that

11  generally accepted police practices.  In his deposition when we

12  ask him to list every generally accepted police practice, he

13  couldn't.

14         During his deposition and prior to when we asked him

15  as an expert under Rule 26, disclose your file to us.  He

16  couldn't because he didn't keep track of what he reviewed.  In

17  his deposition, Mr. Landers concludes in his report, he

18  concludes that these officers didn't receive training.  Well,

19  during his deposition we asked, what do you mean they didn't

20  receive training?  He said, well, I didn't get their training

21  files.  We asked, did you ask for them?  He said, I asked the

22  attorney, but she didn't give them to me and so that is how I

23  rendered the conclusion that they did not receive training at

24  all.

25         Then, we provided --  He got the training log some way

275

March 14, 2023

 1   and then supplemented his report.  So not only is his testimony

 2   not helpful, it's not reliable, and it's not necessary in this

 3   case.  What happened at the stop does not matter.

 4          I can't imagine Brian Landers or any police practice

 5   expert will get up on the stand and say when he thought he would

 6   do a high-risk traffic stop even when he realized the evidence

 7   didn't support doing that high risk of a stop, he should have

 8   went ahead with it.  He should have smashed the windows out, and

 9   he should have dragged the occupants out.  And if he's going to

10   get up on the stand and testify to that, he would be completely

11   wrong, and it would unfairly prejudice the defense in this case.

12          I don't know if you want more detail, but I think the

13   specific opinions have been fully briefed in our Motion in

14   Limine, but his deposition was long.

15          THE COURT:  Ms. Bertrand, anything more you want to

16   add?

17          MS. BERTRAND:  Well, first, I would not be asking him

18   to opine about the extent of the officers or the propriety of

19   the officers' training because the Court said that is not

20   relevant, so we would not bring that up.  We would not go down

21   that rabbit hole.  He did disclose the materials upon which he

22   relied.

23          And when he received the additional training materials

24   he said, yeah, I haven't changed my opinion, but that is to the

25   training, and that's not relevant here.  He's simply going to

276

1    address the training materials that Officer Kaine said he

2    received and the training materials that Officer Kaine says he

3    uses to train and discuss the content of them and how that

4    differs from -- That will show this differs from what Officer

5    Kaine interprets them to be.

6           THE COURT:  All right.  Thank you.  The Court

7    obviously in making the comments that I did, both at the Final

8    Pretrial Conference and at the outset of the trial, has spent

9    more time than any judge would care to have to acknowledge

10   addressing this issue because at the end of the day, it carries

11   no weight in terms of the fact-finding process.

12          Like this jury, whether it's Officer Kaine or his

13   colleagues Officer Vetter, Gabriele or Dienhart, police officers

14   do not leave their common sense at home when they put on the

15   uniform and badge anymore than a jury is expected to leave their

16   common sense on the courthouse steps before fulfilling that most

17   important of civic obligations.

18          So in the final analysis, the matter that underlies

19   this case at the end of the day is truly limited to the

20   information that was reposed with Officer Kaine before he took

21   pursuit of Ms. Adams' vehicle, and if the tip albeit incorrect

22   or misadvised provided ample basis for the institution of the

23   traffic stop.  Again keep in mind, no one was arrested.  No one

24   was harmed.  No one was beaten.  No one was taken to jail.  This

25   was an unfortunate experience to be sure.  But on the other

277

1    hand, it could have been far, far worse had Officer Kaine looked

2    the other way and did nothing.

3         I made the comment in front of the jury on Monday, you

4    see something, you say something, and that's precisely what

5    Mr. Anderson did.  The plaintiffs have flirted throughout this

6    case that there was no informant or tipster or citizen witness.

7    That simply does not pass muster.  The testimony of Mr. Anderson

8    was taken.  It's in a deposition file.  He may or may not appear

9    and testify in person, but this case revolves around the

10   information that Officer Kaine had and how he used it.

11        This whole notion of you order the driver out and the

12   passenger out, that was not necessary here because according to

13   the tip, they were the victims.  Officer Kaine did what any

14   reasonable police officer armed with the knowledge that he had

15   to take steps to separate both the driver and passenger from the

16   identified apparent person involved in having committed or in

17   progress of committing a robbery.  That's Class 101 in police

18   science.  You separate individuals, and that's exactly what was

19   done here.

20        And again to be sure, it was an intrusion.  Make no

21   mistake about it.  But on the other hand, it could have been far

22   worse had Officer Kaine not taken the actions that he did.  And

23   this whole notion of it being identified as a high-risk stop it

24   was, but it was deescalated in a matter of minutes.  And to

25   suggest as Mr. Landers will opine that you either do one or the

278

1    other and this was a no-contact stop from the outside --  outset

2    defies reality, and I'm not going to make the jury's task more

3    confused by allowing that sort of testimony where it certainly

4    serves no interest in the fact-finding process other than to

5    obfuscate and confuse.

6          And accordingly, the Court is consistent in its

7    earlier suggestion that there's no reason for this testimony,

8    and accordingly the Court precludes Mr. Landers from testifying.

9    Do you have any other witnesses, Ms. Bertrand?

10          MS. BERTRAND:  No, Your Honor.  The plaintiff rests.

11          THE COURT:  Very well.  Ms. Baynard, Mr. Wirth, do you

12    have witnesses?

13          MR. WIRTH:  Given that the plaintiff has rested, we

14    have a 50(a) Motion to Dismiss.  If the Court would prefer to

15    take that under advisement, we'll play the tape of

16    Carl Anderson.

17          THE COURT:  You've made a place card holder for such a

18    motion.  But since both sides wanted the case to go to a jury,

19    it will go to the jury, and I will allow you to play the

20    deposition.

21          MR. WIRTH:  I will do my best, Judge.  The Court

22    admonished yesterday that the preferred method would be to play

23    the relevant sections.  I will do my best.  I've got those laid

24    out.  And what I'll do is unless the Court wants the whole hour

25    and ten minutes, I'll cut to the chase.

279

1          THE COURT:  There's no need.  I'm not cutting anybody

2    off.  This is always a problem with depositions because by the

3    time you get to trial, a lot of things that may have been

4    relevant back in April of 2021 when that deposition was taken

5    are not relevant today.  I appreciate your effort in

6    streamlining.

7          MR. WIRTH:  The only other thing I ask is can we take

8    our 15-minute break now?

9          THE COURT:  Certainly.

10         MS. BERTRAND:  Your Honor, I don't mind taking a

11   break, but I do think the plaintiffs have an objection to the

12   use of the Anderson testimony.  He's been served.  He has failed

13   to appear.  I'm making that objection expecting the Court to

14   overrule it.

15         I'll also note I agree with the defense and the Court

16   that there's a preliminary discussion with Mr. Anderson that is

17   not relevant to what happened in this case and the stop, and

18   that that should be edited from any video presentation that the

19   jury sees.  And if it's going to be sent back to the jury

20   likewise should be edited to not include the preliminary

21   discussions with him.

22         THE COURT:  Well, when it comes to the video, the

23   videos will not go back to the jury room.  If they wish to

24   review any of the electronic exhibits, whether it's audio or

25   video, they will do it here in the courtroom and have to make a

1    instructions at the bottom of page 12 to the damage instruction

2    on page 13?  Seriously.

3            MS. BERTRAND:  I am pulling it up right now, Your

4    Honor.

5            THE COURT:  It's saying the same thing, and it's

6    consistent with what was earlier proposed.  And the *Seelye* case

7    which you made reference to is not a Seventh Circuit case.  I

8    appreciate again against the backdrop of having been a Judge for

9    35 and-a-half years, there is precious, precious, precious,

10   precious little about which one cannot find some snidbit of

11   authority for, and that's one of the problems that the English

12   language provides for those who are cast in the role of having

13   to make decisions.

14           What I read on the bottom of pages 12 and 13 of the

15   proposed instructions is another way of virtually telling the

16   jury exactly what you propose in your Sunday evening submission.

17           MS. BERTRAND:  Your Honor, I think what the plaintiffs

18   propose in that supplemental instruction identifies several --

19   identifies the factors that have been presented by the evidence

20   as it's come out in trial, and those are more specific than the

21   general instruction that's taken from the Seventh Circuit's

22   language about what constitutes a reasonable stop, so I don't

23   think it overstates any position.  I don't think it understates

24   any position, but it does give the examples for the jury.

25           As the Court says, they don't get a lot of guidance to

300

 1    consider what factors to weigh here in a more specific way.  I

 2    think this actually helps guide them in their discussions so

 3    they don't go off on a tangent wondering about things that don't

 4    matter.  This is telling them what matters in their analysis.

 5              THE COURT:  Mr. Wirth, Ms. Baynard.

 6              MS. BAYNARD:  Judge, I guess we would disagree that

 7    this instruction wouldn't invite the jurors to go off on a

 8    tangent.  I think the instructions that the Court put in place

 9    adequately -- I mean barring, you know, the punitive damage

10    instruction -- adequately provide the jury what they are being

11    asked to answer.  And I think adding additional instructions

12    just even in general is going to confuse them because there's

13    been a lot of evidence that is not relevant that has come in.

14              So the defense would propose that we stick with the

15    Court's proposed instructions.  And we can discuss the

16    instruction on punitive damages, but that is kind of our

17    position.  I think the reason why there's not a Seventh Circuit

18    case on point is because there's a split, and the Seventh

19    Circuit doesn't follow the *Seelye* case.  I also think that

20    *Seelye* is not exactly applicable here legally or factually, so

21    that's our position on the jury instruction, the proposed jury

22    instruction number B that is on the filing 146.

23              MS. BERTRAND:  This is supplemental jury instruction

24    one we're discussing.

25              THE COURT:  All right.  Any other request,

301

1    Ms. Bertrand?

2             MS. BERTRAND:  Your Honor, the only other supplemental

3    request we had was the supplemental instruction that was based

4    on the Court's discussion in the summary judgment order

5    Document 108 about it being legal to possess a firearm, a gun in

6    Wisconsin.  I think that's a correct statement of the law.  And

7    while we may have disagreement as to what Officer Kaine heard,

8    what Mr. Anderson believes he told Officer Kaine, I think the

9    jury can be told that it's not illegal in itself to possess a

10   firearm.

11            And this may be a robbery in progress.  Why?  Because

12   he has a gun goes back to the Court's discussion when the Court

13   went through the record in meticulous detail in analyzing

14   Mr. Anderson's testimony, comparing that with what Officer Kaine

15   reported he understood the report to be, and it's consistent

16   with at least some of the records showing the information or

17   limited information that Officer Kaine had.  And we just heard

18   in this replay of the deposition that Kaine doesn't take the

19   time to say what exactly gives you this belief?  You know, we

20   hear after the fact, but that's not relevant to an officer's

21   belief at the time of the stop.

22            So I do think this is an appropriate instruction to

23   educate the jury that possessing a firearm in itself is not

24   illegal.  Possessing a firearm in a car in itself is not

25   illegal.

302

1          THE COURT:  We can stipulate to that, and you can

2     argue it to the jury, and you won't get any opposition from

3     Ms. Baynard, but there is no need to put it in the jury

4     instructions.

5          MS. BERTRAND:  I'll follow the Court's direction on

6     that.  Thank you.

7          THE COURT:  Mr. Wirth, Ms. Baynard any request for

8     part 2?

9          MS. BAYNARD:  Your Honor, one instruction that we take

10    issue with based on the evidence that came in was the punitive

11    damage award.  I think the Court's made it clear through the

12    record and with the information that's come in that this case is

13    not a punitive damage case.  And whether the jury, you know,

14    decides -- if they decide that there's liability, the issue of

15    punitive damages should only go in front of the jury if it's

16    applicable, and that would require proof by a preponderance of

17    the evidence that, you know, Officer Kaine's conduct was

18    negligent, reckless, malicious, and the record doesn't

19    demonstrate that, so there's no need for this instruction to go

20    in front of the jury.

21          I also think having a punitive damage instruction when

22    it's unnecessary, unwarranted is unfairly prejudicial to the

23    defense.

24          THE COURT:  Well, to remove that instruction,

25    Ms. Baynard, puts the Court in the role of fact finding.  And

303

 1    reminded you that once the case is submitted to you, you are

 2    free to deliberate as long as you deem appropriate to arrive at

 3    a fair, just, completed, unanimous verdict.  If you wish to

 4    deliberate into the evening tonight, we will make arrangements

 5    for an evening meal.

 6          As I explained yesterday if you choose to suspend for

 7    the evening at some point, we will simply instruct you to return

 8    to continue with your deliberations starting after 8:30 tomorrow

 9    morning.  So with those comments, I am now going to excuse the

10    jury.  As Ms. Vraa will instruct you, you are not to have in the

11    jury room any communication device whether it is a laptop

12    computer or cell phone.

13          In the event any of you may be expecting anything by

14    way of communication whether from an employer or family member,

15    Ms. Vraa will take custody of cell phones and other

16    communication devices.  And should you receive a notification

17    along those lines, she will bring it to your attention.  The

18    Court stands in recess in so far as the jury is concerned.

19          BAILIFF:  All rise.

20       (Jury excused.)

21          THE COURT:  Before recessing, are we squared away an

22    exhibits?

23          MS. BERTRAND:  I think the only exhibit issue is the

24    printed transcript of Mr. Anderson's deposition.

25          MR. WIRTH:  My office just forwarded me the redacted

362

March 14, 2023

1    version.  I will file that electronically.

2              MS. BERTRAND:  Okay.  And Exhibit 41 is acceptable?  I

3    don't know what the defense wants to do with that.

4              MR. WIRTH:  I think what we discussed, Judge,

5    obviously admitted into evidence and put in the category if they

6    ask for it turn it over to them.

7              THE COURT:  And then last matter is the record that

8    both sides wanted to make before the court reporter on the

9    *Batson* challenge yesterday that I denied.  Ms. Bertrand and

10   Ms. Baynard, if you want to make that record, now is a good time

11   to do so.

12             MS. BERTRAND:  Yes.  Your Honor, I believe it was

13   Juror 11.  She was an African American woman who was a social

14   worker in Milwaukee.  She was wearing a black jacket and a black

15   T-shirt.  She was --

16             THE COURT:  I think you misspoke.  I think this is

17   Juror Number 10.

18             MS. BERTRAND:  Okay.

19             THE COURT:  Rashaan Cherry.

20             MS. BERTRAND:  Yes, Your Honor.  And Ms. Cherry by the

21   time we got to preemptory strikes was the only black member of

22   the veneer panel.  I believe the defense struck her as the

23   second or third strike, and the plaintiffs objected when they

24   saw that strike.  Then, the Court held a sidebar about it.

25             THE COURT:  All right.  Thank you.  Ms. Baynard, do

363

1    you want to make your record?

2            MS. BAYNARD:  Yes, Your Honor.  Plaintiffs are both

3    Caucasians and persons of color.  The panel is complied of

4    individuals that are Caucasian and a person of color.  The

5    preemptory strike was based on both her master's degree and her

6    employment as a Milwaukee County Social Service Social Worker.

7            Similarly, there was the behavioral health specialist,

8    number 17, who if would have been on the panel we would have

9    struck.  The basis -- Our concern in this case is there were no

10   physical injuries and what we believe, you know, later on no

11   professional testimony regarding a claim of emotional injuries.

12   That would be an individual who would be sympathetic.  That is

13   why I used it as a preemptory strike.

14           THE COURT:  All right.  And given that one of the

15   plaintiffs' witnesses was a counselor, I think also is a

16   contributing factor for both sides whether you want the

17   individual or don't, and so I find for the reasons that the

18   Court stated off the record yesterday, that the defense has

19   provided a race-neutral reason for having exercised their

20   preemptory strike.

21           And I also noted for the record that this is not a

22   case in which there is a single plaintiff who happens to be a

23   minority whether Hispanic, Asian or African American.  There

24   were also two plaintiffs who are Caucasian, so that effectively

25   neutralizes the entirety of the applicability of the Supreme

364

APPX. 000034

1   Court's ruling in *Batson* beyond the matter of a race-neutral

2   reason for the defense having exercised one of their preemptory

3   challenges as to Juror Number 10, Ms. Rashaan Cherry.  Any other

4   matters that we need to make a record?

5           MS. BERTRAND:  I would like if I may, Your Honor.  In

6   discussing the *Batson* challenge at sidebar, there was a

7   disagreement about whether or not *Batson* is applicable in civil

8   matters.  I'm not sure if the Court wants to make any comment

9   about that.  I just want to make sure the record is clear.  If

10  the Court wants to --

11          THE COURT:  Well, you indicated you had authority to

12  invoke *Batson*.  I have never had occasion to address it other

13  than in multiple criminal cases.

14          MS. BERTRAND:  The authority I would cite is *Edmonson*

15  *v. Leesville Concrete Company*, 500 U.S. 614, 1991.  And in that

16  case, the Supreme Court addressed the application of *Batson* in

17  civil matters and confirmed that *Batson* is applicable in civil

18  matters.  I just want to ensure a complete record.

19          THE COURT:  Certainly.  As to your availability and

20  you're free to leave for the next hour.  At 5 o'clock, I will

21  have Ms. Vraa inquire of the jury as to how long they want to

22  deliberate because we have to make arrangements for an evening

23  meal.

24          And once we know what their requests are or what their

25  schedule may be, we will notify you.  So please provide a cell

365

1   phone number where you can be reached after 5 o'clock.  Between

2   now and 5 clock, you're at liberty.

3            MS. BERTRAND:  Thank you, Your Honor.

4            THE COURT:  The Court stands in recess.

5            BAILIFF:  All rise.

6            THE COURT:  Ms. Vraa, step forward.

7        (Whereupon the bailiff is sworn in.)

8            THE COURT:  Ms. Vraa, as I indicated to counsel at

9   5 o'clock, you may inquire of the jury as to whether they wish

10  to deliberate into the evening since we have to make

11  arrangements for food.

12            BAILIFF:  Okay.

13        (Brief recess taken.)

14        (Back on the record.)

15            THE COURT:  Let the record reflect that we've

16  reconvened in the matter of Akil K. Carter et al. v. City of

17  Wauwatosa, et al.  Ms. Vraa reported to the Court about

18  11 minutes ago that the jury had informed her that the jury had

19  reached a verdict.  Is there anything anyone wishes to make of

20  record before the jury comes in?

21            MS. BERTRAND:  No, Your Honor.

22            MS. BAYNARD:  No, Your Honor.

23            THE COURT:  Very well.  Ms. Vraa, you may invite the

24  jurors in.

25        (Jury enters.)

366

March 14, 2023

1    The jury is excused.

2        (Jury excused.)

3            THE COURT:  Mr. Carter, Ms. Barr and Ms. Adams, I well

4    appreciate this is yet another moment in what probably can be

5    best described as a most unfortunate series of events that

6    culminates with the jury having spoken.  And based on the jury's

7    verdict, the Court's obliged to enter a judgment dismissing the

8    case as to each of the defendants, the city, chief of police and

9    the City of Wauwatosa.  The jury having spoken finding no

10   liability on behalf of the principal actor, Mr. Patrick Kaine.

11           I'll direct that the clerk of the court enter a

12   judgment based on the jury's finding of no liability dismissing

13   the case together with such costs as may be taxed by the clerk

14   of the court.  Any other matters that we need addressed to?

15           MS. BERTRAND:  No, Your Honor.  Thank you.

16           THE COURT:  Mr. Wirth and Ms. Baynard.

17           MS. BAYNARD:  No, Your Honor.  Thank you.

18           THE COURT:  Very well.  The Court stands in recess.

19       (Whereupon proceeding was concluded.)

20

21

22

23

24

25

370

March 14, 2023

```
 1                  C E R T I F I C A T E

 2

 3            I, SUSAN ARMBRUSTER, RPR, RMR, Official Court Reporter

 4    for the United States District Court for the Eastern District of

 5    Wisconsin, do hereby certify that the foregoing pages are a true

 6    and accurate transcription of my original machine shorthand

 7    notes taken in the aforementioned matter to the best of my skill

 8    and ability.

 9

10    Signed and Certified July 13, 2023.

11    /s/Susan Armbruster

12    Susan Armbruster

13

14                      Susan Armbruster, RPR, RMR
                        United States Official Reporter
15                      517 E Wisconsin Ave., Rm 200A,
                             Milwaukee, WI 53202
16                   Susan_Armbruster@wied.uscourts.gov

17

18

19

20

21

22

23

24

25
```

371

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

----------------------------------------------------------------

AKIL K. CARTER, et al,                )
                                      )
                  Plaintiffs,         )        Case No. 19-CV-1422
                                      )        Milwaukee, Wisconsin
       vs.                            )
                                      )        March 13, 2023
PATRICK KAINE,                        )        8:30 a.m.
                                      )
                  Defendant.          )        **Volume 1**
                                      )
----------------------------------------------------------------

**TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE JP STADTMUELLER
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

 For the Plaintiff
 Akil K. Carter, et al:        Joy Bertrand Esq
                               By: Joy M Bertrand
                               PO Box 2734
                               Scottsdale, AZ 85252-2734
                               602-374-5321
                               Fax: 480-361-4694
                               Email: Joy@joybertrandlaw.com
 For the Defendant
 Patrick Kaine:                Wirth & Baynard
 (Present)                     By: James Wirth & Jasmyne Baynard
                               9898 W Bluemound Rd - Ste 2
                               Wauwatosa, WI 53226
                               414-291-7979
                               Fax: 414-291-7960
                               Email: Kbz@wbattys.com




 U.S. Official Reporter:       SUSAN ARMBRUSTER, RPR, RMR,
 Transcript Orders:            Susan_Armbruster@wied.uscourts.gov

Proceedings recorded by computerized stenography,
transcript produced by computer aided transcription.

1

1    John to grant them that right.  And shortly after our

2    Constitution was adopted more than 350 years ago, amendments

3    were added to ensure the right to a jury trial in both civil and

4    criminal cases.

5         I'm also going to take this opportunity to introduce

6    to you the balance of the court staff.  Our court security

7    officer who is in charge of the jury is Ms. Linda Vraa.  My

8    courtroom room deputy for the trial is Ms. Caitlin Willenbrink,

9    and our court reporter today is Ms. Susan Armbruster.

10        At this juncture, I'm going to ask that each member of

11   the panel stand, and Ms. Willenbrink will administer the oath to

12   you as prospective jurors.

13   (Jury panel sworn in.)

14        THE COURT:  Members of the panel, the case for which

15   you have been summoned this morning is entitled Akil K. Carter

16   et al. v. City of Wauwatosa, et al, Case No. 19-CV-1422 JPS.

17   This is a civil case.  And for your general information, the

18   party who initiates a lawsuit is referred to as the plaintiff.

19   The party or parties against whom a lawsuit is initiated is

20   referred to as the defendant or defendants.

21        In this particular case, the individual plaintiffs,

22   Akil Carter, Paulette Barr and Sandra Adams, collectively the

23   plaintiffs, claim that a Wauwatosa police officer while acting

24   under the color of law initiated an investigative stop of their

25   automobile without reasonable suspicion to do so.

5

1    The claim is alleged to be in violation of the

2    individual plaintiffs' rights under the Fourth Amendment to the

3    US Constitution.

4    The Fourth Amendment prohibits individuals from

5    unreasonable searches and seizures.  The incident about which

6    plaintiffs complain, which serves as the basis for their

7    lawsuit, occurred more than four and-a-half years ago on a

8    Sunday, namely September 2, 2018, when shortly before noon a

9    citizen witness while driving his vehicle on West North Avenue

10   near Highway 100 and Mayfair shopping center in Wauwatosa took

11   note of what the witness observed to be a robbery in progress

12   occurring in the vehicle traveling next to him.

13   And despite the fact that the witness was under some

14   time constraints to get his son back to the University of

15   Wisconsin, Whitewater where the witness is attending college, he

16   was sufficiently concerned about what he had observed; that is,

17   if you see something, say something.  Thus upon noticing a

18   Wauwatosa police officer seated in a marked squad car at the

19   intersection of North 106th Street and North Avenue, the witness

20   circled back to draw to the officer's attention to what he had

21   observed.

22   Thereafter, the officer initiated what in the law is

23   known as a *Terry* stop; that is, the ability to stop a vehicle

24   for purposes of investigating conduct, whether it be speeding,

25   drunk driving, the commission of a criminal offense or the like.

6

March 13, 2023

1   Because the incident was referred to by the witness as a

2   possible robbery in progress, the officer called upon fellow

3   officers who also arrived at the scene as back up.

4           The plaintiffs' vehicle was stopped several blocks

5   down the street.  The occupants were ordered by the officer to

6   exit the vehicle.  And consistent with the officer's commands,

7   the individual seated in the rear seat of the vehicle was

8   ordered to take a seat in the rear portion of the officer's

9   squad car, and he was handcuffed for a few minutes while the

10  officer delved into the totality of the facts and circumstances

11  surrounding the incident.

12          And within a period of several minutes, it became

13  clear that no crime had been committed, and all of the

14  individuals were released to go about their affairs.

15          The Wauwatosa police officers defending this case

16  stand on their defense that there was no violation of the

17  plaintiffs' rights given what the officers perceived to have

18  been a potential crime in progress.

19          The jury selected to hear the evidence in this case

20  will have to determine ultimate facts, including whether their

21  rights were at any time violated.

22          In order to select a jury to hear the evidence in this

23  case, it's going to be necessary for the Court to put a number

24  of questions to you commonly referred to as the voir dire

25  examination.  The words voir dire are of french derivation and

7

March 13, 2023

1      MS. BERTRAND:  Your Honor, we've made our record

2  regarding the propriety of dismissing these other defendants and

3  particularly dismissal of the *Monell* claim, which is a distinct

4  claim.

5      With regard to the necessity of the witnesses, the

6  plaintiffs have filed with the Court affidavits of service for

7  Nicole Gabriel, Barry Weber, Dwight Johnson, and Carl Anderson.

8  Dwight Johnson is the plaintiffs' witness regarding Mr. Carter's

9  damages, which the Court has said is of concern to the Court,

10  and Dwight Johnson treated Mr. Carter for post-traumatic stress

11  disorder after this incident, so he is a relevant witness.

12      Barry Weber was the chief at the time of this.  He has

13  specific knowledge about this event.  He spoke with lieutenant

14  now Captain Vetter about this event, so he's a relevant witness,

15  and he's failed to appear.  There's been no Motion to Quash his

16  subpoena.  That leaves Nicole Gabriel also whose subpoena they

17  have not moved to quash and whom the plaintiffs have served.

18      So I don't think that it's appropriate to simply

19  excuse these witnesses.  They are all relevant witnesses.  The

20  Court said at the final pretrial if it did allow the plaintiffs

21  to proceed on only a limited defendant, the other officers would

22  remain as fact witnesses.  And certainly the Court set this

23  trial date in December of 2022 and Officer Gabriel is not here,

24  so I don't think it's as simple as just excusing the --

25      THE COURT:  First of all, the fact that Ms. Gabriel is

53

1   a named party does not ensure that she has to be here for trial.

2   This is a civil case.  And the fact of the matter is you waited

3   until about a week ago to serve her.  I don't think she's been

4   effectively served.  The subpoena was left at the Wauwatosa

5   Police Department.  She's not even there.  She's on vacation, so

6   I don't know how you can contend you've effectively served her

7   when she (a) hasn't been at work and is on vacation.

8            MS. BERTRAND:  Well, Your Honor, the rules allow --

9   federal rules allow for service at the place of employment if

10   the person is allowed to accept service.  That happened.

11            I would also note that before Ms. Gabriel was

12   dismissed from this matter, these subpoenas also were served

13   upon their counsel, and counsel said they were not authorized to

14   accept the service.

15            THE COURT:  That's right.  So as far as the Court's

16   concerned, there's been no effective service on Ms. Gabriel.

17   That's a non-starter.

18            MS. BAYNARD:  Mr. Weber was personally served.

19            THE COURT:  And he can come in, but you're going to

20   have a tall order to convince the Court that his testimony is

21   even relevant.  That's the whole problem in this case.  It got

22   off on the wrong foot because there was no discovery taken for

23   about 18 or 20 months into the case, and it's gone downhill from

24   there.

25            And to be blunt and direct, had this case been

54

March 13, 2023

1  effectively litigated in terms of discovery and summary

2  judgment, I have little doubt in conveying this morning that

3  there is probably less than one tenth of one percent that this

4  case would even be here for trial because number one, this is

5  not a racial-profiling case.  This is not an improper training

6  case.  It's not an arrest case.

7          All of these things were thrown at the wall like a bad

8  dish of spaghetti back in 2019 when the case was filed.  The

9  word processor was engaged without the benefit of the core facts

10  of the case, and that's something you're going to have to

11  convince the court of appeals on, Ms. Bertrand.  And Ms. Baynard

12  can regale the Seventh Circuit with more than 147 docket entries

13  on a case that should have been tried a couple of years ago but

14  for the pandemic.

15          MS. BERTRAND:  Your Honor, that leaves the issue of

16  Dwight Johnson.  He's a plaintiffs' witness.  He is a witness as

17  to damages.  That is relevant, and he is available.  He's

18  planning to attend this afternoon.

19          THE COURT:  That's fine.  I have not precluded

20  Mr. Johnson from testifying.  Obviously, if the jury finds there

21  was a Fourth Amendment violation here, damages become relevant.

22  On the other hand, should the jury answer the question no, then

23  in spite of all what Mr. Johnson testifies to, the jury will

24  never reach that question.

25          MS. BERTRAND:  So we're all clear, is the Court saying

55

1   it's bifurcating these deliberations?

2          THE COURT:  No.  I'm saying that the testimony of

3   Mr. Johnson is no longer relevant if the jury finds that there

4   was no violation.  I think the problem the plaintiffs have in

5   this case is convincing whether it's Wauwatosa or the Court or

6   jury that this is anything but a routine *Terry* stop.  That's

7   where the plaintiff and defense part company, but I'm going to

8   allow the case to go to the jury, but I have strong reservation

9   about the viability of the case.  We'll see what the jury has to

10  say about all of this and be guided by their determination and

11  any post-verdict motions.  Mr. Wirth, anything further you want

12  to add?

13         MR. WIRTH:  No.  Judge along those lines if the 54(b)

14  motions have been granted, then the defendants have no objection

15  to the now witnesses being sequestered.

16         THE COURT:  All right.  The officers may take a seat

17  in the corridor on the benches.  If, in fact, Mr. Wirth and you

18  can agree as to whether or not the testimony will even be

19  necessary given all of the facts and circumstances, the timeline

20  here of ten or 11 minutes, this case should take less than an

21  hour to try except for a contention on damages.

22         MS. BAYNARD:  Your Honor, one additional thing,

23  Attorney Baynard here.  Barry Weber was personally served about

24  36 hours ago on a Saturday afternoon.  He gave me a call.  I

25  don't -- I can let him know that he was supposed to be here at

56

1   9:00.  He had something.  If the Court is not releasing him from

2   the subpoena, we will inform him to leave where he lives in

3   Germantown and to get here.  I wanted to make the Court aware

4   that if she were to call him as the first witness, it's likely

5   that he won't be here by that time.  He was served on Saturday

6   afternoon.

7           MS. BERTRAND:  I'd like to make a record about that if

8   the Court would allow me to.

9           THE COURT:  Certainly.

10          MS. BERTRAND:  Mr. Weber was personally served after a

11  week of effort trying to locate him and properly serve him,

12  including going to several residences that are associated with

13  him.  And it was finally after -- I'm happy to bring my process

14  server in or file an affidavit.  This is not as if we were

15  waiting until the last minute, Your Honor.  We have been looking

16  for him, and we will proffer he has been making it difficult for

17  us to serve him.

18          THE COURT:  Well, that may be true.  But on the other

19  hand if you look at the docket sheet, the parties have been

20  aware of the date for the trial not only at the Pretrial

21  Conference on February 8th, but when the Court rescheduled the

22  case on December 12th.  Normally experienced lawyers within a

23  week particularly in a case that has been so bitterly, bitterly

24  contested, witnesses, whether plaintiff or defense, should have

25  been served before the end of 2022.  Make no mistake, just

57

March 13, 2023

1   another vinya of the lack of attentiveness to detail.

2           MS. BERTRAND:  Your Honor, I would also note to make

3   the record, I'm not arguing with the Court, but I would like the

4   record to reflect that initially when Mr. Weber was substituted

5   by Mr. MacGillis because he was named only in his official

6   capacity, the agreement was with the defense that they would

7   ensure that he still appear for trial and testify.  That changed

8   at some point from their end.  We relied on that representation.

9   When I found out they were not going to accept subpoena, we had

10  to act to have him served.

11          THE COURT:  Understood.  Again, with all due respect

12  Ms. Bertrand, if you or any lawyer looked at the docket sheet in

13  this case, you talk about obfuscations and stream of

14  consciousness and lack of professionalism in response to this

15  Court's order, and I specifically am referencing the matter of

16  the summary judgment debacle and now just last night at 9:00

17  filing changes in jury instructions.  Those are not going to go

18  anywhere because you did not meet and confer, and you had every

19  day since February 8th to do just that, and you chose a

20  different path, and there are consequences seriously.  Serious

21  consequences I might add.

22          If that's the way you can practice law in Arizona, God

23  bless you, but it ain't the way things are done in Judge

24  Stadtmueller's court.  And I say that against the backdrop of

25  over 35 years as a judge and over 250 trials.  I dare say there

58

 1    are pro se litigants without the benefit of counsel who endeavor

 2    mightily to comport their filings with the protocols required of

 3    the Court.  And the reason that these protocols are in place is

 4    not to make life difficult for lawyers, but to ensure that our

 5    limited resources are applied without having to engage what

 6    might be charitably described as a truffle hunt or an

 7    archeological dig looking for facts buried in transcripts and a

 8    record because lawyers professionally don't have the intestinal

 9    fortitude to sit down and evaluate a case against the facts, not

10    against a fairy tale or alternative reality.

11            And what's happening in this case is reality has

12    caught up and the facts are there to support the reality, not

13    make believe.  And that should have happened back in April of

14    2021 when Mr. Anderson's deposition was taken, and you had the

15    benefit of all the facts.  And quite honestly had been I aware

16    of the facts as they are now before the Court, one of two things

17    or two things potentially could have happened.  One, the case

18    dismissed on summary judgment or failure to do so.

19            You're opening yourself up for attorney's fees and

20    sanctions, and those are not subjects that should be taken

21    lightly.  There wasn't sufficient work done in preparation of

22    the pleadings all be they filed in state court.  There are lots

23    of things that may sound good for purposes of Saturday evening

24    cocktail conversation, but they have no relevancy in a

25    meaningful way to address what is before the Court.

59

```
 1          And no matter whether Officer Vetter or Gabriel were
 2   named, that's not going to change the damage calculation.
 3   There's only one damage.  The question is who is responsible for
 4   it?  And the only individual who is responsible for having
 5   stopped Mr. Carter's grandmother's car is Officer Kaine, and he
 6   operated not on the basis of a hunch or suspicion or profiling
 7   but an articulable fact given by a lay witness who was
 8   concerned.  He didn't do this lightly.  After all, he had to
 9   turn around and come back and sought out Officer Kaine.
10          Given the significance of what Mr. Anderson observed,
11   an individual seated on the edge of a seat in-between the
12   passenger and driver with something in his hand and against the
13   backdrop of the significant number of these kinds of cases in
14   the Milwaukee metropolitan area, Officer Kaine did what any
15   reasonable officer should have done.  If he had looked the other
16   way and your client's injured, we would be here looking at an
17   entirely different case because the officer didn't oblige his
18   sworn duty to protect and serve.
19          And so there's an awful lot of grist in the mill here.
20   And unfortunately, this is not the kind of grist that makes for
21   a successful case.  Seriously.
22          MS. BERTRAND:  Your Honor, I have never said this to a
23   Court before.  But I think given the Court's comments today and
24   the opinions it's expressing both about the strength of this
25   case and about counsel, I would ask the Court to recuse itself.
```

60

1    I do not say that lightly, but I believe that I have to make

2    that request.

3              THE COURT:  That request is denied.  The court of

4    appeals can look at the same record that Judge Stadtmueller

5    looked at.  These comments were not made in front of a jury.

6    You can have the court of appeals look at the case.  In the end,

7    it's going to be a very expensive process.  Ms. Baynard

8    Mr. Wirth, anything before we invite the jurors in?

9              MR. WIRTH:  Nothing from the defense, Your Honor.

10             THE COURT:  You may invite the jury in.

11         (Jury enters.)

12         (Back on the record.)

13             THE COURT:  Members of the, Jury, after addressing

14   some preliminary matters with counsel, we're ready to proceed

15   with opening statements.  At this time, I'm going to call on

16   Ms. Bertrand.

17             MS. BERTRAND:  Thank you, Your Honor.  Ladies and

18   Gentlemen of the Jury, good morning.  My name is Joy Bertrand.

19   I represent the plaintiffs in this matter, Sandy Adams, Paulette

20   Barr and Paulette Barr's grandson, Akil Carter.

21             This case involves a stop by the police of their

22   vehicle, and so it's called a seizure.  You'll hear that word

23   used quite a bit in this case.  We use the word detention

24   sometimes but the old word we use in the Constitution is

25   seizure.

61

1  down on your knees.  Mr. Carter follows direction, gets on his

2  knees.  And at this point, you see Officer Kaine approach him

3  unholstering his side arm.

4       And as Officer Kaine handcuffs Mr. Carter, you will

5  hear in the video it is in two separate squad cam videos,

6  Officer Dienhart arrives thinking he's arrived at a robbery.  So

7  having not been told stand down, you know, just hold back, he's

8  armed for bare.  He grabs his AR15, charges it, and holds it

9  ready to use on the driver's side of the car.

10      Ms. Barr and Ms. Adams remain in the car.  Ms. Barr

11 sees her grandson handcuffed, and she summons her courage and

12 gets out of the car and says, what are you doing?  Is someone

13 going to tell me what's going on?  They say, get back in the

14 car.  She does.  They take Mr. Carter, place him in the squad

15 car still handcuffed.

16      They approach Ms. Barr and she says what are you

17 doing, that's my grandson?  And it's clear we have a problem.

18 So Officer Kaine starts saying, well, I got a report, you got to

19 understand.  And you're going to hear him make these excuses as

20 he's standing there.  Even after they know this is Ms. Barr's

21 grandson, he's done nothing wrong, there's no crime, there's no

22 gun.  They let him sit in the car.

23      And, in fact, Officer Gabriel comes and starts

24 questioning him.  What is your father's name?  What's your name,

25 date of birth, address?  Still handcuffed.

67

1          Finally, they are allowed to leave, and they're quite

2   shaken.  It is expected that the defense is going to say one of

3   two things.  The first is what was he supposed to do?  What was

4   Kaine supposed to do?  He got a report of a robbery.  In fact,

5   he did.

6          Possessing a gun in Wisconsin is not a crime.  What he

7   could have done, he could have followed the car, observed

8   there's no crime being committed.  They are calm.  Sandy is

9   turning on her turn signal, she changes lanes.  There is no

10  ruckus in the car.  Had he gotten close or driven next to her,

11  next to it, he would have seen Akil with his headphones on in

12  the back.

13         He and Vetter as they are coming together with their

14  plan could have, as is consistent with their training, ordered

15  Ms. Adams out of the car.  Come back to us.  We have a report,

16  we are making sure everything is okay.  This would have been

17  done in two minutes, no automatic rifles, no guns drawn.  They

18  don't.  They just forge ahead and, in fact, they allow the other

19  officers to still think they are coming to a robbery with the

20  adrenaline pumping and them getting ready mentally and body to

21  use deadly force if necessary.

22         They are conducting what's called a high-risk stop.

23  That is a term, a police term.  Depending on your age, it is a

24  felony stop, but that language changed to reflect the risk

25  involved.  Also, sometimes the people that you're focusing on

68

1    are not felons.  They do none of that.  They keep it amped up

2    and amped up enhancing the danger, never mitigating the danger.

3    And so that's the answer to the first defense.  I'm sure they'll

4    have comments when they get their opening.

5          The second question that they are going to raise with

6    you that we can address now is it is only 15 minutes max.

7    Mr. Carter was in that squad maybe five to seven minutes.  You

8    can watch the time run on the squad cam.  Well, you know, if

9    they didn't hurt anybody, well if they didn't cause any physical

10   injuries, true and thank you.  But each one of these plaintiffs

11   is going to get up and tell you about the experience of being in

12   that car and the waiting and seeing Officer Kaine draw his

13   weapon as he approaches Mr. Carter.

14         You'll hear from Mr. Carter about the experience of

15   being ordered out for something he didn't do, ordered to his

16   knees, shackled in broad daylight, placed in a squad car and

17   questioned.

18         Damages can be broken bones.  They can be bruises.

19   Thank God we don't have worse damages here.  Damages can also be

20   emotional damages, anxiety, loss of sleep, nightmares, and

21   that's what you're going to hear about here.

22         The other kind of damages that the Court is allowing

23   you to consider are punitive damages, which are exactly like

24   they sound.  They are intended to deter, to punish, to say this

25   is not okay.  This was not reasonable, and we want you to think

69

1    twice before you do this again.  That will be a jury question

2    you will be asked to consider as well.

3            At the end of this case, we'll be able to come back up

4    and give closing statements.  In that closing statement, we'll

5    review whether or not any of this was reasonable.  And how

6    reasonable was it for Kaine to rely on some random citizen

7    pulling over, refusing to give his name, refusing to say how he

8    knew this car was involved in anything and jumping from a man in

9    a car with a gun to car involved in a robbery.  And we'll be

10   asking how is this reasonable?  How in the totality of the

11   circumstances is this reasonable?

12           I will be here to say it wasn't.  And the value that

13   you decide to place on that is the damage.  That value can

14   include the mental harm, the anxiety, the fear that they

15   continue to experience to this day.  Thank you.

16           THE COURT:  Thank you, Ms. Bertrand.  Mr. Wirth.

17           MR. WIRTH:  Thank you, Your Honor.  Carl Anderson that

18   was his name.  That was the witness' name.  His name is

19   Carl Anderson, and you'll hear him testify.

20           As defendants we go second.  And what we need to ask

21   of you is to not make up your minds until you've heard both

22   sides of the story.  We trust that you'll be able to do that.

23   One of the things we want to do is give you the entire story.

24           This is essentially a trial in two phases.  The first

25   phase is the stop, which you've heard referred to as a *Terry*

70

March 13, 2023

1    stop.  Now, the phrase that you will hear repeated is reasonable

2    suspicion.  An officer has to have reasonable suspicion to make

3    a stop where he has the opportunity to then investigate what's

4    going on.

5         You will hear that in this traffic stop there was no

6    arrest.  There was no physicality.  There was no tasing.  There

7    was no gunfire.  There were no guns pointed at anybody.  There

8    was no physical harm.  Eleven minutes start to finish.  This

9    stop took 11 minutes.  Of those 11 minutes, Mr. Carter was under

10   the control of officers for about six.

11        We are here today about a *Terry* stop that produced

12   essentially a six-minute detention with no injuries.  The first

13   phase of this trial will be what I refer to as the why phase.

14   Why was the Adam's vehicle stopped on September 2, 2018?  The

15   second phase will be the how.  How was the traffic stop handled?

16   One is why, two is how.

17        As I said, the plaintiff goes first generally on these

18   issues, and we would ask that you wait for the defense to either

19   cross-examine or use their evidence before you start making up

20   your minds.

21        Now, with respect to the trial of this case, the

22   lawyers present to you the facts, and we do that using witnesses

23   and exhibits, documents and video.  Then, we're permitted at the

24   end to present our analysis of how the facts apply to the law.

25   It is the Judge who instructs you on what the law is.  The

71

1    lawyers' job is to introduce the facts, have you meet the

2    witnesses, consider the exhibits, listen to what the Judge has

3    to say, the law is, and then we'll have an opportunity to argue

4    how those two interact.

5            While the lawyers may offer you their analysis, it is

6    just that.  In fact, it is called argument.  We would prefer it

7    be referred to as analysis, but it is called argument.

8            The lawyers have been working on this case for years,

9    on this case for years.  So when I stand here and tell you these

10   are what the witnesses are going to say, it is because I already

11   know what they're going to say.  We had the opportunity to take

12   their depositions.  Carl Anderson, the man who stopped in front

13   of Officer Kaine and reported the facts and the inferences that

14   lead Officer Kaine to initiate this *Terry* stop, has been

15   deposed.  He's testified under oath.  We know what he's going to

16   say.  We videotaped his deposition.

17           Depositions are sworn testimony of the same gravity as

18   presented in the courtroom.  It is under oath.  It is in front

19   of a court reporter.  In this case, it is videotaped.  You won't

20   have to guess what Mr. Anderson told Officer Kaine.  He'll tell

21   you what he told him.  It wasn't there was a gun in the car.

22   That's not what Mr. Anderson told Officer Kaine.  He had been

23   proceeding generally westbound, and it is actually on Burleigh.

24   The Court indicated North.  It was actually Burleigh.  He was

25   proceeding westbound on Burleigh Avenue, and Officer Kaine was

72

1    stationed where 106th Street --

2              I'm going to continue on.  If the map pops up, we'll

3    take a look at it.  Part of it is because I'd like you to see

4    the video.

5              THE COURT:  We'll get a technician to get it.

6              MR. WIRTH:  I'll continue on until we get to that

7    point.  106th Street ends at Burleigh.  Officer Patrick Kaine

8    has his squad stationed kind of at the stop sign so to speak

9    watching traffic go by on Burleigh.  One of the cars that goes

10   by on Burleigh is the blue Lexus of Ms. Adams.  Another car is

11   the blue Chevrolet of Carl Anderson.

12             Here's what Carl Anderson tells Officer Kaine.  He's

13   proceeding westbound.  The Adams' Lexus passes him on the left.

14   He's going the speed limit so he notices it because it is going

15   above the speed limit.  He looks over.  As he sees the car go by

16   him, like, what the heck.  What he sees is an individual in the

17   back seat between the two front seats leaning forward with his

18   arm over the front seat passenger holding what he thinks is a

19   gun.  He doesn't report there's a gun in the car.  He reports an

20   armed robbery.

21             Whole different story.  Carl Anderson will tell you

22   that scared him.  He saw -- He looked directly at the occupants

23   of the car.  What he did is as he's going, he's about to call

24   911, but then he sees at 106th and Burleigh Officer Kaine's

25   squad.  So he does kind of a mini U-turn to go back and then

73

March 13, 2023

1    turns onto 106th Street and has this conversation with Officer

2    Kaine.

3            Officer Kaine rolls down his window, and it is kind of

4    staggered a little bit.  Officer Kaine rolls down his window.

5    Mr. Anderson rolls down his window and is, like, what can I do?

6    And Mr. Anderson tells him, there is a robbery going on in that

7    blue Lexus.  Black man in the back seat, two older white women

8    in the front seat.  What?  Where?  Where?  That blue Lexus at

9    the stop light, robbery in progress.

10           Officer Kaine will tell you he has about 15 seconds to

11   decide what to do with this because they are in a car.  They are

12   going up Burleigh.  But at that point, they are at a stop light,

13   so he makes the decision that he will institute this *Terry* stop.

14   He makes the decision that when someone approaches you and says

15   I have witnessed an ongoing robbery in that car right there,

16   identifies the occupants, identifies the car, identifies the

17   direction of travel, that that makes a reasonable police officer

18   suspicious.

19           As you heard, the concept of reasonable suspicion is

20   attributable to a case called *Terry v. Ohio*.  You're probably

21   wondering, is there a definition of reasonable suspicion?  Not

22   really.  What the United States Supreme Court essentially said

23   the Fourth Amendment, there's the guess.  There's guesswork I

24   feel like it.  There's probable cause, which allows you to

25   arrest someone.  Somewhere in that divide is reasonable

74

 1    suspicion where you can stop someone.  And what the United

 2    States Supreme Court has said is the Fourth Amendment does not

 3    require a policeman who lacks the precise level of information

 4    necessary for probable cause to arrest to simply shrug his

 5    shoulders and allow a crime to occur or a criminal to escape.

 6         This is the supreme court telling you this.  On the

 7    contrary, *Terry* recognizes that it may be the essence of good

 8    police work to adopt an intermediate response.  The intermediate

 9    response in this case is to stop the vehicle, identify it, stop

10    it, observe that, in fact, there is an African American

11    individual in the back seat and two older white women in the

12    front.  Order that individual out.  That's phase one.

13         As I said, the Judge will instruct you on the law.

14    The Judge will also be the person who hands you the special

15    verdict form, the questions you will answer at the conclusion of

16    this trial.

17         The burden of proof.  You've heard that phrase before.

18    The burden of proof is generally in the special verdict

19    questions upon the side upon the parties that wants you to

20    answer a question yes.  So it is the plaintiffs' burden of proof

21    in this case to have you read the question that will say

22    something along the lines of on September 2, 2018, did Officer

23    Patrick Kaine stop or seize the Adams' vehicle without

24    reasonable suspicion?  They have to make you more probable than

25    not come to the conclusion that when a person reports an ongoing

75

1   armed robbery in a moving vehicle, that's not suspicious.

2          Consequently, we believe the facts in this case as you

3   will hear them from the witnesses, there's only two that know

4   what was said.  You will be able to answer that question no.  In

5   other words, you'll be able to say come on, of course there's

6   reasonable suspicion.  Of course when a police officer is told

7   that car, those people, gun, ongoing robbery, the police officer

8   is obligated to make a stop.  That is the end of phase one.

9   You'll be asked that question.  We will ask that you answer it

10  no.  No, he did not stop them without reasonable suspicion.

11         Officer Kaine will also testify.  Officer Anderson

12  will testify --  Mr. Anderson will testify that he observed an

13  ongoing robbery and a gun, and he reported it to the police.

14  What about Officer Kaine?  What will he testify?  Officer Kaine

15  will testify that he was monitoring traffic.  An individual came

16  roaring up to him, had this conversation.  And as he was saying

17  wait, which car, Mr. Anderson was getting more and more

18  agitated.  They are getting away.  Which car?  That car, that

19  blue Lexus heading toward the stop lights.

20         Well, okay.  Tell me.  I can't tell you more.  They

21  are getting away now at which point Officer Kaine says to

22  Mr. Anderson okay, you either wait here or you follow me, and he

23  pulls out into traffic.  We're now in phase two.

24         Phase one is did he have reasonable suspicion to

25  initiate that stop?  Obviously, he did.  That one will be easy.

76

1    That will be a no answer.  The second one is okay now the stop

2    has become initiated, the how.  How was the stop performed?

3              When an officer is told there's an ongoing robbery in

4    a moving vehicle, that is what's called a high-risk traffic

5    stop.  It is high risk to the officers.  It is high risk to the

6    potential victims.  It is high risk to the public.  So a

7    high-risk traffic stop is kind of a red alert, so you'll hear

8    that within seconds he radios in report of a robbery, going to

9    make a stop.  That comes over the speaker system in the police

10   department.  It comes over the PA ban across the police radios,

11   and it initiates a practice where back up is called.

12             So I'm going to walk you through the stop itself, and

13   then I'll sit down.  Blue Lexus.  Individual.  Two individuals

14   in the front.  For the first 30 seconds, the sound doesn't come

15   on.  After the first 30 seconds sound comes on.  Ms. Adams

16   begins to change lanes wondering like we all do, please don't

17   let that police officer be behind me, but he is.

18       (Whereupon tape is played.)

19             And so what you will notice is where Officer Kaine

20   pulls Ms. Adams' vehicle over near where that Mayfair Collection

21   is on Burleigh.  Activates sirens.  Two things.  One, this

22   vehicle is about a block away from the freeway onramp.  Officers

23   know if that vehicle makes it to the freeway, it could be gone.

24             Two, Officer Kaine has called in a high-risk traffic

25   stop.  Two, Ms. Adams complies, okay.  She doesn't run.  She

77

1   doesn't head for the freeway.  And of course, we're sitting here

2   in March of 2023, so I know it's Akil Carter in the back seat.

3   You know it's Ms. Adams driving.  You know it's Ms. Barr in the

4   passenger seat.  Obviously, none of that wasn't known in

5   September of 2018.

6         But here's the first thing.  Pull her over, and she

7   complies.  Okay.  So Officer Kaine sits behind her and waits for

8   back up.  So there's literally, I mean there's literally four

9   minutes of just waiting.  So I'm going to skip that, and we go

10  to -- So at this point, we've got -- That's the first time

11  Officer Kaine makes contact with the occupants.  At this point,

12  lieutenant now Captain Vetter pulls up behind him.

13        But Officer Kaine will tell you at this point, he

14  opens his car door, and he stands in that kind of V while he

15  watches this.  And he waits for his lieutenant, his captain.  So

16  there is no threat.  There's no breaking any windows.  There's

17  no pulling anybody out of the car.  He's waiting and observing

18  the scene.

19        See my little time sheet here.  Officer Vetter is now

20  there.  Let's go up to the next thing that happens which is --

21  which you will hear, okay.  That is Officer Kaine and Captain

22  Vetter deciding what they're going to do.  In a true high-risk

23  traffic stop what they're going to do is they're going to wait

24  for angled back up to flank the car.  They are going to wait for

25  a car in front to pull up to stop it from moving forward.

78

 1    comes around the car and takes his gun out and puts it down in

 2    what's called the low-ready position.  He doesn't aim it at

 3    anybody.  He's got to cover Captain Vetter while he's

 4    handcuffing Mr. Carter.

 5          So Officer Kaine comes out with the gun like this.

 6    They handcuff Mr. Carter.  They walk him back to the patrol car.

 7    They don't even close the door, okay.  The level is now down to

 8    here.  They are deescalating what could be an extra ordinarily

 9    tense situation, a moving armed robbery.  They have now

10    deescalated to seating Mr. Carter in the back of the car with

11    the door open.

12          You'll see Officer Kaine come around what's called a

13    cover position.  Now, what's going to happen next I'll probably

14    skip forward a few seconds, but what's going to happen next is

15    once he walks Mr. Carter back to the back seat, Officer Kaine

16    has one --  the potential danger now of the potential suspect as

17    they are trying to figure out under a *Terry* stop what's going

18    on, is there any crime underway?  The potential danger that may

19    have been represented by Akil Carter has now been essentially

20    neutralized.

21          There's one more thing to do.  Unfortunately probably

22    the only quasi dangerous thing is now the passenger door opens

23    up and someone gets out.  We're going through this entire

24    deescalation and the passenger door opens up.  Imagine you're

25    the officers.  The last thing you want to do is the door open

81

March 13, 2023

1               C E R T I F I C A T E

2

3          I, SUSAN ARMBRUSTER, RPR, RMR, Official Court Reporter

4    for the United States District Court for the Eastern District of

5    Wisconsin, do hereby certify that the foregoing pages are a true

6    and accurate transcription of my original machine shorthand

7    notes taken in the aforementioned matter to the best of my skill

8    and ability.

9

10   Signed and Certified July 20, 2023.

11   /s/Susan Armbruster

12   Susan Armbruster

13

14                    Susan Armbruster, RPR, RMR
                      United States Official Reporter
15                    517 E Wisconsin Ave., Rm 200A,
                      Milwaukee, WI 53202
16                    Susan_Armbruster@wied.uscourts.gov

17

18

19

20

21

22

23

24

25

214

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| AKIL K. CARTER, PAULETTE H. BARR, and SANDRA K. ADAMS, | |
| Plaintiffs, | Case No. 19-CV-1422-JPS |
| v. | |
| CITY OF WAUWATOSA, JAMES MACGILLIS, PATRICK KAINE, LUKE VETTER, NICOLE GABRIEL, and DEREK DIENHART, | **ORDER** |
| Defendants. | |

After a history of what the Court has previously described as "clumsy motion practice," ECF No. 83 at 3, together with trial delays stemming from inadequate preparation, *see* ECF No. 113, the above-captioned case was reset for trial beginning on March 13, 2023. In preparation for the rescheduled trial, the Court held a final pretrial conference on February 8, 2023, at which time the Court distributed to counsel "its draft of what it sees as an appropriate set of jury instructions and [a] verdict form, reflecting that [the] case should only proceed to trial as to Defendant Kaine, with Kaine and Carl Anderson as [the] primary witnesses." ECF No. 132 at 1; *see also* ECF No. 133 at 2, 4 (hearing transcript). The Court also stated:

> I don't find, at least on the state of what the Court has been able to glean from the Final Pretrial Report and the Court's earlier decision on summary judgment, that there's any need for expert testimony in the case, whether from Mr. Landers or the Wauwatosa Equity Inclusion Commission or the Chief of Police, whether Mr. Weber or his successor. If the Court be in

error on any of these preliminary thoughts, we'll address them during the trial. . . .

[W]hen it comes to your witnesses, based on the Court's preliminary review, there will be no need for the custodian of records at the University of Wisconsin, Milwaukee. The expert witness Mr. Sean Lowe, Mr. Dwight Johnson. . . .

But as you will see in the jury instructions, there is[. . .][,] at least at the moment[,] no Monell claim, no training claim keeping in mind that what occurred with respect to Officer Kaine's interactions with the three plaintiffs occurred in a period of probably 11 to 15 minutes, and it was based upon an articulated tip from Mr. Anderson. There was, in the Court's view, no racial profiling associated with what occurred here, and so that is a rabbit hole that need not be visited because it has no application to the core facts of the case. . . .

I'll strongly commend that you meet and confer and review what the Court has put together for jury instructions and a verdict form. And if the Court is missing something, we'll be happy to entertain your further request.

ECF No. 133, 6–7. At that hearing, Plaintiffs' counsel posed no questions about the Court's approach nor took any exception to the Court's comments. *See generally id.*

Presently before the Court is Plaintiffs' expedited "motion to reconsider the Court's February 8, 2023 rulings," ECF No. 134. Plaintiffs bring their motion pursuant to Federal Rule of Civil Procedure 54(b), which allows the Court to "revise[] at any time before the entry of judgment" "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties." Fed. R. Civ. P. 54(b). Plaintiffs argue that the Court, at the February 8 hearing, limited the number of defendants and claims that may proceed to trial, effectively issuing a summary judgment ruling without giving the parties notice and an opportunity to respond. ECF No. 134 at 1–3. Plaintiffs also

argue that, since the Court's most recent summary judgment order, ECF No. 108, no change in the factual record has occurred that might justify this change in the Court's position. *Id.* Finally, Plaintiffs argue that the Court was clearly in error and committed manifest injustice when it stated that the testimony of certain of Plaintiffs' witnesses would not be necessary at trial. *Id.* at 3–4. All this, Plaintiffs argue, amounts to error that may be corrected upon a Rule 54(b) motion.

Defendants oppose the motion. ECF No. 136. Defendants have not quite responded in substance to Plaintiffs' arguments; rather, their opposition rests on the argument that the Court's statements at the February 8 hearing were not error and, rather, reflected a reasonable response to Plaintiffs' record of "failure to comply with the orders of the court" and "pattern of dilatory or sanctionable conduct" in this case, including Plaintiffs' failure to disclose certain pretrial submissions to Defendants. ECF No. 136 at 2, 3–4.

Motions for reconsideration under Rule 54(b) of orders and decisions that adjudicate fewer than all the claims or the rights and liabilities of all parties are appropriate in very few contexts. The motions may be brought where the Court has "patently misunderstood a party," "has made an error not of reasoning but of apprehension," or where there has been a "controlling or significant change in the law or facts since the submission of the issue to the Court." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990). Reconsideration is "not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion." *Caisse Nationale de Credit Agricole v. CBI Indus.*, 90 F.3d 1264, 1270 (7th Cir. 1996).

The Court will deny Plaintiffs' motion. To begin, it is not clear what order or decision there is to reconsider. During the February 8 conference,

the Court, to be sure, expressed an opinion as to the merits of certain claims in this case—but nonetheless made clear that the jury instructions it distributed then were in draft form, and characterized its statements on the necessity of certain witnesses at trial as "preliminary" findings. ECF No. 133, 2, 4, 6–7. Plaintiffs' argument that the Court effectively granted summary judgment on some of their claims overreaches; if the Court intended to vacate its prior order on summary judgment, it would have said so explicitly.

To the extent these statements during the hearing constitute a definitive ruling, as to the claims and defendants in this case, that can be revisited on a Rule 54(b) motion, they are consistent with the Court's findings in its Order on summary judgment that the core issue in this case, indeed the issue on which all the other claims turn, is whether Officer Kaine had reasonable suspicion to initiate the vehicle stop of Plaintiffs. *See* ECF No. 108 at 29–32; *see also id.* at 34 ("Without a determination of whether any underlying constitutional violation occurred, the Court cannot say one way or another whether the City of Wauwatosa can be liable for it."). All the other federal claims in this case rise and fall on the jury's determination of that question. As to Plaintiffs' state law claims, the Court expressly reserved ruling on those matters until the federal claims were resolved. *See id.* at 36.

The Court's statements during the February 8 hearing reflects its reasoned judgment—upon review of the record in this case—that the jury members' and the Court's time will likely be best spent contemplating a smaller number of questions than Plaintiffs might prefer. *See Fuery v. City of Chicago*, 900 F.3d 450, 452 (7th Cir. 2018) (quoting *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) and noting that "[d]istrict courts 'possess certain inherent powers . . . to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'"). Similarly, to the

extent the Court's statements constituted a definitive ruling on any of Defendants' motions *in limine* related to the testimony of certain witnesses, such rulings are committed to the broad discretion of the trial court, *see Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002), and in any event "may be revisited based on the court's exposure to the evidence at trial." *In re Depakote*, 87 F. Supp. 3d 916, 920 (S.D. Ill. 2015) (citing *United States v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989)).

The Court is therefore unable to conclude that any of the bases for granting a motion for reconsideration are present under these circumstances. *See Bank of Waunakee*, 906 F.2d at 1191. To be clear, Plaintiffs remain free to pursue at trial the claims delineated in their complaint, muddled as they may be. *See* ECF No. 108 at 2, n.3 (noting that the Court was forced to "adopt[] Defendants' construction of Plaintiffs' federal constitutional claims"). Plaintiffs also remain free, before or at trial, to submit an offer of proof as to the evidence they would like to present. *See* Fed. R. Evid. 103. Both parties remain free to raise objections and engage in motion practice during trial. The jury instructions and verdict form will be finalized after the close of evidence.

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion for reconsideration, ECF No. 134, be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin this 3rd day of March, 2023.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

AKIL K. CARTER, PAULETTE H. BARR,
and SANDRA K. ADAMS,

                        Plaintiffs,                                 Case No. 19-CV-1422-JPS

v.

CITY OF WAUWATOSA, BARRY
WEBER, PATRICK KAINE, LUKE
VETTER, NICOLE GABRIEL, DEREK                          **AMENDED**
DIENHART, JOHN DOES 1–3 and JANE               **TRIAL SCHEDULING**
DOES 1–3,                                                            **ORDER**

                        Defendants.

---

On August 10, 2022, the Court denied the parties' cross-motions for summary judgment. ECF No. 108. Accordingly, the case was set to proceed to trial on August 22, 2022. *See* ECF No. 84 (prior trial scheduling order). However, due to the parties' failure to conform their pretrial submissions to the Court's orders, the trial was adjourned pending further submissions from the parties. ECF No. 113. Although the parties have informed the Court that they remain in contact in regard to their pretrial submissions, ECF Nos. 114 and 116, they have not yet submitted such materials. The Court will therefore set the case for trial according to the schedule set forth in this Order.

The requirements applicable to pretrial materials as set forth in the previous Trial Scheduling Order, ECF No. 84, remain in place and must be carefully followed. The parties' motions in limine, ECF No. 105 and 106, and motion to exclude, ECF No. 107, remain pending; should a party wish

APPX. 000071

to withdraw any of these motions, they may do so by motion pursuant to Local Rule 79(c).

In order that the above-captioned litigation—now pending since September 2019—be brought to conclusion, the following dates[1] have been set before the Honorable J.P. Stadtmueller in the United States District Court for the Eastern District of Wisconsin, Room 425 United States Courthouse, 517 East Wisconsin Avenue, Milwaukee, Wisconsin, 53202:

| | |
|---|---|
| **FINAL SETTLEMENT REPORT:** | **Friday, January 20, 2023** |
| **MOTIONS IN LIMINE:** | **Friday, January 27, 2023** |
| **RULE 702 MOTIONS:** | **Friday, January 27, 2023** |
| **FINAL JOINT PRETRIAL REPORT:** | **Wednesday, February 1, 2023 at 2:00 PM** |
| **FINAL PRETRIAL CONFERENCE:** | **Tuesday, February 7, 2023 at 8:30 AM** |
| **JURY TRIAL:** | **Monday, March 13, 2023 at 8:30 AM** |

Where not otherwise specified, the parties should follow the standard deadlines as set by the Federal Rules of Civil Procedure and the

---

[1] No deadline for dispositive motions is set in this Trial Scheduling Order. Because this has previously been a source of contention for the parties, and moreover in light of the fact that the Court has identified disputes of fact that preclude summary judgment, ECF No. 108, the Court makes it absolutely clear that **no further dispositive motions will be accepted** from any party.

local rules. Motions for extensions of time will not be looked upon favorably. The parties and their counsel are bound by the dates set herein, and no extensions or continuances will be granted in the absence of good cause shown.

Dated at Milwaukee, Wisconsin, this 12th day of December, 2022.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

Page 3 of 3

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| AKIL K. CARTER, PAULETTE H. BARR, and SANDRA K. ADAMS, | |
| Plaintiffs, | Case No. 19-CV-1422-JPS |
| v. | |
| CITY OF WAUWATOSA, BARRY WEBER, PATRICK KAINE, LUKE VETTER, NICOLE GABRIEL, DEREK DIENHART, JOHN DOES 1–3, and JANE DOES 1–3, | **ORDER** |
| Defendants. | |

## 1.     BACKGROUND

This action arises from a police-initiated traffic stop in September 2018. Plaintiffs Akil Carter, Paulette Barr, and Sandra Adams bring this action, alleging violations of federal and state law, against Defendants the City of Wauwatosa; Barry Weber ("Chief Weber"), Chief of Police of the City of Wauwatosa at the time this action was filed;[1] and Patrick Kaine, Luke Vetter, Nicole Gabriel, Derek Dienhart, and six John and Jane Doe

---

[1]Plaintiffs state that Barry Weber is named only in his official capacity (although this is not clear from the face of their complaint). *See* ECF No. 104 at 3. As Defendants point out, Barry Weber retired as Chief of Police in 2021. ECF No. 97 at 17. His successor, James MacGillis, will be substituted as a defendant. *See* Fed. R. Civ. P. 25(d). However, since the parties have consistently referred to Defendant *Weber* in their summary judgment briefing, the Court will do the same in this order.

officers,[2] all law enforcement officers employed by the City of Wauwatosa Police Department ("WPD") (collectively, the "Officer Defendants"). ECF No. 1-2.

Plaintiffs primarily allege that Defendants violated their constitutional rights during a traffic stop.[3] *Id.* The three bases Plaintiffs appear to allege to support their Fourth Amendment unlawful search and seizure claim are (1) Defendant Kaine initiated a traffic stop of Plaintiffs' vehicle without a sufficient legal basis to do so, (2) Defendant Kaine conducted an investigative detention of Plaintiff Carter, pursuant to the

---

[2]Defendants also point out that the John and Jane Doe officer defendants named in the original complaint have not subsequently been identified or named in an amended complaint. ECF No. 97 at 29. Because Plaintiffs' time to amend their complaint has expired, *see* Fed. R. Civ. P. 15(a)(1), and because Plaintiffs' own summary judgment submissions make no mention of the John and Jane Doe officer defendants, these defendants will be dismissed from the case.

[3]Plaintiffs' complaint states that the action "is brought under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution." ECF No. 1-2 at 2. Two of the ten counts in the complaint allege federal causes of action. Count One does not state which specific constitutional right(s) the Defendants allegedly violated, but rather asserts "Violations of the Plaintiffs' Civil Rights Under 42 USC § 1983" as the cause of action. *Id.* at 11. Likewise, Count Two is entitled "*Monell* liability" without specifying which specific constitutional rights the City of Wauwatosa's acts violated.

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution." *Baker v. McCollan*, 443 U.S. 137, 144, n.3 (1979). By extension, *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) also cannot be read to confer substantive rights. Before exploring liability under § 1983, the Court must "isolate the precise constitutional violation" Defendants allegedly committed. *Baker*, 443 U.S. at 140. The Court adopts Defendants' construction of Plaintiffs' federal constitutional claims and each of their factual bases as arising under the Fourth Amendment's prohibition against unlawful search and seizure, as applied to the states by the Fourteenth Amendment. *See also* note 16 *infra*.

Page 2 of 38

traffic stop, which exceeded the scope of the legal basis for the stop, and (3) the Officer Defendants used excessive force against Mr. Carter during this investigation. *Id.* The Officer Defendants are sued in their individual capacities for these alleged violations. Plaintiffs also sue the City of Wauwatosa, arguing municipal liability under *Monell* for the alleged Fourth Amendment violations due to a de facto policy to allow, and/or a failure to train, discipline, and supervise WPD employees to avoid, racial profiling or constitutional violations in WPD-administered traffic stops. *Id.* at 11–16.

Plaintiffs allege an array of state- and common-law claims against the Officer Defendants as well. *Id.* at 16–20; *see also* ECF No. 104 at 3. Plaintiffs allege that the Officer Defendants violated Plaintiffs' rights under the Wisconsin Constitution to due process, to equal treatment, and to be free from unreasonable search and seizure. ECF No. 1-2 at 16–18. Plaintiffs further assert a claim of negligence based on the circumstances under which the Officer Defendants both initiated and continued the traffic stop; one claim each of both negligent and intentional infliction of emotional distress; a claim of false imprisonment; and a claim of negligent hiring, training, and promotion. *Id.* at 16–20.

This case—set for a jury trial on August 22, 2022—has been pending for almost three years. Defendants removed this action from Milwaukee County Circuit Court to the Eastern District of Wisconsin and it was assigned to this Court on September 30, 2019. ECF No. 1. After a series of modifications to the briefing schedule and extensions of time; denial of the parties' initial cross-motions for summary judgment, ECF No. 65; denials of various motions related to discovery disputes, ECF Nos. 83 and 90; and two

APPX. 000076

mediation sessions that failed to resolve the litigation, the parties chose to file dispositive motions on the eve of trial.

On July 19, 2022, Defendants filed a motion for summary judgment and, in keeping with applicable protocols, a joint statement of facts. ECF Nos. 95 and 96. On July 26, 2022, Plaintiffs filed an amended cross-motion for partial summary judgment that adopted the joint statement of facts. ECF No. 100. Plaintiffs then filed their response to Defendants' initial motion for summary judgment on August 2, 2022, along with a statement of the facts they dispute. ECF Nos. 103 and 104.

Although the motions are not yet fully briefed, the Court has determined from the parties' submissions that sufficient disputes of fact exist such that summary judgment for either side is precluded; further response and reply briefs would not alter this conclusion.[4] Accordingly, the Court is obliged to deny the parties' cross-motions for summary judgment.

2.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a

---

[4]This is not the first time in this case that the Court has taken the step of ruling on the parties' motions before full briefing. *See* ECF No. 65 at 1 (denying cross-motions for summary judgment to prevent further instances of the parties' "protracted and resource-draining approach to resolving litigation").

reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). "The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs 'that [the court] leave[s] those tasks to factfinders.'" *H–D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1010 (E.D. Wis. 2018) (quoting *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010)). "[T]he non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

**3.    RELEVANT FACTS**

Alongside Defendants' opening brief, the parties submitted a joint statement of material facts. ECF No. 96. The Court will adopt the relevant[5] agreed-upon facts with minor, non-substantive edits.[6]

---

[5]Almost five pages of the parties' joint statement of facts is the contents of a report from Plaintiffs' expert witness, Brian Landers. The Court has excised this material. Even if the parties have stipulated to inclusion of this material as a "fact," the decision to credit expert witness testimony is for the jury, not the Court. Plaintiffs may not stipulate their way out of the basic allocation of courtroom decision-making power.

[6]Video and audio recordings of the traffic stop of Plaintiffs have been submitted, and the Court will adopt the parties' underlying citation to these materials when the joint statement of facts quotes verbal statements directly from them (but will exclude underlying citations to video imagery). Similarly, the Court will adopt the parties' underlying citation to deposition transcripts where they are quoted directly.

Page 5 of 38

### 3.1     The Traffic Stop

On September 2, 2018, Plaintiff Sandra Adams was driving a blue Lexus vehicle with Plaintiff Paulette Barr riding in the front passenger seat and Plaintiff Akil Carter riding in the back seat. *Id.* at 1. Mr. Carter is the grandson of Ms. Barr. Ms. Adams and Ms. Barr are Caucasian. Mr. Carter is African American. *Id.*

Defendant Patrick Kaine ("Officer Kaine") and Carl Anderson, a citizen and a witness in this case, have testified that, on September 2, 2018, at approximately 11:50 a.m., Mr. Anderson contacted Officer Kaine who was in a marked Wauwatosa Police Department squad parked near North 106th Street and West Burleigh Street. *Id.* Mr. Anderson reported to Officer Kaine that he saw what he believed to be "a possible robbery that's taking place in that blue Lexus that's going westbound on Burleigh." *Id.* (quoting ECF No. 62[7] at 35 (Anderson deposition transcript)). Officer Kaine testified in his deposition that Mr. Anderson was speaking in an excited manner. *Id.* (citing ECF No. 78-2 at 46:16–22).

Mr. Anderson also testified in his deposition that he told Officer Kaine that he saw something in Mr. Carter's[8] hand, which Mr. Anderson described as follows:

---

[7]The joint statement of facts cites to Mr. Anderson's deposition transcript by the ECF docket number assigned to it when Plaintiff originally filed it under seal. The deposition transcript is not sealed and is viewable at ECF No. 62. The Court has updated references to Mr. Anderson's deposition transcript accordingly.

[8]The parties have stipulated to this phrasing. However, in his deposition testimony, Mr. Anderson does not refer to Mr. Carter by name or indicate that, at the time he allegedly spoke with Officer Kaine, he had identified the person in the vehicle as Mr. Carter. *See* ECF No. 62 at 40–43.

A. I said it was a long black object in his hand, it may be a gun. It looked like a gun.

Q. But it wasn't longer than this iPhone?[9]

A. I didn't see—I only saw maybe about two or three inches of it because the right hand was—his right hand was over her left shoulder.

*Id.* at 2 (quoting ECF No. 62 at 42 (Anderson deposition transcript)).

Officer Kaine then notified dispatch: "I just got flagged down at Mayfair and Burleigh that there is an individual robbing two females in a blue Lexus." *Id.* (quoting ECF No. 94-1 at 0:00-0:20 (radio dispatch transcript)). Dispatch assigned Officers Nicole Gabriel and Derek Dienhart to assist with the traffic stop. Lieutenant Luke Vetter ("Lieutenant Vetter") was also near the area and heard Officer Kaine radio regarding the robbery complaint and responded to assist. *Id.*

Officer Kaine also radioed dispatch to send someone to try to locate the citizen who flagged him down and provided the following information: that the vehicle of "the citizen who flagged me down may be either behind me or over at 107th and Burleigh" and was a "blue Chevy" containing a "black male driver" and "another person in the passenger seat." *Id.* (quoting ECF No. 94-1 at 1:55–2:12 and citing ECF No. 93-5 at 01:19–01:32 (footage from front-facing camera in Officer Kaine's squad vehicle)). Police Officer Julie Gibbs went to the surrounding area of North 106th Street and West Burleigh Street but did not locate the vehicle or the complainant that had flagged Officer Kaine down. *Id.*

---

[9]The parties agree that the iPhone referenced at this point during Mr. Anderson's deposition was an iPhone X. ECF No. 96 at 2.

Once traffic started to proceed westbound on Burleigh Street with the green light, Officer Kaine observed a blue Lexus, 2011, model ES350, 4-door, with Wisconsin plate number 212-GJZ, traveling westbound through the intersection. *Id.* There were no other blue Lexus cars in the intersection. *Id.* Officer Kaine proceeded westbound following the blue Lexus and observed that there was at least one person in the back seat and two people sitting in the front seats, but he could not distinguish any race until the car was stopped. *Id.* While following the Lexus, Officer Kaine did not observe the driver violate any traffic law. *Id.*

Officer Kaine testified as follows regarding following the Lexus:

> Q: Okay. As you're following this Lexus, what if anything do you observe the people in the car do?
>
> A. Nothing jumps out at me that they're doing this or that. They're just driving along, as far as I can tell.
>
> Q. They're going the speed limit or below the speed limit—
>
> A. From recollection, yes.
>
> Q. They're staying in the lane and not driving erratically, correct?
>
> A. Not that I can recall.
>
> Q. Do you see any people in the car make any furtive movements?
>
> A. No.
>
> Q. Other than the statement of the person in the blue Chevrolet, do you have any reason to believe that there is a violation of any kind occurring with this Lexus?
>
> A. No. No.

*Id.* (quoting ECF No. 78-2 at 55:4–20 (Kaine deposition transcript)).

Page 8 of 38

Officer Kaine then turned on his lights and initiated a traffic stop of the blue Lexus in the 11400 block of West Burleigh Street. *Id.* at 3. The blue Lexus pulled over at 11:51:00 a.m. *Id.* Officer Kaine waited for other officers to arrive and did not approach the vehicle. *Id.* While waiting for backup, Officer Kaine made verbal contact with the occupants of the blue Lexus through his squad car's PA and instructed "everybody put up their hands in the car." *Id.* (quoting ECF No. 93-5 at 01:42–01:54 (Kaine squad car dash footage)).

Lieutenant Vetter was the second to arrive on the scene. Lieutenant Vetter believed he was responding to "a robbery occurring inside a blue vehicle."[10] Upon arriving on the scene, he observed the stopped blue Lexus with two women in the front seat and one male in the back seat. Lieutenant Vetter also observed Officer Kaine standing outside of his squad car behind the open driver's side door for "some cover and safety." *Id.* (quoting ECF No. 94-3 at 32–33 (Vetter deposition transcript)). Lieutenant Vetter approached Officer Kaine and the two formulated a plan. *Id.*[11]

Once backup arrived, Officer Kaine ordered, "Person in the back seat. I need you to step out of the car with your hands up, facing away from us. Do you understand?" *Id.* (quoting ECF No. 93-5 at 05:10 (Kaine squad car dash footage)). The rear passenger side door then opened and a person, who was later identified as Mr. Carter, exited, and walked backwards

---

[10]The parties have not provided a citation to the record for this direct quote; it is sufficient that the parties have stipulated to its occurrence.

[11]The parties stipulate in the joint statement of facts that "Lieutenant Vetter never pointed his service weapon at Carter or any occupants of the Lexus." *Id.* at 4. However, the parties' fact statements do not address whether or when Lieutenant Vetter ever *un*holstered his service weapon.

Page 9 of 38

toward the officers, as instructed. *Id.* Mr. Carter was ordered to his knees. *Id.* Mr. Carter was placed in handcuffs by Lieutenant Vetter to detain him in order to further investigate the robbery complaint. *Id.* Mr. Carter was also patted down for weapons. *Id.* Mr. Carter was not armed. Mr. Carter remained calm and respectful throughout. *Id.*

Officer Derek Dienhart ("Officer Dienhart") heard Officer Kaine's dispatch communication and was dispatched to the area near 114th Street and West Burleigh Street to assist. He was the third officer on the scene and parked to the left of Officer Kaine's vehicle. *Id.* Officer Dienhart believed he was responding to a high-risk traffic stop. *Id.* When Officer Dienhart arrived on the scene, he observed both Officer Kaine and Lieutenant Vetter outside of their squad cars ordering a subject to walk backwards toward their vehicles. *Id.* The subject had his arms up. *Id.*

Officer Dienhart believed his role upon arrival was a cover officer. *Id.* Accordingly, Officer Dienhart got his rifle (an AR-15), exited his squad, and pointed the rifle at "a low ready position basically covering" the driver's side of the vehicle. *Id.* (quoting ECF No. 59-1 at 24:3–25:13 (Dienhart deposition transcript)). In the low ready position, the rifle was "not pointed at an individual or at the vehicle directly." *Id.* (quoting ECF No. 59-1 at 26:14–15). Officer Dienhart had "charged"[12] the AR-15. *Id.* Once Officer

---

[12]The parties employ the word "charged" without further explanation. The Court assumes this refers to the act of either chambering a round in the firearm or moving the firearm's hammer or firing mechanism to a position such that the firearm is ready to fire. *See Glossary of Firearms Terms*, WIKIPEDIA, https://en.wikipedia.org/wiki/Glossary_of_firearms_terms (last visited Aug. 5, 2022).

Page 10 of 38

Dienhart realized that "maybe this isn't what it was initially reported as" he "brought the gun down and had it pointed straight down at the ground." *Id.* (quoting ECF No. 59-1 at 29:19–24). Officer Dienhart was on the scene for approximately four minutes. *Id.*

Officer Nicole Gabriel was the fourth officer to arrive on the scene and her role was as an assisting officer. *Id.* at 4. Officer Gabriel believed she was responding to a robbery, and when she arrived on-scene she observed the other officers had a subject detained. *Id.* Lt. Vetter then escorted Mr. Carter to the back of Officer Kaine's squad car, where Mr. Carter was seated and turned over to Officer Gabriel until the investigation could be completed. *Id.*

Once Mr. Carter was secured, Officer Kaine holstered his gun[13] and approached the blue Lexus. *Id.* Officer Kaine never pointed his service weapon at Mr. Carter or at the occupants of the vehicle. *Id.* When Officer Kaine's service weapon was unholstered it was pointed "down to the side." *Id.* (quoting ECF No. 78-2 at 58:18–24 (Kaine deposition transcript)). When asked why he made the decision to carry his weapon unholstered and down, Officer Kaine testified:

> By the time I stopped the car, to that point, based on the behaviors of the driver of the blue Lexus and his grandmother who was in in the front passenger seat, I didn't get the feeling

---

[13]The parties do not state in the joint statement of facts, and Plaintiffs' statement of disputed facts does not address, when exactly Officer Kaine *un*holstered his service weapon. (The complaint alleges that Officer Kaine "ordered Mr. Carter out of the vehicle, while Officer Kaine had his firearm drawn." ECF No. 1-2 at 8.)

that they were the victims of a robbery in progress, which is
what I was told[.]

*Id.* (ECF No. 78-2, 59:7–22).

Officer Kaine spoke with the front seat passenger, Ms. Barr, and the
driver, Ms. Adams. Ms. Barr told Officer Kaine that Mr. Carter was her
grandson and there was no robbery. *Id.* Officer Kaine then apologized
multiple times and said that Mr. Carter was going to be released. *Id.* Officer
Gabriel further explained the situation to Mr. Carter and apologized for the
misunderstanding. *Id.* Officer Gabriel was on-scene with Plaintiffs for
approximately six minutes. *Id.* While on scene, Officer Gabriel never
unholstered her weapon. *Id.*

Once it was determined that the complaint was unfounded and that
there was no robbery in progress, the handcuffs were removed, and Mr.
Carter was released. *Id.* Mr. Carter was in handcuffs for approximately five
minutes. *Id.* Mr. Carter was in the back of the squad car for approximately
two minutes with the squad door open. *Id.* The total time between Officer
Kaine initiating the traffic stop and Plaintiffs being released from the scene
was approximately eleven minutes. *Id.*

After the officers determined the complaint was unfounded but
before Plaintiffs drove away from the scene, Officer Kaine is recorded in his
squad car video as telling Mr. Carter that there was a "black guy robbing
two white ladies." *Id.* at 5 (quoting ECF No. 93-5 at 12:01:13 (Kaine squad
car dash footage)). Defendant Kaine followed up that statement by telling
Ms. Carter the witness was "he himself was the color of yourself." *Id.* Kaine
is also heard telling Mr. Carter, "[I]t's not something I made up." *Id.*
(quoting ECF No. 93-5 at 12:01:45). After Mr. Carter was released, Officer

Page 12 of 38

Kaine is heard telling one of the other officers on scene that the basis for the stop was that he was told there was a "black dude robbing two white ladies." *Id.* (quoting ECF No. 93-5 at 12:02:22). In the immediate seconds, if not minutes, following the stop, Officer Kaine is heard explaining his stop to his colleagues that he was told one black male was "robbing" two white females. *Id.*

Officer Kaine's incident report, dated September 4, 2018, states that the driver of a "newer blue passenger car (possibly a Chevrolet)" who was a "M/B in his 40's" told him that "two black guys" were robbing a white female driver in the blue Lexus. *Id.* (citing to ECF No. 78-2 at 46 (Kaine deposition transcript)).[14] Officer Kaine's report quoted the language, "two black guys." *Id.* (citing to ECF No. 78-2 at 46). In his deposition, Officer Kaine testified that he recalled the tipster telling him "[t]hat there were two black guys in the back seat of a blue Lexus and that they were robbing a white lady." *Id.* (quoting ECF No. 78-2 at 48).

### 3.2    City of Wauwatosa and WPD Policies

The City of Wauwatosa does not have an express policy encouraging Wauwatosa Police Department officers to conduct race-based,

---

[14]The parties have not provided a copy of Officer Kaine's incident report. The quoted language in this sentence is attributed to ECF No. 78-2, Officer Kaine's deposition transcript. However, the quoted language does not appear in the deposition transcript. Additionally, the deposition transcript reflects that Officer Kaine was, at this point in the deposition, recounting his memory of the interaction with Mr. Anderson, not viewing his incident report, or recounting his memory of writing the report. The Court will nonetheless adopt this as a stipulated material fact.

unsubstantiated vehicle stops. *Id.* Wauwatosa Police Department Policy No. P17-12, "Racial Profiling," provides the following:

> Racial Profiling: Any police-initiated action that relies upon race, ethnicity, or national origin of an individual rather than the behavior of that individual, or information that leads the police to a particular individual who has been identified as being engaged in or having been engaged in criminal activity.
>
> Two corollary principles follow from this definition:
>
> Police must not use racial or ethnic stereotypes as factors in selecting whom to stop and whom to search[.]
>
> Police may use race or ethnicity to determine whether a person matches a specific description of a particular suspect.
>
> A sworn officer's decisions to stop, detain, question, investigate, identify, search, warn, cite, or arrest an individual will be based upon probable cause or reasonable suspicion and will not be based on racial profiling.
>
> A sworn officer may use gender, race, ethnicity, or national origin to determine whether a person matches a description of a particular suspect that they are lawfully attempting to locate.

ECF No. 96 at 6 (quoting ECF No. 93-2 (Chief Weber declaration)).

The Wauwatosa Police Department Policy No. P16-12 "Use of Force" provides the following:

> The nature of police work at times requires an officer to use force to perform his/her duties. The purpose of this policy is to provide our officers with guidelines on the use of deadly and non-deadly force.
>
> It is the policy of the Wauwatosa Police Department that police officers use only the amount of force reasonable and necessary to arrest, apprehend or control any person, or situation.

Page 14 of 38

The decision to use force is based on the facts and circumstances known to the officer at the time the decision to use force was made.

*Id.* at 6 (quoting ECF No. 93-3 (Chief Weber declaration)).

### 3.2.1   Plaintiffs' Disputed Facts

Plaintiffs do not dispute the language of the City of Wauwatosa's policies. In their statement of disputed facts, ECF No. 103, Plaintiffs offer the following facts, or characterizations of the underlying facts.

African Americans are 30 times more likely than Caucasians to be arrested in Wauwatosa. ECF No. 103 at 2. A 2021 report commissioned by the City of Wauwatosa and published on the City's website recommended changes, *inter alia*, to the Department's racial profiling policy, its methods of tracking demographic data in arrests, and its implicit bias training. *Id.* The study noted a "significant higher number of arrests" for Black/African American people than people of other races or ethnicities. *Id.* (quoting ECF No. 102-5 at 72–73 (Center for Public Safety Management report to City of Wauwatosa)).[15] The study also concluded the number of traffic stops conducted by WPD was "an enormous amount of activity" and recommended that the number of stops be curtailed. *Id.* (quoting ECF No. 102-5 at 45). The study made similar recommendations for officer-initiated

---

[15]The full text from which Plaintiffs excerpt the quoted text reads:

When examining individuals arrested by city residency (Milwaukee, Other, and Wauwatosa) by race for the years 2017, 2018, and 2019, there was a consistent pattern of a significant higher number of arrests for Black/African American, Other, and White individuals with residency in Milwaukee, as compared to Wauwatosa or [an]other residency.

ECF No. 102-5 at 73.

Page 15 of 38

"suspicious persons" stops and noted that these stops could be construed as consistent with racial profiling. *Id.* (quoting ECF No. 102-5 at 48).

### 3.3     The Officers' Training

Training of police officers in Wisconsin is governed by state law. *Id.* at 6. Wisconsin has established the Law Enforcement Standards Board to prescribe minimum requirements for police officer training. *Id.* Officers Kaine, Vetter, Gabriel, and Dienhart have met the minimum training requirements established by the State of Wisconsin to be certified as a police officer and have maintained their respective certifications throughout their employment with the City of Wauwatosa. *Id.* Officer Kaine is not only a certified law enforcement officer, but he also is an instructor for "driving for emergency vehicle operation." *Id.* In addition, Wauwatosa trains its officers annually on legal updates. *Id.*

When asked "what in your mind is the difference between the three kinds of stops?" referencing felony stops, contact stops, and non-contact stops, Defendant Kaine testified:

> The non-contact stop is where you don't – you don't approach the vehicle, but you engage, you have the subject exit his vehicle, and you can have him stand by the rear of his car, and you can stand by your car, and you just have a conversation.
>
> Felony is a high risk stop. Generally speaking, you want to have at least four officers at the scene. You set up your cars like this angled at the suspect vehicle about 50 feet behind the suspect vehicle. That's basically the high risk stop where one officer would be giving directions to the people in the vehicle. Eventually. . . they order the subject out of the car, walk backwards towards the officers, hands in the air, order them back basically to the front of the two vehicles, and then, if you want to do a full felony stop or high risk stop, you can order them down to their knees or prone. . . to the ground. Then one

> officer would be the arresting officer. Place them in handcuffs,
> sit them up, bring them back.

*Id.* (quoting ECF No. 78-2 at 22-24 (Kaine deposition transcript)).

When asked "what does a high[-]risk traffic stop look like versus a non-contact traffic stop," Vetter testified:

> There are going to be more squad cars, more officers. There will probably be a much higher level of force that's obvious, meaning weapons probably will be drawn and/or pointed at that vehicle and oftentimes loud commands being given, whether that's over a PA or just being hollered out at the car and occupants involved.

*Id.* (quoting ECF No. 94-3 at 24:25–25:7 (Vetter deposition transcript)).

### 3.3.1   Plaintiffs' Disputed Facts

Plaintiffs do not dispute the training the Officer Defendants received. In their statement of disputed facts, ECF No. 103, Plaintiffs offer the following facts, or characterizations of the underlying facts.

Officer Kaine and Chief Weber could not describe the three types of car stops trained by the Wisconsin Department of Justice. ECF No. 103 at 2. The Defendants gave varying responses to what constitutes "force." *Id.* Chief Weber could not articulate the force continuum used to train his officers. *Id.* Officers Vetter and Gabriel each testified that the implicit bias training they received from the Wisconsin Department of Justice was not particularly helpful. *Id.*

**4.    ANALYSIS**

Defendants move for summary judgment[16] on the following bases. First, they argue that the undisputed facts show that Officer Kaine's actions in initiating the traffic stop and conducting the ensuing investigation had an adequate legal basis (with the applicable standard being reasonable suspicion), and that his actions are protected by qualified immunity. Relatedly, they argue that Lieutenant Vetter and Officers Dienhart and Gabriel had no personal involvement in initiating the traffic stop and therefore cannot be held liable even if the traffic stop lacked a legal basis, or if they are liable, that they are protected by qualified immunity for any constitutional infirmities in the scope of the investigation because they were entitled to rely on Officer Kaine's legal conclusions. Second, Defendants

---

[16]Defendants' opening brief also argues that Plaintiffs' complaint fails to state a claim in two regards: (1) by failing to specify which claims are alleged against which Defendants, and in what capacity, thereby failing to put Defendants fairly on notice of what conduct they are each being sued for, and (2) by failing to adequately plead an excessive force claim. ECF No. 97 at 2, 5, 12. Defendants further suggest that the Court may dispose of Plaintiffs' complaint, at least in part, under the standard for a motion to dismiss rather than the summary judgment standard. *Id.* Plaintiff counters that Defendants have waived any sufficiency-of-the-claim defense by failing to raise it in a motion pursuant to Federal Rule of Civil Procedure 12. ECF No. 104 at 3.

Neither party's position is entirely correct. Challenges to the sufficiency of a claim under Federal Rule 12(b)(6) are "expressly preserved against waiver" and may be raised in the circumstances outlined in Rule 12(h)(2): in a responsive pleading, in a motion for judgment on the pleadings, or at trial. Fed. R. Civ. P. 12 Advisory Committee's Note to 1966 Amendment. But none of the circumstances in Rule 12(h)(2) apply here. The Court therefore finds it is appropriate to address the instant motions under the summary judgment standard, and *only* the summary judgment standard. As noted in notes 1 and 3, *supra*, the Court adopts Plaintiffs' statement in their response brief that Chief Weber is named in his official capacity and Defendants' construction of the causes of action alleged in Plaintiffs' complaint.

Page 18 of 38

argue that the Officer Defendants did not employ excessive force in detaining Mr. Carter, and that their actions are protected by qualified immunity. Third, Defendants argue that the City of Wauwatosa and Chief Weber cannot be held liable under *Monell* because Plaintiffs have failed to sufficiently establish that the Officer Defendants acted pursuant to a de facto municipal policy of conducting traffic stops in an unconstitutional and/or racially discriminatory way, or that their actions resulted from the City's or Weber's failure to train or supervise employees. Fourth, they move for summary judgment on all of Plaintiffs' state law constitutional claims, as not permitted by state law or precluded by sovereign immunity, and they move for summary judgment on all of Plaintiffs' common-law tort claims, as precluded by governmental immunity doctrines (and in the case of Plaintiffs' claims of intentional tort, as precluded by a lack of evidence of requisite mental state for such a claim). Fifth, they move for summary judgment on Plaintiffs' request for punitive damages, on the basis that Plaintiffs have failed to show the requisite mental state to recover such damages. Sixth, they move for summary judgment on Plaintiffs' request for injunctive relief, on the basis that Plaintiffs lack standing for such relief.

Plaintiffs move for partial summary judgment as follows. First, they argue that the undisputed facts show that Officer Kaine's actions in initiating the traffic stop and conducting the ensuing investigation lacked an adequate legal basis (with the applicable standard being probable cause), and that his actions are not protected by qualified immunity. Relatedly, they argue Lieutenant Vetter is liable for failure to intervene in a traffic stop he believed lacked an adequate basis in law. Second, they argue that the

APPX. 000092

Officer Defendants employed excessive force in detaining Mr. Carter and are not protected by qualified immunity.

The Court addresses each of these sets of arguments in turn.

## 4.1    Defendants' Traffic Stop of Plaintiffs

As a threshold matter, Plaintiffs suggest the Court should find that the traffic stop of Plaintiffs' vehicle was a full custodial arrest, rather than a brief investigative stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). ECF No. 100 at 13–17. Consequently, Plaintiffs argue that the Court may apply the probable cause standard to assess Defendants' actions for purposes of summary judgment. *Id.* However, the parties argue the *Terry* reasonable suspicion standard in their submissions on Defendants' motion for summary judgment, and Plaintiffs in their cross-motion concede that "the Court need not reach" a determination about the nature of the stop. *Id.* at 13. Considering this, the Court will conduct its analysis under the reasonable suspicion standard. In any event, significant disputes of material fact and credibility preclude the Court from granting summary judgment to Defendants under the reasonable suspicion standard—so, by extension, summary judgment could not be granted to Plaintiffs under a probable cause standard either. *See United States v. Raibley*, 243 F.3d 1069, 1074 (7th Cir. 2001) (comparing the reasonable suspicion and probable cause standards).

### 4.1.1    Basis for the Stop

Police officers may not perform investigatory stops of individuals without a reasonable, articulable suspicion that criminal activity has occurred or is afoot, as judged by an objective inquiry into all the circumstances the officer knows at the time of the stop. *See Huff v. Reichert*,

Page 20 of 38

APPX. 000093

744 F.3d 999, 1004 (7th Cir. 2014); *United States v. Snow*, 656 F.3d 498, 500 (7th Cir. 2011); *Smith v. Ball State Univ.*, 295 F.3d 763, 768 (7th Cir. 2002) ("[T]he legitimacy of a *Terry* stop depends upon an officer's ability to produce articulable facts giving rise to a reasonable suspicion that a defendant has been, is, or is about to be engaged in criminal activity.") (internal citations omitted). Reasonable suspicion requires more than a "hunch" of criminal activity. *Matz v. Kotka*, 769 F.3d 517, 522 (7th Cir. 2014).

Reasonable suspicion for an investigative stop may be based on "information supplied by another person," not just a police officer's personal observation. *Adams v. Williams*, 407 U.S. 143, 147 (1972). This includes anonymous tips. *Alabama v. White*, 496 U.S. 325, 327 (1990). An anonymous tip alone, without more, is not sufficient to justify a police officer's investigatory stop. *Florida v. J.L*, 529 U.S. 266, 266 (2000). But an anonymous tip may provide an adequate legal basis for an officer's investigative stop when the tip "exhibit[s] sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *White*, 496 U.S. at 327.

In assessing the indicators of reliability of an anonymous tip, courts look to whether "the tipster (1) asserts eyewitness knowledge of the reported event; (2) reports contemporaneously with the event; and (3) uses the 911 emergency system, which permits call tracing." *United States v. Watson*, 900 F.3d 892, 895 (7th Cir. 2018) (citing and distinguishing *Navarette v. California*, 572 U.S. 373, 400–01 (2014)). An anonymous tip that contemporaneously describes an "ongoing emergency," as opposed to describing "general criminality," may evince sufficient reliability to support that an officer had reasonable suspicion to act on it, provided the

Page 21 of 38

anonymous tip otherwise "allow[s] the police to test the informant's credibility." *United States v. Hicks*, 531 F.3d 555, 558–59 (7th Cir. 2008). An anonymous tip must be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Florida v. J.L.*, 529 U.S. at 271–72 (finding anonymous tip did not support reasonable suspicion because tipster did not "explain[] how he knew about the gun nor suppl[y] any basis for believing he had inside information about" the suspect he named).

The validity of Officer Kaine's decision to initiate a traffic stop of Plaintiffs' vehicle hinges on whether the tip bore sufficient indicia of reliability such that Officer Kaine was justified in relying on it.[17] The answer to this question depends on the resolution of factual disputes and credibility determinations. The Court is not authorized to resolve either as a matter of law, and therefore is obliged to deny summary judgment so that these disputes and determinations may be submitted to a jury.

First, the parties dispute how to characterize Mr. Anderson's tip to Officer Kaine, and indeed whether it was ever given at all. Defendants argue that the tip was not anonymous because, although Mr. Anderson did not provide his name, "Officer Kaine saw him, his vehicle, and observed his demeanor." ECF No. 97 at 7. This, they appear to argue (though they cite no case on point), makes the tip akin to a 911 call, which should be enough to get around the heavy emphasis that *Navarette* places on an anonymous tipster's use of the 911 system in assessing indicia of reliability.

---

[17]Since it is undisputed that Officer Kaine did not himself witness the blue Lexus in which Plaintiffs were traveling commit any traffic violation or see the occupants of the Lexus make any "furtive" movements, the validity of the traffic stop depends entirely on whether the alleged anonymous tip was reliable enough to establish that Officer Kaine had reasonable suspicion to initiate it.

Page 22 of 38

Plaintiffs (although they stipulate to Mr. Anderson's and Officer Kaine's statements in their depositions) dispute whether Mr. Anderson ever reported a tip to Officer Kaine at all. ECF Nos. 100 at 13 and 104 at 5–6. Further, Plaintiffs point out that when Mr. Anderson allegedly pulled his vehicle up next to Officer Kaine's squad car to relay his tip, Officer Kaine "does not get one single letter or digit of the license plate," "does nothing to document the conversation," and despite "the ability to manually turn on his front and rear squad cams," does not "record anything from this encounter." ECF No. 104 at 6–7. Plaintiffs, in other words, seemingly call on the Court to recognize the lack of any recording of or an effort to record the interaction (which would have occurred had the tip been given via the 911 system) as weighing more heavily against the tip's reliability.

The question of whether a tip was indeed an anonymous tip received within the 911 emergency system context, for purposes of assessing its reliability, has been found to present a factual dispute that precluded summary judgment. *Beal v. Beller*, 847 F.3d 897, 904–05 (7th Cir. 2017). In *Beal,* the plaintiff was stopped pursuant to an anonymous tip, subjected to a search that revealed drugs, and then prosecuted for drug possession. *Id.* at 899. His prosecution was dismissed after he prevailed on a motion to suppress the drugs, and he then brought a § 1983 action against the apprehending detectives' initial search. *Id.* at 900. The Seventh Circuit reversed the district court's grant of summary judgment to the detectives, due to fact disputes surrounding how the anonymous tip that led to the plaintiff's arrest was made, which dictated how the reliability of the tip should have been evaluated. *Id.* at 904–05. In doing so, the Seventh Circuit pointed out that *Navarette v. California*'s reasoning that an officer may

Page 23 of 38

justifiably rely on an anonymous tip when (in combination with other factors) the tipster makes their report to the 911 emergency system, applies where the anonymous tip was *actually made* to the 911 system. *Id.* Where there is a factual dispute over whether the 911 system's "features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity," *Navarette*, 573 U.S. at 400, were present in the reporting of the tip, a district court cannot rule on the tip's indicia of reliability as a matter of law. *Beal* at 905; *see also Watson*, 900 F.3d at 895 (finding reasonable suspicion did not exist partially because tipster used a stranger's phone to dial 911, therefore "*Navarette*'s rationale for deeming 911 calls reliable ha[d] less force").

The same logic applies here. To adopt Defendants' position, the Court would have to accept that a face-to-face, anonymous, unrecorded tip is perfectly analogous—as a matter of law—to an anonymous call placed to the 911 emergency system. The Court cannot do so, given that *Navarette*'s 911 traceability rationale is not present here. The Court would also have to find that the face-to-face, anonymous, unrecorded tip occurred, which the Court cannot do in a summary judgment posture, considering Plaintiffs' dispute of this key fact (and, as discussed below, the credibility determinations required to assess whether the tip provided a valid legal basis for the traffic stop).

Even setting aside this factor in the analysis, further fact and credibility disputes preclude summary judgment on the question of whether Mr. Anderson's tip bore sufficiency indicia of reliability to permit Officer Kaine to rely on it in stopping Plaintiffs. While it is true that Mr. Anderson's tip "asserts eyewitness knowledge of the reported event,"

APPX. 000097

*Watson*, 900 F.3d at 895, it is unclear whether it purports to describe an "ongoing emergency," *Hicks*, 531 F.3d at 558.

Mr. Anderson has stated that, when he gave the tip, he told Officer Kaine he believed there may be a gun involved in the supposed robbery, based on what he saw occurring inside the blue Lexus from his vantage point. Aside from his perception of a gun in the vehicle, Mr. Anderson did not otherwise specify what information persuaded him that there was a robbery occurring (at least according to the parties' fact statements)—for example, whether the people inside the blue Lexus looked distressed or whether the driver was driving erratically as if being threatened by a weapon. For his part, Officer Kaine has not stated whether Mr. Anderson ever told him about a gun when giving the tip. Officer Kaine did not mention a possible gun or armed suspect in any of his communications with dispatch or the other officers; he only made conclusory statements about "a possible robbery."

The difference between how Mr. Anderson recalled giving the tip, and how Officer Kaine relayed the tip to others and recalled it in his deposition, points to a significant dispute of material fact: what did Officer Kaine know after he spoke with Mr. Anderson? *See Huff*, 744 F.3d at 1004 (assessing reasonable suspicion requires objective examination of the circumstances the officer *knows* at the time of the stop). On the facts now before the Court, it is unclear what part(s) of Mr. Anderson's statements Officer Kaine knew when he stopped Plaintiffs—this is a jury question.

This question also puts Officer Kaine's and Mr. Anderson's credibility in play. While Mr. Anderson does "explain[] how he knew about the gun," *Florida v. J.L.*, 529 U.S. at 271–72, whether Officer Kaine was

Page 25 of 38

justified in relying on Mr. Anderson's supposed knowledge relies at least in part on whether the factfinder is persuaded that Mr. Anderson accurately perceived whatever was occurring inside the blue Lexus. Officer Kaine's credibility, insofar as whether he accurately perceived Mr. Anderson's tip, is also for the jury to determine (considering, for example, that Officer Kaine recounted Mr. Anderson's tip as to the racial and gender makeup of the occupants of the vehicle differently before the stop versus after).

Even if the jury finds Mr. Anderson's statement about seeing a gun in the blue Lexus credible and finds that Officer Kaine both accurately perceived and knew of the statement, Mr. Anderson's tip might still not have described criminal activity in progress or an "ongoing emergency." *Hicks*, 531 F.3d at 558. In *United States v. Watson*, the Seventh Circuit distinguished 911 calls that "report[] conduct that the officers reasonably suspected to be criminal," such as the caller in *Navarette* being run off the road by a truck, from calls that raise the mere possibility of unlawful possession or use of a gun where it is otherwise legal to do so. *Watson*, 900 F.3d at 895–96. Wisconsin law permits a person to carry a firearm in their vehicle under certain circumstances. *See* Wis. Stat. §§ 167.31(2)(b)–(c). Even if a jury credited Mr. Anderson's and Officer Kaine's accounts, the jury would still need to decide whether their allegations support a reasonable suspicion that the firearm in the blue Lexus was being used unlawfully.

These disputed facts and credibility determinations are material, and thus preclude summary judgment. These issues are for the factfinder to resolve. *See Beal*, 847 F.3d at 905.

Defendants next argue that, even if Plaintiffs establish a constitutional violation, Officer Kaine is nonetheless shielded by qualified

Page 26 of 38

immunity. Plaintiffs argue for a finding to the contrary. The qualified immunity doctrine protects government officials from civil liability when they perform discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

To determine the applicability of qualified immunity at the summary judgment stage, a court must engage in a two-part analysis to determine whether (1) the facts, viewed in the light most favorable to the non-movant, establish the violation of a constitutional right, and (2) the constitutional right at issue was "clearly established" at the time of the official's purportedly illegitimate conduct. *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019). A right is clearly established when its contours are "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotations and alterations omitted). Courts should "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).

Viewing the facts in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have established a potential violation of their Fourth Amendment right to be free from traffic stops (or arrests) that are not supported by a sufficient legal basis. This right appears to be[18] clearly

---

[18]The Court notes that "[t]he plaintiff bears the burden of establishing the existence of a clearly established constitutional right." *Kernats v. O'Sullivan*, 35 F.3d

Page 27 of 38

established. *Compare United States v. Packer*, 15 F.3d 654, 659 (7th Cir. 1994) (no reasonable suspicion where citizen tip on which police acted described suspects' behavior as "suspicious" but otherwise lacked "minimal detail of information that would point to any arguably particularized suspicion of criminal conduct") *and Gentry v. Sevier*, 597 F.3d 838, 843, 846 (7th Cir. 2010) (no reasonable suspicion where dispatch report on which police acted reported activity that was not, in itself, a crime) *with Green v. Newport*, 868 F.3d 629, 634 (7th Cir. 2017) (officer had reasonable suspicion for *Terry* stop where tip on which officer relied matched suspect's vehicle, officer observed behavior consistent with casing a business before a robbery, and suspected robbery was occurring at a place that had previously been robbed).

Although the right is clearly established, the application of qualified immunity in this case remains unclear. While disputed material fact issues and credibility determinations remain as to whether Officer Kaine had reasonable suspicion of the alleged robbery, the Court cannot find that he is protected by qualified immunity as to the initiation of the traffic stop. *See Koh v. Ustich*, 933 F.3d 836, 838 (7th Cir. 2019) (dismissing interlocutory appeal on question of qualified immunity for lack of jurisdiction where appellant's arguments were "inseparable from the questions of fact identified by the district court").

### 4.1.2   Scope of the Ensuing Investigation

Defendants preemptively move against Plaintiffs' claim that the scope or duration of Officer Kaine's investigation after he pulled over

---

1171, 1176 (7th Cir. 1994). Across two briefs, Plaintiffs offer only a single case that is not on point. ECF Nos. 100 at 23–24 and 104 at 13–14.

Plaintiffs violated the Fourth Amendment. ECF No. 97 at 7. Here, summary judgment is precluded as well.

"For an investigative stop based on reasonable suspicion to pass constitutional muster, the investigation following it must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests." *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994). Of course, this rule presupposes that "the circumstances that justified the stop in the first instance" amount to a valid legal basis for conducting the stop. *See United States v. Bullock*, 632 F.3d 1004, 1016–18 (finding "officers [who] acted diligently . . . to investigate their well-founded suspicions of [suspect's] criminal activity" did not unduly prolong a *Terry* investigative detention).

Defendants invite the Court to proceed directly to determining whether the conditions of Mr. Carter's brief detention were appropriate. However, unresolved factual and credibility disputes drive whether Officer Kaine's suspicions of criminal activity occurring in Plaintiffs' vehicle were "well-founded." *Bullock*, 632 F.3d at 1018. Without a clearer picture of what Officer Kaine was detaining Plaintiffs *for*, the Court also cannot rule definitively on whether the conditions of the ensuing investigation exceeded the factual basis that initially justified the traffic stop. Similarly, the Court will not yet wade into whether Officer Kaine is protected by qualified immunity as to the scope and duration of the investigatory stop.

### 4.1.3   Other Officers' Involvement

Defendants argue that, to the extent Plaintiffs name Lieutenant Vetter and Officers Dienhart and Gabriel as responsible for their claim that

Page 29 of 38

the initial stop lacked reasonable suspicion, these officers had no personal involvement and cannot be held liable for initiation of the stop. ECF No. 97 at 4. The Court concurs in this point. *See Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996) (quoting *Schultz v. Baumgart,* 738 F.2d 231, 238 (7th Cir. 1984) ("Liability under § 1983 must be 'predicated upon personal responsibility.'")).

Defendants further ask the Court to hold, as a matter of law, that Lieutenant Vetter and Officers Dienhart and Gabriel are entitled to qualified immunity for any constitutional violations that may have arisen in the scope and duration of the investigation pursuant to the stop, because they were entitled to "reasonably rely on Officer Kaine's legal conclusions." ECF No. 97 at 10–12. In *Duran v. Sirgedas*, the Seventh Circuit affirmed that certain officers had qualified immunity when they acted in reliance on other officers' statements and conduct (for example, another officer's statement that he "wanted [the suspect] arrested") as demonstrating there was probable cause for their actions. 240 Fed. App'x. 104, 114–16 (7th Cir. 2006). Here, each officer attributed to Officer Kaine a different legal conclusion on which they relied. *Id.* ("Lieutenant Vetter . . . believed he was responding to an in-progress vehicle robbery"; "Officer Dienhart believed he was responding to a high-risk traffic stop"; "Officer Gabriel believed she was responding to a robbery[.]") Whether each of these differing beliefs was reasonable, in light of the limited information they received from radio dispatch and the information that was apparent to them when they showed up on scene, is a question of credibility for the trier of fact. Neither summary judgment nor a finding of qualified immunity is appropriate on this point at this juncture.

Page 30 of 38

Plaintiffs move for a finding on summary judgment that Lieutenant Vetter, specifically, knew or believed Officer Kaine's traffic stop lacked a viable basis in law, yet failed to intervene to end the stop, and is therefore liable for resulting constitutional violations. *See Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). A failure to intervene presupposes a constitutional violation, which due to the factual disputes outlined above, cannot be determined on the present facts in a motion for summary judgment.

### 4.2    Plaintiffs' Excessive Force Claim

The Court cannot grant summary judgment for either party on whether the Officer Defendants used excessive force in detaining Plaintiffs. The parties primarily debate whether the unholstering or drawing of officers' service weapons, and the pointing of weapons in the direction of Plaintiffs' vehicle, constitutes excessive force under these circumstances. ECF Nos. 97 at 12–16 and 100 at 17–19. However, the disputed material facts and credibility determinations described *supra* in Section 4.1.1 bear on whether Officer Kaine had the requisite reasonable suspicion of the alleged (possibly armed) robbery to justify the use of service weapons in the ensuing investigation.

"[A]ll claims that law enforcement officers have used excessive force . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). "The reasonableness inquiry is an objective one, examining 'whether the officer's actions are objectively reasonable in light of the totality of the facts and circumstances confronting him or her, without regard for consideration of the officer's subjective intent or motivations." *Payne v. Stacy*, Case No. 18-CV-850, 2020 WL 886185, at *3 (E.D. Wis. Feb. 24, 2020), *appeal dismissed*,

Page 31 of 38

Case No. 20-1509, 2020 WL 5793102 (7th Cir. June 12, 2020) (quoting *Estate of Williams v. Ind. State Police Dep't*, 797 F.3d 468, 473 (7th Cir. 2015)). The actions taken by an officer "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry*, 392 U.S. at 20–22). "In the end, the excessive force inquiry 'looks to whether the force used to seize the suspect was excessive in relation to the danger he posed—to the community or to the arresting officers—if left unattended.'" *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000) (quoting *McDonald v. Haskins*, 966 F.2d 292, 294 (7th Cir. 1992).

Without resolution on whether Officer Kaine had reasonable suspicion to conduct the initial traffic stop—which informs what "danger," if any, Kaine believed he was responding to—the Court cannot determine whether it was appropriate for any of the Defendants to engage in the kind of investigatory stop that might allow for the use of force under WPD policy and constitutional standards. *See Jacobs*, 215 F.3d at 773 (finding excessive force where officers executed a seizure without probable cause to suspect a crime had occurred).

Accordingly, the excessive force analysis collapses into whether Officer Kaine had reasonable suspicion that a robbery was occurring in the blue Lexus. As the Court has already determined, the material facts underlying reasonable suspicion are in dispute and require the factfinder to conduct credibility determinations. Once the factfinder determines whether Officer Kaine had reasonable suspicion to conduct the traffic stop, the factfinder may determine whether the drawing of weapons was either a reasonable or excessive use of force.

Defendants again argue that even if the force used was excessive, Officer Kaine and the rest of the Officer Defendants are protected by qualified immunity. At this juncture, when disputed material fact issues and credibility determinations exist as to whether Officer Kaine had reasonable suspicion, the Court cannot find that he is protected by qualified immunity as to the drawing of service weapons. *See Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) ("[I]f the facts draw into question the objective reasonableness of the police action under the alleged circumstances, they must be developed in the district court before a definitive ruling on the defense can be made.") Similarly, as discussed in section 4.1.3 *supra*, the extent to which the other three Officer Defendants reasonably relied on Officer Kaine's legal conclusions is for the trier of fact to decide, so their entitlement to qualified immunity is also left open.

As above, Plaintiffs move for a finding on summary judgment that Lieutenant Vetter, specifically, knew or believed Officer Kaine's traffic stop lacked a viable basis in law, yet failed to intervene to prevent excessive force from occurring, and is therefore liable for resulting constitutional violations. *See Yang*, 37 F.3d at 285. This cannot be determined on the present facts in a motion for summary judgment.

### 4.3    *Monell* **Liability**

Plaintiffs also sue the City of Wauwatosa, arguing it is liable under *Monell* for the alleged Fourth Amendment violations due to a de facto policy to allow, and/or a failure to train, discipline, and supervise WPD employees to avoid, racial profiling or constitutional violations in WPD-administered traffic stops. Defendants move for summary judgment in

Page 33 of 38

their favor on this question, but factual disputes again preclude the Court from granting their motion.

As a threshold matter, without a determination of whether any underlying constitutional violation occurred, the Court cannot say one way or another whether the City of Wauwatosa can be liable for it. *See City of Los Angeles v. Heller*, 475 U.S. 796, 798–99 (1986) ("[I]f [the officer] inflicted no constitutional injury on respondent, it is inconceivable that petitioners could be liable to respondent."); *see also Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010) ("[A] municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict.").

"[L]ocal governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' 'even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 690–91. Liability may attach "if the unconstitutional act complained of is caused by . . . a governmental practice or custom that, although not officially authorized, is widespread and well settled." *Thomas*, 604 F.3d at 303. There is no bright-line rule defining what constitutes a "widespread" custom, policy, or practice, but "the plaintiff must demonstrate that there is a policy at issue rather than a random event." *Id.* The plaintiff must also demonstrate that municipal policymakers were "aware of the risk created by the custom or practice and . . . failed to take appropriate steps to protect the plaintiff." *Id.* Similarly, "an inadequacy in police training can serve as a basis for liability under Section 1983, but only where the failure to train amounts to deliberate indifference to the citizens the officers encounter." *Matthews v. City of E. St. Louis*, 675

Page 34 of 38

F.3d 703, 709 (7th Cir. 2012). "Beyond these threshold requirements, the jury must make a factual determination as to whether the evidence demonstrates that the [municipality] had a widespread practice that [resulted in] the alleged constitutional harm." *Thomas*, 604 F.3d at 303.

Defendants argue that Plaintiffs have not marshaled sufficient evidence to demonstrate the existence of a widespread city policy or practice. Plaintiffs counter by referring, in their statement of disputed facts, to a report issued to the City of Wauwatosa recommending that the City address WPD's arrest rates of Black and African American individuals, rates of traffic stops, and rates of officer-initiated "suspicious persons" stops, ECF No. 102-5, and to a news article detailing the disproportionate rates of arrests of Black individuals by the WPD, ECF No. 102-1. Plaintiffs' allegations, while threadbare, do enough to at least call into question whether Officer Kaine's decision to stop Plaintiffs' vehicle was completely random (and not pursuant to a de facto custom or policy), and whether Wauwatosa policymakers knew that officers such as Officer Kaine might be engaging in such practices. The final factual determinations on these issues are for the jury.

Absent a determination of whether any underlying constitutional violation occurred, and absent a determination of whether the City of Wauwatosa had a widespread custom or practice of condoning the kind of traffic stop Officer Kaine engaged in, the Court may not grant summary judgment on this question.

### 4.4    State Law Claims

Defendants move for summary judgment on Plaintiffs' claims under the Wisconsin Constitution on the basis that the state constitution does not

Page 35 of 38

authorize suits for money damages in this context, and that Plaintiffs'
request for injunctive relief (to the extent they have standing to bring it, see
4.6 *infra*) is barred by state sovereign immunity and federalism principles.
ECF No. 97 at 22. Plaintiffs do not seek summary judgment on their state
constitutional claims.

Similarly, Defendants move for summary judgment on Plaintiffs'
remaining tort claims on the basis that Wisconsin's governmental immunity
statute would shield Defendants from liability for acts performed in the
exercise of discretion and judgment. *Id.* at 23–26. Defendants also argue that
Defendants lacked the requisite state of mind to prove an intentional
infliction of emotional distress claim. *Id.* at 27. Plaintiffs do not move for
summary judgment on their tort claims.

The Court declines to determine how to apply Wisconsin state law
to these Defendants until the underlying factual dispute as to liability for
alleged federal law violations is resolved. The Court will therefore not grant
summary judgment to Defendants on these questions at this time.

### 4.5    Punitive Damages

Defendants move for summary judgment on the question of
whether, in the event Defendants are found liable, Plaintiffs are entitled to
recover punitive damages. *Id.* at 28. Specifically, they argue (1) that punitive
damages are not recoverable in Section 1983 suits against municipal
defendants or officials sued in their official capacity, and (2) that the
evidence does not support a finding that the Officer Defendants had the
requisite state of mind for punitive damages to be available. *Id.* Plaintiffs
do not seek summary judgment on this question.

Page 36 of 38

The Court declines to address what, if any, damages are recoverable in this matter until the underlying factual dispute as to liability for alleged federal law violations is resolved. The Court, therefore, will not grant summary judgment to Defendants on this question at this time.

### 4.6    Equitable Relief

Plaintiffs in their complaint seek "declaratory, injunctive, and other equitable relief, reforming the Defendant City of Wauwatosa policies, practices, and procedures to prevent like actions and harms in the future." ECF No. 1-2 at 21. Defendants argue that these claims should be dismissed for lack of standing. ECF No. 97 at 28. Plaintiffs do not seek summary judgment on this question, but in their response to Defendants' motion, counter that they are likely to travel through Wauwatosa again and that injunctive relief would enable them to do so without interference from Defendants. ECF No. 104 at 4. Without clarity on whether the underlying alleged constitutional violation occurred, the Court cannot decide the appropriateness of injunctive relief against any prospective violations. The Court will therefore not grant summary judgment to Defendants on this question at this time.

### 5.    CONCLUSION

Because this case presents significant disputes of material fact and credibility determinations that must be resolved by a jury—and many corollary legal questions that can only be resolved once the underlying factual issues are resolved—the Court denies the parties' cross-motions for summary judgment.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment, ECF No. 95, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiffs' amended motion for summary judgment, ECF No. 100, be and the same is hereby **DENIED;**

**IT IS FURTHER ORDERED** that Defendants John Does 1–3 and Jane Does 1–3 be and the same are hereby **DISMISSED** from this action; and

**IT IS FURTHER ORDERED** that James MacGillis be substituted as a Defendant for Barry Weber.

Dated at Milwaukee, Wisconsin, this 10th day of August, 2022.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge

Page 38 of 38

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| AKIL K. CARTER, PAULETTE H. BARR, and SANDRA K. ADAMS, | |
| Plaintiffs, | Case No. 19-CV-1422-JPS |
| v. | |
| CITY OF WAUWATOSA, BARRY WEBER, PATRICK KAINE, LUKE VETTER, NICOLE GABRIEL, DEREK DIENHART, JOHN DOES 1–3, and JANE DOES 1–3, | **ORDER** |
| Defendants. | |

On March 31, 2021, Plaintiffs and Defendants filed competing motions for summary judgment. (Docket #28, #37). On August 27, Defendants filed a belated response to Plaintiffs' motion partial summary judgment. (Docket #55). On September 19, 2021, Plaintiffs filed their long-awaited response to Defendants' motion for summary judgment. (Docket #60). These motions, which ought to have been fully briefed in May, each still require a reply. Indeed, throughout the case, the Court has been extremely accommodating with granting extensions. *See* (Docket #17, #20, #22, #40, #47, #48, #49, #54, #57). Having now received the parties' initial submissions on summary judgment, the Court finds it necessary to suspend this protracted and resource-draining approach to resolving litigation.

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that *there is no genuine dispute as to any material fact* and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a) (emphasis added). Accordingly, this Court will consider motions for summary judgment with disputed material facts to be a non-starter. The present motions before the Court were each accompanied with sets of disputed or competing facts. (Docket #44, #58). Therefore, the Court will deny the motions for summary judgment without prejudice. The Court has adopted a new protocol, which will be explained below. If either party elects to file dispositive motions, they must fully comply with each of the following requirements:

> If dispositive motions are contemplated, the parties are directed to meet and confer prior to filing such a motion in order to prepare but a single, agreed-upon narrative of material facts for submission to the Court. For summary judgment motions, the parties must meet and confer at least 30 days prior to filing the motion. The agreed-upon statement of facts must contain pinpoint citations to the record. Any disputed facts must be itemized and supported by each party's separate pinpoint citation to the record. Itemized disputed facts may not exceed one (1) page. In order to determine which facts are material for a given case, counsel must draw upon relevant case authority including appropriate jury instructions. If the parties cannot agree upon a set of facts, or if any of the disputed facts are material, then summary judgment is not appropriate. Fed. R. Civ. P. 56(a). In short, simply because an attorney can submit a motion for summary judgment does not mean that they are obliged to do so.

> If the parties do submit motions for summary judgment, they must be mindful of each of the following constraints. Parties may cite no more than ten (10) cases per claim on which the party moves for summary judgment; responses are also limited to ten (10) cases per claim. Reply briefs must conform with Civil Local Rule 56(b)(3) and may not address issues beyond the scope of the opposition brief. Additionally, though it should go without saying, the parties must have

actually read the cases to which they cite. No string citations will be accepted.

> Similarly, if defendants contemplate a motion to dismiss, the parties must meet and confer before the motion is filed. The defendant[s] should take care to explain the reasons why they intend to move to dismiss the complaint, and the plaintiffs should strongly consider filing an amended complaint. The Court expects this exercise in efficiency will obviate the need to file most motions to dismiss. Indeed, when the Court grants a motion to dismiss, it also grants leave to amend; therefore, it is in the interest of all parties to discuss the matter prior to filing such motions. Briefs in support of, or opposition to, motions to dismiss should cite no more than ten (10) cases per claim. No string citations will be accepted.

In other words, if the parties are unable to agree on a set of material facts, then they should not waste their clients' resources and the Court's time.

The parties also filed several motions to restrict or seal documents. Specifically, three motions seek to seal a deposition transcript, as well as "all pleadings and exhibits relating to the parties' dispositive motions." (Docket #41, #42, #61). The declaration in question "relates to police interaction with African Americans in the City of Wauwatosa" and, in light of the then-imminent verdict of Derek Chauvin, Defendants believed the submissions should be sealed "in the best interest of the safety of the Declarant." (Docket #41 at 1–2). Additionally, Defendants contend that the pleadings and exhibits related to the parties' dispositive motion threaten to reveal the identity and circumstances of the person who was involved in calling the police in this case.

"Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality." *In re*

*Specht*, 622 F.3d 697, 701 (7th Cir. 2010). In this case, the documents in question were filed because the parties believed they were necessary to the disposition of the litigation; Defendants have not pointed to any statute, rule, or privilege that justifies confidentiality. Indeed, the public has a strong interest in open litigation, and in understanding police interaction with the African American community—sealing the records, including all pleadings and exhibits related to the parties' motions, would do nothing to promote Americans' confidence in their governing institutions. These motions will be denied. If the parties so choose, they may retract their filings given that the Court has denied the summary judgment motions as moot. If the parties so choose, they must file a letter on the docket no later than **Tuesday, October 12, 2021** indicating which documents should be retracted. In the future, should the parties choose to include documents with sensitive information, they must follow Civil Local Rule 79 and heed the committee comment to that rule. Any motion to seal should be "limited to that portion of the material necessary to protect the movant from the harm that may result from disclosure." Civ. L.R. 79 cmt.

On the other hand, Plaintiffs' counsel's motion to seal the motion to extend time (Docket #63) will be granted because it addresses counsel's personal medical information and is entirely unrelated to the litigation. Relatedly, Plaintiffs' motion to extend time (Docket #64) will be denied as moot.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (Docket #28) be and the same is hereby **DENIED without prejudice**;

**IT IS FURTHER ORDERED** that Plaintiffs' partial motion for summary judgment (Docket #37) be and the same is hereby **DENIED without prejudice**;

**IT IS FURTHER ORDERED** that the motions to seal or restrict documents related to the litigation (Docket #41, #42, #61) be and the same are hereby **DENIED without prejudice**;

**IT IS FURTHER ORDERED** that the parties may file a letter indicating which documents they wish to retract no later than **Tuesday, October 12, 2021**;

**IT IS FURTHER ORDERED** that if no letter is filed by **Tuesday, October 12, 2021**, the Clerk of Court is ordered to **UNSEAL** all documents contemplated in (Docket #41, #42, #61).

**IT IS FURTHER ORDERED** that Plaintiffs' counsel's motion to restrict (Docket #63) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that Plaintiffs' counsel's motion for another extension of time (Docket #64) be and the same is hereby **DENIED as moot**.

Dated at Milwaukee, Wisconsin, this 28th day of September, 2021.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge